**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

JOHN DOE,

        Plaintiff,

                                     No. 1:23-cv-01025-GBW-JFR

      vs.

SANTA FE PUBLIC SCHOOLS, by and through the
BOARD OF EDUCATION OF THE SANTA FE PUBLIC SCHOOLS;
ROBERT APODACA; CANDICE FLINT; ROBIN CHAVEZ;
ROMAN CATHOLIC CHURCH OF THE ARCHDIOCESE OF SANTA FE;
SANTO NIÑO REGIONAL CATHOLIC SCHOOL;
SAN ISIDRO PARISH; CRISTO REY PARISH;
SHRINE OF OUR LADY OF GUADALUPE PARISH;
ST. ANTHONY OF PADUA PARISH; ST. ANNE'S PARISH;
ST. JOHN THE BAPTIST PARISH;
SANTA MARIA DE LA PAZ CATHOLIC COMMUNITY PARISH;
THE CATHEDRAL BASILICA OF ST. FRANCIS OF ASSISI PARISH; and
ANNE LANDAU,

        Defendants.

                                           Jury Demanded

**<u>SECOND AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION
OF CIVIL RIGHTS, TITLE IX, RACKETEERING,
AND OTHER TORTIOUS CONDUCT</u>**

        Plaintiff John Doe, by and through his attorneys, Paul Linnenburger, Maggie H. Lane, and

Wendell Lane, of Lane + Linnenburger + Lane LLP, and Ian F. King of The King Law Firm, brings

the following causes of action:

**INTRODUCTION**

        Events in recent years have revealed two tragic facts about childhood education in northern

New Mexico. First, there is an epidemic of child sexual predators operating in positions of

authority over children within our schools. Second, a breathtaking number of the adults who have

the knowledge and power to do something about it either cannot, or will not, protect our children

from these predators. At the epicenter of this tragedy stand the Santa Fe Public Schools, the largest public school district in northern New Mexico, and Santo Niño Regional Catholic School, a private pre-K to sixth-grade school operated by the Roman Catholic Church of the Archdiocese of Santa Fe and several of its parishes.

The Santa Fe Public Schools and Santo Niño Regional Catholic School have recently sheltered such child predators on their own staffs. When they were sued over it, these schools vigorously denied the allegations against them at first, only to eventually settle those cases by making large payments to the victims of their abuse. Meanwhile, the predator employees they protected were convicted of molesting students and sent to prison, sometimes for centuries. Those experiences should have been a catalyst for change at these schools, motivating them and their administrators to seriously engage in protecting the children in their care and custody. This case arises because they did not.

In one horrendous example, Santa Fe Public Schools enabled the notorious predator schoolteacher Gary Gregor, even to the point of providing him with a neutral employment recommendation, despite receiving complaints about his inappropriate touching of several schoolchildren. In that case, Santa Fe Public Schools defended their actions and denied the allegations at first, only to see Gregor convicted and sent to prison while the school district paid millions of dollars to his victims. But while Santa Fe Public Schools was paying for Gregor's atrocities, it turned a blind eye to another predator on its campuses, this time in the nurse's offices of their community schools – Robert Apodaca.

As he worked as a nurse aide for Santa Fe Public Schools, Apodaca's outward behavior was textbook sexual grooming. Administrators in the schools where he worked were warned of red flags by others and observed those same red flags themselves. But they did nothing to stop

him. They watched as Apodaca collected victims. They sheltered him while he bragged about the "power" he held because of his relationships with them. They silenced the voices that raised concerns about him. They protected him. They even joked about his alarming behavior with children. Emboldened by the indifference, Apodaca took advantage of their protection to keep abusing more children within Santa Fe Public Schools.

This manifest cowardice and treachery towards our youth did not end with the officials at Santa Fe Public Schools. As it became harder to protect Apodaca within the school district, one of its administrators, Robin Chavez, left the public schools to preside over Santo Niño Regional Catholic School as its principal. Chavez brought Apodaca with her and gave him even more access to children. With the assistance of Chavez and others, Apodaca continued his reign of sexual terror, but this time it was at the small Catholic school that advertises itself as "extremely safe," and as a place where, due to small class sizes and a close-knit community, problems are "swiftly resolved." Once he was there, Apodaca abused numerous other children. And while Apodaca was committing crimes against the children of Santo Niño, a former Santo Niño teacher, Aaron Chavez, was being sentenced to prison for doing the same thing. But the experience with Aaron Chavez was not the only time the leaders of Santo Niño failed to learn their lesson. As Apodaca continued his sexual abuse, the Archdiocese of Santa Fe, which owns and controls Santo Niño, was enmeshed in bankruptcy arising from decades of unleashing sexual predators on the children of New Mexico.

The leaders of Santa Fe Public Schools and the Catholic Church in Santa Fe failed to protect far too many of Santa Fe's young students. But one of those students is now taking a stand and demanding accountability from the adults who practically ensured that he would be sexually abused by Robert Apodaca. This case is about that young student—now a young man—and his quest to make sure that no other little boy in Santa Fe will have to endure his pain.

## PARTIES

1.       Plaintiff is eighteen years old and a resident of Santa Fe County, New Mexico.

2.       Defendant Santa Fe Public Schools is a governmental entity within the State of New Mexico and a local public body as defined in the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-3(B) and (C), and a political subdivision of the State of New Mexico and a "person" pursuant to 42 U.S.C. § 1983. Defendant Santa Fe Public Schools is sued by and through the policy making entity that oversees Santa Fe Public Schools, the Board of Education of the Santa Fe Public Schools, and hereinafter "SFPS" refers jointly to Santa Fe Public Schools, the political subdivision, and the Board of Education of the Santa Fe Public Schools, the governing body thereof. SFPS has the capacity to sue and be sued pursuant to NMSA 1978, § 22-5-4(E) and is responsible for the administration of public schools within its geographic boundaries in and around Santa Fe, New Mexico. Upon information and belief, SFPS received federal funding and financial assistance at all times referenced in this Complaint.

3.       SFPS employed Defendants Robert Apodaca, Candice Flint, and Robin Chavez during some of the events described in this Complaint. Plaintiffs' claims under the New Mexico Tort Claims Act against SFPS arise under NMSA 1978, § 41-4-6, and SFPS is vicariously liable for the acts and omissions of Defendants Apodaca, Flint, and Chavez.

4.       Defendant Robert Apodaca ("Apodaca") is an incarcerated resident of Santa Fe County, New Mexico.  Apodaca was employed by SFPS as a nurse aide during some of the events described in the Complaint, and during those times he was a public employee as defined by the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(F). Apodaca was assigned to numerous SFPS schools during his tenure as a nurse aide. The last of those was Gonzales Community School, where he worked during the 2018-2019 and 2019-2020 school years.

5.      Apodaca acted under color of law and within the scope of his duties as an employee of SFPS and the Archdiocese Defendants (identified below), and he is sued in his individual capacity as to Plaintiff's claims brought under 42 U.S.C. § 1983.

6.      During some of the events described in the Complaint, Apodaca was employed by the Defendants Santo Niño Regional Catholic School, The Roman Catholic Church of the Archdiocese of Santa Fe, San Isidro Parish, Cristo Rey Parish, Shrine of our Lady of Guadalupe Parish, St. Anthony of Padua Parish, St. Anne's Parish, St. John the Baptist Parish, Santa Maria de la Paz Catholic Community Parish, and The Cathedral Basilica of St. Francis of Assisi Parish (collectively, the "Archdiocese Defendants.") Apodaca was employed by the Archdiocese Defendants as staff member at Santo Niño Regional Catholic School. Among his titles there, he was the school's Extended Care Program Director for minor children. In that position, Apodaca was the Plaintiff's supervisor, while the Plaintiff was employed by the Archdiocese Defendants to assist with the Santo Niño after-school program. During the events described in this Complaint, Apodaca was supervised by Defendants Flint and Chavez at SFPS, and by Defendant Chavez at Santo Niño Regional Catholic School.

7.      Defendant Candice Flint ("Flint") is, upon information and belief, a resident of Santa Fe County, New Mexico, and was, during the events described in the Complaint, employed by SFPS as a school principal and a public employee as defined by the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(F). As the Principal of Gonzales Community School between 2018 and 2020, Flint was the chief administrative officer of Gonzales Community School and one of Apodaca's supervisors. Her responsibilities and duties included maintaining and overseeing the safety and security of students at Gonzales Community School, overseeing educational activities there, and overseeing and supervising the student body and staff, including evaluating their

performance and taking disciplinary action against them when appropriate. Flint acted within the scope of her duties as an SFPS employee and under color of law at all times material hereto and is sued in her individual capacity as to Plaintiff's claims brought under 42 U.S.C. § 1983.

8.      Defendant Robin Chavez ("Chavez") is, upon information and belief, a resident of Santa Fe County, New Mexico, and was, during some of the events described in the Complaint, employed by Defendant SFPS as an assistant school principal and a public employee as defined by the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(F). As the assistant principal at Gonzales Community School between 2018 and 2020, Chavez was one of Apodaca's supervisors and her responsibilities and duties included maintaining and overseeing the safety and security of students at Gonzales Community School, overseeing educational activities there, and overseeing and supervising the student body and staff. Chavez acted at all times during her tenure with Defendant SFPS within the scope of her duties as an SFPS employee and under color of law, and she is sued in her individual capacity as to Plaintiff's claims brought under 42 U.S.C. § 1983.

9.      Chavez was also, during other events described in the Complaint, employed by the Archdiocese Defendants as the Principal of Santo Niño Regional Catholic School in Santa Fe, New Mexico.  As such, she was also one of Apodaca's supervisors there and her responsibilities and duties included maintaining and overseeing the safety and security of minors associated with the sanctioned programs of Santo Niño and overseeing and supervising the school's student body and staff.

10.     Defendant Roman Catholic Church of the Archdiocese of Santa Fe ("Archdiocese") is a New Mexico corporation that operates and oversees church parishes and schools in central and northern New Mexico, including in San Miguel County, Santa Fe County, and the City of Santa Fe, New Mexico. Those parishes include Defendants San Isidro Parish, Cristo Rey Parish, Shrine

of Our Lady of Guadalupe Parish, St. Anthony of Padua Parish, St. Anne's Parish, St. John the Baptist Parish, Santa Maria de la Paz Catholic Community Parish, and the Cathedral Basilica of St. Francis of Assisi Parish (collectively the "Parish Defendants.")  The schools the Archdiocese operates and oversees includes Defendant Santo Niño Regional Catholic School ("Santo Niño.")

11.    Defendant Santo Niño Regional Catholic School ("Santo Niño,") is a New Mexico Corporation that conducts business in Santa Fe County, New Mexico, including the operation of a private Catholic school for pre-K through sixth-grade students, as well as an after-school program and summer programs for Santa Fe area children. Santo Niño is operated and overseen by the Archdiocese and the Parish Defendants. Its board is made up of the leaders of these organizations, and the leadership of Santo Niño is subject to the supervision and control of these Defendants.

12.    Defendant San Isidro Parish (San Isidro) is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

13.    Defendant Cristo Rey Parish ("Cristo Rey") is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

14.    Defendant Shrine of Our Lady of Guadalupe Parish ("OLOG") is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

15.     Defendant St. Anthony of Padua Parish ("St. Anthony") is a New Mexico corporation that conducts business in San Miguel and Santa Fe Counties, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

16.     Defendant St. Anne's Parish is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

17.     Defendant St. John the Baptist Parish ("St. John") is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

18.     Defendant Santa Maria de la Paz Catholic Community Parish ("Santa Maria") is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

19.     Defendant The Cathedral Basilica of St. Francis of Assisi Parish ("Basilica") is a New Mexico corporation that conducts business in Santa Fe County, New Mexico, including the operation and oversight of Santo Niño Regional Catholic School in Santa Fe, New Mexico, in conjunction with the remaining Parish Defendants.

20.     Defendant Anne Landau, upon information and belief, is a resident of Cook County, Illinois, and the owner of the home located at 876 Camino de Jemez, Santa Fe, New Mexico, which she also owned during the events described in the Complaint.

**JURISDICTION AND VENUE**

21.     This Court has jurisdiction over the subject matter and parties to this action pursuant to the Court's general jurisdiction, N.M. Const. art. VI, § 13, and 42 U.S.C. §1983.

22.     Venue is proper because Plaintiff is a resident of Santa Fe County, New Mexico, and because events giving rise to the Complaint occurred there as well.

**FACTUAL ALLEGATIONS**

23.     The preceding paragraphs are incorporated as if restated in full.

**Santa Fe Public School's Broken Promise**

24.     The 2018-2019 school year School Information Booklet published by SFPS declared a mission "to provide a well-rounded education to every child that addresses their physical, social, **emotional** and educational needs." (Emphasis added).

25.     At SFPS, nursing services are provided through the Office of Student Wellness. SFPS states that the Office of Student Wellness is designed to:

> …promote and support collaborative systems, practices and policies **that enhance protective factors** and foster respect, inclusion, equity and **health** so our students and our community thrive.

(Emphasis added).

26.     According to SFPS, the Office of Student Wellness provides "guidance to schools, **students, and families**" which includes "intensive support services." (Emphasis added).

27.     SFPS claims that, through the Office of Student Wellness and its nursing services, the district "is committed to developing and supporting the wellness and mindfulness of the students, staff and families." The Office of Student Wellness has the following goals:

- "Foster meaningful connections with students";

- "Understand and respond to the challenges presented by trauma, stress, anxiety, and depression"; and

- "Develop, practice and reflect on the attitudes, skills and knowledge for positive personal and social growth and academic and career success."

28.    Vulnerable children, including children dealing with difficult transitions, disruptions in home life, and health issues, often have more frequent interactions with school health care staff, and especially with the staff members stationed in the school nurse's offices. Those staff members often act as physical health care providers, first responders, counselors and confidants, and are supposed to be professionals who can safely provide care and compassion to children in need.

29.    Vulnerable children were and are encouraged by SFPS to utilize the services of the Office of Student Wellness, including the services provided by its nurse aides, like Defendant Apodaca.

30.    While he was attending Gonzales Community School, Plaintiff was just such a vulnerable child, because his parents were divorcing, and his father had left the family home. As is expected of a middle school student going through such a transition, Plaintiff had frequent interaction with the nursing staff at his school, primarily Defendant Apodaca.

31.    Contrary to the stated purpose and goals of the Office of Student Wellness, SFPS exposed children to sexual abuse and other trauma by providing Apodaca unfettered access to vulnerable children and then concealing concerns about Apodaca's conduct with young male students.

**Robert Apodaca's History as a Nurse Aide at Santa Fe Public Schools**

32.     Public records indicate that Apodaca began working as a nurse aide at SFPS during the 2012-2013 school year, when he was 21 years old. He remained employed in such a position almost continuously until approximately 2020.

33.     Before his employment with SFPS as a nurse aide, Apodaca's only prior employment experience was as a restaurant host at Red Lobster.

34.     From 2012 until 2018, Apodaca served as a nurse aide in various SFPS schools, including Kearny Elementary School, where he worked during the 2016-2017 school year. Apodaca briefly left SFPS in 2016, but he returned almost immediately, reapplying and being assigned to Gonzales Community School at the behest of the school's administration, including Defendant Flint.

35.     Despite red flags about his behavior, discussed in more detail below, between 2016 and 2019 Apodaca was also selected by SFPS to work directly with young students in an after-school program known as 21st Century Community Learning Centers. That program operated four days a week, between the hours of 3:30 and 5:30 pm. On information and belief, Apodaca was employed at various times to serve as a nurse aide at this after-school program, in various SFPS schools, including Kearny Elementary and Milagro Elementary. Working in that program, he had even more unsupervised access to some of SFPS's most vulnerable students.

36.     During his employment with SFPS, Apodaca was supervised by building administrators in the schools to which he was assigned. Those administrators included Flint and Chavez during his tenure at Gonzales Community School.

37.     In practice Apodaca was often largely unsupervised by SFPS, Flint and/or Chavez, despite the fact that his job gave him access to and authority over vulnerable children, and despite

his lack of relevant experience or training. In short, the supervision of Apodaca was nearly non-existent; however, SFPS, Flint, and Chavez (collectively the "SFPS defendants") provided Apodaca unsupervised access to a uniquely vulnerable population of children.

38.     During his tenure as a nurse aide with SFPS, Apodaca was reassigned to different SFPS schools often. This is a pattern SFPS has followed in the past; transferring staff members involved in sexual misconduct with children from one school to another.

39.     For instance, between 2000 and 2005, SFPS employed Gary Gregor as an elementary teacher. In that brief period, and while he was actively engaged in sexually abusing schoolchildren, SFPS transferred Gregor from Ortiz Middle School to Agua Fria Elementary School. Then, like in this case, SFPS passed him off to another school district with a neutral employment recommendation, so Gregor continued to sexually abuse schoolchildren, but this time it was the children of the Española Valley.

40.     For a brief period in or around 2018, Apodaca left SFPS to work as a nurse tech at Presbyterian Healthcare Services (PHS) in Rio Rancho, New Mexico. SFPS was aware that Apodaca was going to work for PHS because he notified SFPS in his letter of resignation.

41.     Upon information and belief, Apodaca's employment as a nurse tech at PHS ended abruptly and PHS determined that he was not eligible for rehire.

42.     Apodaca then reapplied for a position as a nurse aide for SFPS for the remainder of the 2018-2019 school year.

43.     Reasonable employers view applicants who are ineligible for rehire at a previous place of employment with extreme caution because such a notation indicates the potential for a serious issue with the employee. This is particularly true with applications for positions that require contact and oversight of children and the provision of healthcare.

44.     A simple reference check by SFPS would have revealed that Apodaca could not have been rehired by PHS. Given SFPS's knowledge of Apodaca's departure and quick return, the need for inquiry into the circumstances should have been apparent.

45.     After its experience with Gary Gregor, as described above, SFPS should have been vigilant in conducting reference and background checks for employees hired to interact with children. Before he came to Santa Fe, Gary Gregor had a reported history of misconduct with young girls during his previous employment in Utah. SFPS either failed to adequately investigate Gregor's background, or they chose to disregard it.

46.     Due to legal action associated with Gary Gregor's sexual misconduct at SFPS, the issue of adequate background checks was front and center for SFPS at the time that Apodaca applied to return to the school district in 2018. Gregor was facing a very public criminal trial for charges of child sexual abuse committed while he was a teacher in New Mexico, and national and local media had focused on the failures of schools, including SFPS, to stop Gregor's abuse instead of simply "passing the trash" to other schools.

47.     Regardless, SFPS rehired Apodaca as a nurse aide partway through the 2018-2019 school year and again placed him in a position of authority, guardianship and responsibility over a vulnerable student population.

48.     When Apodaca began his job at Gonzales Community School, Chavez was Flint's Assistant Principal there and, upon information and belief, she was friendly with Apodaca.

49.     Flint requested that SFPS assign Apodaca as a nurse aide at Gonzales Community School, where Plaintiff was an unassuming, small- statured middle school student.

50.     Pursuant to Flint's request, Apodaca was assigned to Gonzales Community School as a nurse aide, and he worked there during the 2018-2019 and 2019-2020 school years.

**Apodaca's Open and Obvious Abuse of Boys at Gonzales Community School**

51.     Gonzales Community School is a K through 8 public school in the Casa Solana neighborhood of Santa Fe with a high percentage of economically disadvantaged students.

52.     Gonzales Community School published materials for public consumption in 2018 that declared "[o]ur dedicated and caring staff works as a team to promote the health and well-being of every student," but during that time the administration of Gonzales, including Defendants Flint and Chavez, were sheltering a predator who was harming children at Gonzales.

53.     The Gonzales Community School Compact for the 2018-2019 school year indicated:

> Gonzales Community School is dedicated to establishing an atmosphere in which students, parents and staff work together to provide a caring, safe, educational environment…

54.     These publications were released while Defendant Flint was principal and Defendant Chavez was assistant principal.

55.     At Gonzales Community School, the SFPS Defendants gave Apodaca, as a nurse aide, unsupervised access to this vulnerable population of children.

56.     The nurse's office played a very important role at Gonzales Community School as the sole means of access to on-site health care for students, and it often served as a location that purported to provide counseling and solace in addition to other health care needs.

57.     With no nursing degree and with insufficient experience, Apodaca should have been closely supervised at Gonzales Community School by a licensed health care professional from the SFPS Office of Student Wellness. Instead, he was almost always the only member of the nursing staff there. Therefore, Apodaca received only nominal supervision and, at best, an occasional evaluation from the SFPS head nurse.

58.     Apodaca was the only health care worker at Gonzales Community School; therefore, the SFPS Defendants, including Flint and Chavez, affirmatively placed schoolboys, including Plaintiff, in a position where they were forced to interact with Apodaca about private health concerns, including matters of mental and physical health.

59.     At Gonzales Community School, the nurse's office was located close to the main administrative offices of Flint and Chavez.

60.     There were certain specific male students at Gonzales who were frequently in the nurse's office with Apodaca.

61.     Plaintiff was one of the boys who visited Apodaca's office frequently, and as stated above, he was particularly vulnerable at the time.

62.     Apodaca's familiar and indulgent behavior with these specific schoolboys, including Plaintiff, was markedly different from his treatment of other students.

63.     For example, Apodaca was known to provide treats and goodies to students that frequented the nurse's office, and especially to those specific schoolboys.

64.     Apodaca regularly supplied Plaintiff with treats, snacks, and gifts, including video games, an iTunes subscription, and even a BB gun.

65.     Staff at Gonzales also noticed that Apodaca would immediately send some students back to class after they were sent to the nurse's office, regardless of the severity of the student's medical complaint. However, staff noticed that Apodaca kept specific schoolboys in his office for much longer periods of time.

66.     Plaintiff was one of those specific schoolboys that Apodaca would keep in the nurse's office for extended periods. Plaintiff would often visit the nurse's office multiple times a day, where he would stay alone with Apodaca.

15

67.     Apodaca was also unusually physical with specific schoolboys at Gonzales, including Plaintiff, and was even seen by staff walking around school grounds with those boys arm-in-arm. Sometimes Apodaca walked around Gonzales during school hours with his arm around Plaintiff. At other times he would walk around the school holding hands with Plaintiff, a middle school student.

68.     Although it was not part of his job duties, staff observed that Apodaca watched certain schoolboys unusually closely during lunch and recess. Apodaca was known to regularly volunteer to oversee children at recess, particularly the male students who were in middle school grades. During one such incident, security staff witnessed Apodaca become upset with one of the specific schoolboys because the boy was sitting next to a female student.

69.     Another time when Apodaca had volunteered to oversee lunch and recess, he instructed other staff to watch one of the specific schoolboys he favored because, according to Apodaca, that boy "was not allowed to be with any girls."

70.     Defendant Apodaca would inject himself in this way often during lunchtimes and recesses for the seventh and eighth-grade students.

71.     At the time, Plaintiff was enrolled at Gonzales as an eighth grader, and was a student in the classroom of Christopher Lopez, who was then a teacher at Gonzales.

72.     Teachers at Gonzales apparently noticed Apodaca's behavior during these periods and even joked about it among themselves.

73.     For instance, on October 11, 2018, Apodaca sent an email to the staff of Gonzales, stating that he wanted to "write a book about the stuff i see in the Health Office…. to be called 'Behind the Band-Aid- The tail of many ailments.'" In response, Mr. Lopez, Plaintiff's eighth grade-teacher, sent an email to Rod Dobbs, then a seventh-grade teacher at Gonzales, noting how

16

Apodaca used the word "tail" instead of "tale," while referring to the children who visited his office. Mr. Lopez wrote to Mr. Dobbs, "hahahaha…Tail," apparently laughing at the fact that Apodaca had used a slang reference for sex.

74.    Apodaca would also take specific schoolboys, including Plaintiff, off campus in his car, in full view of other staff and students.

75.    Other staff at Gonzales Community School who observed Apodaca's interactions with these specific schoolboys became concerned about his open and obviously inappropriate behavior, because it appeared to be grooming for potential sexual abuse.

76.    Defendant Apodaca's behavior raised red flags for personnel at Gonzales, including at least one security officer who tried to stop it but was silenced by SFPS, Flint, and Chavez.

**Security at Gonzales Caught Defendant Apodaca Abusing a Child**
**but SFPS, Through Flint and Chavez, Instructed Her <u>Not</u> to Submit a Written Report**

77.    Upon information and belief, SFPS contracted with a private company to provide security services at Gonzales Community School during the 2018-2019 and 2019-2020 school years.

78.    A security officer assigned to Gonzales Community School witnessed Apodaca's alarming behavior and reported her concerns to the administrators at Gonzales, including Flint and Chavez.

79.    That security officer witnessed Apodaca's unusually close physical contact with schoolboys in an open and obvious manner during school hours, including walking arm-in-arm with them. The officer observed that certain schoolboys were frequently in Apodaca's company, and she noticed that Apodaca took unusual interest in certain schoolboys and their personal relations during recess and lunch periods. She also overheard him make comments that suggested an unusual and troublesome closeness to certain schoolboys.

17

80.    The officer noticed that Plaintiff was frequently with Apodaca throughout the school day, including lunchtimes and recesses, and she observed that Apodaca showed unusual and concerning interest in Plaintiff.

81.    The security officer reported her concerns to the administrators but there was no follow-up by SFPS, Flint, or Chavez.

82.    Instead, SFPS, through Flint and Chavez, told the concerned security officer that Apodaca's relationships with schoolboys was none of the officer's business and that they and SFPS knew Apodaca was their "mentor". Those statements indicated that SFPS, Flint, and Chavez knew that Apodaca had unique access to, and special relationships with, particular schoolboys at Gonzales Community School, facts that should have been red flags for any experienced educator.

83.    According to published SFPS policy in effect at the time, the school principal (i.e., Defendant Flint) or designated administrator (i.e., Defendant Chavez) were required to approve of such relationships in writing and thus, upon information and belief, Defendants Flint and/or Chavez specifically sanctioned Apodaca acting in this capacity with students at Gonzales Community School.

84.    The claim that Apodaca was a "mentor" to certain schoolboys was a patently absurd one to make about an entry-level nurse aide at a K through 8 school.  Instead, this inappropriate closeness was another disregarded red flag, particularly when viewed in the context of Apodaca's outwardly physical relationship with those same schoolboys.

85.    Any reasonable adult, particularly given the intense media coverage of Gary Gregor's criminal trial and the related civil lawsuits against SFPS, would have followed up intently on the concerns raised by the security officer, in particular given the likelihood that Apodaca's conduct represented violations of SFPS's purported policies and conduct standards for staff

members and employees. Yet the SFPS Defendants made it clear through their absurd comments about Apodaca's mentorship of schoolboys and by instructing the security officer to mind her own business, that they were unconcerned about Apodaca's obvious grooming behavior.

86.    Regardless of its written policies, this apparent lack of concern was consistent with the SFPS's *actual* policy for dealing with reports of potential misconduct from staff towards students; that is, taking no action or even condoning and ratifying such conduct. This actual policy is evidenced by the SFPS Defendants' reactions to reports and obvious and open signs of misconduct by Apodaca, which were a continuation of the way SFPS and its agents and representatives had dealt with the Gary Gregor case earlier.

87.    The continual downplaying and aggravation expressed by the SFPS Defendants about the concerns raised by the security officer sent a clear message that the security officer should cease raising questions. In the 2018-2019 school year, this message was directly given to the security officer after she witnessed an extremely alarming incident of likely abuse.

88.    During the 2018-2019 school year, the same school security officer was called to the administrative offices of Gonzales by the SFPS Defendants.

89.    On that day, the security officer was tasked by the administrative staff, including Flint, to perform a check on the nurse's office where Apodaca worked.

90.    When the security officer approached the nurse's office, she observed the lights inside were turned off and the blinds on the windows were drawn closed.

91.    The security officer attempted to open the door, but it was locked.

92.    The security officer knocked on the door.

93.    There was no answer to her knock.

94.     The security officer returned to the administration offices and reported to the SFPS Defendants what she observed at the nurse's office.

95.     Flint told the security officer that the administrators would "take care of it" and then directed the security officer to return to her post.

96.     As the officer was returning to her post, she passed by the nurse's office one last time and when she did, the door to the nurse's office suddenly opened.

97.     Defendant Apodaca and a young boy emerged from the dark office.

98.     In the view of the officer, the young boy looked scared and sad.

99.     Alarmed, the officer immediately returned to the administrative offices to report what she had just witnessed.

100.    The security officer believed it was necessary to write a formal report about what she had witnessed and inquired of the SFPS Defendants about doing so.

101.    In an apparent attempt to cover up Apodaca's conduct, Flint and Chavez instructed the security officer not to write a report on the incident.

102.    The security officer's report was a good faith attempt to comply with the SFPS written policies concerning required reporting of improper employee conduct to "an appropriate supervisor or administrator."

103.    Defendants Flint and Chavez did not investigate the report in any manner, let alone in a timely and thorough way.

104.    Defendants Flint and Chavez did not take appropriate and timely corrective action following the report.

105.    While the actions of Defendants Flint and Chavez's actions violated written policy of SFPS, they acted in accordance with the unofficial policy of SFPS to disregard reports of such misconduct and to violate written policies.

**Additional Detail of Defendant Apodaca's Abusive Relationship
with Plaintiff while Apodaca was the Nurse Aide at Gonzales**

106.    Defendant Apodaca used his position as nurse aide at Gonzales to gain more and more access to Plaintiff, and to progressively make more intrusive contact with Plaintiff, from grooming, to abuse and molestation, and, ultimately, rape.

107.    During the 2016-2017 school year, when Defendant Apodaca was a nurse aide at Kearny Elementary School, Plaintiff's mother also worked there as an administrator. Apodaca was introduced to the Plaintiff while Apodaca was stationed at Kearny, although Plaintiff was a student at Gonzales Community School.

108.    At that time, Apodaca knew that Plaintiff's parents were divorcing and that his father had left the family home. Apodaca manipulated this situation to gain greater access to Plaintiff by claiming to mentor and tutor Plaintiff, insisting that he assist Plaintiff with homework. After the divorce was completed, Apodaca even suggested to Plaintiff's mother that he would provide adult male guidance to Plaintiff.

109.    Upon information and belief, other teachers and administrators, including Flint and Chavez, knew that Plaintiff was dealing with family turmoil at that time, and knew that he was particularly vulnerable.

110.    Upon information and belief, during this time  the administrators at Gonzales Community School placed Plaintiff on a plan under Section 504 of the Federal Rehabilitation Act ("504 plan,") without his parents' agreement, knowledge or participation, in violation of law.

111.    Plaintiff's mother first learned about the 504 plan years later when Apodaca contacted her to arrange an "exit interview" with the Plaintiff, as he was preparing to leave Gonzales Community School for secondary school. Plaintiff's mother was surprised to learn about the 504 plan, which should have required her participation in the initial evaluation process as well in the required periodic reevaluations.

112.    Upon information and belief, the adoption of a 504 plan for Plaintiff at Gonzales Community School required participation from administrators, teachers, and Apodaca, and gave each of those actors unique access to Plaintiff and to information about his health status, including his mental health status. Those individuals would have collaborated in developing the plan, suggesting that numerous agents and employees of Gonzales Community School and SFPS were intimately aware of Plaintiff's situation. Moreover, the reevaluation requirements of section 504 required administrators, including Flint and Chavez, and teachers and health care personnel, including Apodaca, to conduct periodic reevaluations, so they would have remained intimately aware of Plaintiff and closely monitored his interaction with health care personnel, including Apodaca.

113.    During this tumultuous time in Plaintiff's life, Apodaca befriended Plaintiff and sought to "mentor" Plaintiff as an adult male figure and role model, injecting himself as an active participant in all facets of Plaintiff's life and even trying to act as Plaintiff's caretaker.

114.    In and around the 2018-2019 school year, Plaintiff's life was in turmoil due to his parents' divorce, which made him particularly vulnerable to Apodaca's grooming. The SFPS Defendants were aware of this through their acquaintance with Plaintiff's mother, who was an administrator within the SFPS system, as noted above.

115.    During his seventh and eighth-grade years at Gonzales Community School, Plaintiff went to the nurse's office increasingly frequently. Plaintiff was at least a daily visitor to the nurse's office while Apodaca was there, and multiple times a week would go to the nurse's office for assistance with his homework. Further, Plaintiff went to the nurse's office more and more with complaints of stomach aches, headaches, fatigue, and manifestations of anxiety.

116.    Before Apodaca arrived at Gonzales Community School, the school would often contact Plaintiff's mother when he visited the nurse's office so that she could pick him up from school. But after Apodaca assumed duties as the nurse aide at Gonzales, while Plaintiff's trips to the nurse's office increased, the nurse aide—Apodaca—no longer called Plaintiff's mother to retrieve Plaintiff except on rare occasions. Instead, Defendant Apodaca would keep Plaintiff with him in the office, often alone and behind closed doors.

117.    Plaintiff went to the nurse's office multiple times a day, where he would remain alone and unsupervised with Apodaca. Plaintiff's teacher, Christopher Lopez, even sent Plaintiff to the nurse's office frequently, supposedly so Plaintiff could finish his school assignments.

118.    Upon information and belief, other staff, administrators and teachers recognized that Plaintiff was appearing at the nurse's office an inordinate amount.

119.    Apodaca would provide snacks and treats to Plaintiff.

120.    Apodaca would not send Plaintiff back to class like he would with many other students; instead, he would keep Plaintiff in the nurse's office for extended periods of time.

121.    Apodaca groomed and molested Plaintiff in the nurse's office.

122.    While Apodaca was more aggressive toward Plaintiff behind closed doors, he was overly and outwardly friendly toward Plaintiff in public, significantly more so than he was with most of the rest of the Gonzales students. In public, he openly showed physical signs of affection,

such as holding Plaintiff's hand and wrapping his arm around Plaintiff. This occurred during school hours at Gonzales in view of other staff and administrators.

123.     As the school's representative from the Office of Student Wellness, Apodaca had extensive access to Plaintiff and information about his vulnerabilities, including his medications, health care needs, mental health status, and other details. Apodaca took this access and used it to emotionally and mentally manipulate and abuse Plaintiff. For instance, Apodaca would provide gifts and purport to offer father-like guidance to Plaintiff, knowing Plaintiff's father was not in the family home. In classic pedophilic style, Apodaca praised Plaintiff and offered him affection and support at times.

124.     But at other times Apodaca would mock and belittle Plaintiff to make Plaintiff feel small while Apodaca inflated his own importance and stature to Plaintiff, playing on Plaintiff's insecurities. This is a known pattern of grooming and abuse.

125.     By virtue of his access to Plaintiff's 504 plan and related files, Apodaca would have been aware of Plaintiff's particular vulnerabilities and Apodaca manipulated those vulnerabilities by mocking Plaintiff's socialization skills and status and making comments related to Plaintiff's diagnosis.

126.     Apodaca would engage in sexualized conversations with Plaintiff, describing the best ways to get girls to have sex and bragging about his own purported sexual exploits, including an incident wherein Apodaca proudly claimed a former sexual partner asked him to "shove his fist in her vagina."

127.     When Apodaca learned Plaintiff was being subjected to homophobic taunts by classmates and that Plaintiff was upset by about having his masculinity questioned by other school children and Apodaca used that information to mock Plaintiff and call him "gay."

128.    Apodaca sometimes took Plaintiff to and from school grounds in his personal vehicle. For instance, Apodaca would provide transportation from school to Plaintiff's grandparent's home when Plaintiff's mother was unavailable and Apodaca would transport Plaintiff to baseball practice.

129.    Apodaca increasingly provided transportation to Plaintiff, including to and from school grounds and school-sponsored activities.

130.    While Plaintiff was in Apodaca's car, Apodaca would rub and massage Plaintiff, and caress Plaintiff's shoulders and private areas. Often when this happened, Plaintiff would freeze and attempt to pretend he was sleeping.

131.    Apodaca sexually abused Plaintiff in his car on the many occasions when he drove Plaintiff to various locations in and around Santa Fe, including from school or work to Plaintiff's home, to school sanctioned and sponsored events, and as part of Plaintiff's required work duties while Apodaca was his supervisor. This happened too many times for Plaintiff to remember.

132.    Moreover, approximately two to three times per week Apodaca would physically and aggressively wrestle with Plaintiff and other schoolboys. This often occurred while Apodaca would "play fight" and grab Plaintiff's behind and pull Plaintiff close to him.

133.    Plaintiff would try to protect his genitals from Apodaca during the wrestling incidents and Apodaca would always get extremely excited during the physical contact.

134.    Apodaca would physically overpower Plaintiff, including placing Plaintiff in extreme positions and holds despite Plaintiff telling Apodaca to stop.

**Gonzales Community School Administrators Protected**
**Defendant Apodaca Despite Awareness of Likely Ongoing Sexual Abuse**

135.    Upon information and belief, Apodaca and Chavez held a pre-existing social relationship prior to working together at Gonzales Community School.

136.    While they were both employed at Gonzales Community School, Apodaca and Assistant Principal Chavez had a close personal relationship.

137.    Apodaca and Chavez were often observed together in the nurse's office or the main administrative office.

138.    Apodaca and Chavez were often observed going to lunch together.

139.    Apodaca bragged about the amount of "power" his relationship with Chavez provided to him.

140.    During their time at Gonzales Community School, the same security officer who witnessed Apodaca emerge from the dark, locked nurse's office with a scared and sad schoolboy, repeatedly expressed concern to Flint and Chavez about Apodaca's relationship with schoolboys.

141.    These reports were based not only on the locked door incident, but on the totality of what the security officer observed about Apodaca's behavior, as described above.

142.    At the time these reports were received, the SFPS Defendants, including Flint and Chavez, were already aware of the dangers of predators in the SFPS school system because of the contemporaneous legal action and media coverage associated with Gary Gregor. Yet perhaps because of the close relationship between Apodaca and Chavez, the SFPS Defendants did nothing to ensure that students at Gonzales Community School were safe and not in danger of abuse.

143.    Instead, the SFPS Defendants, including Flint and Chavez, told the security officer that Apodaca's actions and relationships with schoolboys was none of the security officer's business and that she should just return to her post.

144.    The security officer understood from their statements and their lack of response that she was at risk of losing her position at Gonzales Community School if she did not stop raising concerns about Apodaca's open and obvious grooming behavior with schoolboys.

145.    The SFPS Defendants, including Flint and Chavez, were threatening to retaliate because the security officer attempted in good faith to report apparent employee misconduct and valid concerns as to the safety of students.

146.    The SFPS Defendants, including Flint and Chavez, ignored the open and obvious signs of Apodaca's inappropriate relationships and contact with schoolboys.

147.    The SFPS Defendants, including Flint and Chavez, ignored the concerns of others about Apodaca's inappropriate relationships and contact with schoolboys.

148.    The SFPS Defendants, including Flint and Chavez, failed to investigate or inquire.

149.    The SFPS Defendants, including Flint and Chavez, failed to take any other corrective action or seek disciplinary measures.

150.    The SFPS Defendants, including Flint and Chavez, did not report any concerns to law enforcement or other appropriate authorities such as the Children, Youth & Families Department.

151.    Even while Gary Gregor was being convicted and SFPS was answering numerous lawsuits concerning his sexual abuse of students, the SFPS Defendants did nothing to protect children from Apodaca. In fact, they were deliberately indifferent to the open and obvious need to do so.

152.    The valid concerns raised by the security officer were brushed aside by the SFPS Defendants, including Flint and Chavez, to the detriment of Plaintiff and Apodaca's numerous other victims.

153.    Apodaca was using his position as a nurse aide within SFPS in connection with the "power" provided by his relationship with Chavez to select and groom particularly vulnerable SFPS schoolboys, including Plaintiff, for sexual abuse.

27

154.    Apodaca was using his position as a nurse aide within SFPS in connection with the "power" provided by his relationship with Chavez to sexually abuse schoolboys, including Plaintiff, at various locations, including in the nurse's office, in his car on trips in which Apodaca removed boys from school grounds, and at other locations in and around Santa Fe.

155.    For instance, in a particularly disturbing incident late in the 2018-2019 school year, Apodaca enlisted Plaintiff to assist Apodaca at the Gorham Scout Ranch where Apodaca was going to be a medical officer during the summer of 2019, and where he would eventually pay Plaintiff "under the table" to be his assistant. To work at the Scout Camp with Apodaca, Plaintiff had to undergo required training related to sexual grooming behavior. (The Boy Scouts apparently made more of an effort than SFPS in this regard). That training occurred after school on a school day, with Plaintiff and Apodaca alone in the nurse's office at Gonzales Community School.

156.    During that "training" session, administrative staff remained at Gonzales in the neighboring offices and, upon information and belief, were fully aware that Apodaca was alone in the nurse's office with Plaintiff after school.

157.    While other Gonzales staff were mere steps away, Apodaca used the opportunity to groom, caress and molest Plaintiff *while Plaintiff was purportedly being trained about the dangers of sexual grooming behavior.*

158.    This event occurred after the SFPS Defendants, including Flint and Chavez, had received the direct report from the security officer concerning Apodaca emerging with a scared boy from a locked and dark room and after they had directed the security officer not to write any reports concerning the incident.

159.    According to SFPS Policy 218, the conduct of Apodaca during this event was connected to his employment with SFPS.

160.    The SFPS Defendants utterly disregarded the safety of Plaintiff and other male students at Gonzales Community School when they failed to take appropriate and necessary corrective action following incidents of which they were aware or should have been aware, and they failed take any other reasonable steps to ensure the safety of male students at Gonzales Community School.

161.    The SFPS Defendants were deliberately indifferent to the safety of the male students at Gonzales despite knowledge of alarming conduct by Apodaca towards Plaintiff and other male students, including unnecessary and unusual physical contact, showing physical affection, unusually concentrated attention, taking male students from school grounds, and keeping male students alone with Plaintiff behind locked doors.

162.    The response of the SFPS Defendants to Apodaca's open and notorious grooming and abusive conduct was to accept and permit the conduct and refuse to train and/or discipline Apodaca. Thus, said Defendants condoned and ratified Apodaca's alarming conduct toward particular schoolboys, including Plaintiff.

163.    The failures, omissions, and actions of the SFPS Defendants, including Flint and Chavez, permitted, endorsed, and ratified Apodaca's conduct, which was discriminatory, abusive, and constituted violations of federal and state law.

164.    The failures, omissions, and actions of the SFPS Defendants, including Flint and Chavez, caused Plaintiff to be harmed by Apodaca and caused Plaintiff's educational experience to be unreasonably inhibited and detrimentally altered.

165.    The SFPS Defendants fraudulently concealed Apodaca's activity from Plaintiff, and from other students and parents.

166.    On July 24, 2023, Apodaca pleaded guilty to sexually abusing at least one Gonzales student while he was a nurse aide there, in Case No. D-101-CR-2021-00254 in the District Court for the First Judicial District Court, Santa Fe County.

**Unable to Hide Longer Within SFPS, Apodaca Follows his Friend Robin Chavez to Santo Niño Regional Catholic School Where He is Again Protected and Permitted to Continue Abusing Students with School Authorities Condoning and Ratifying the Same**

167.    Upon information and belief, the incident involving the locked nurse's office, which was discovered by security personnel, meant Apodaca was in danger of being exposed as a predator, despite the protective circle the SFPS Defendants had been maintaining, sheltering and harboring Apodaca and his vile conduct.

168.    Instead of reporting Apodaca to authorities as mandated by law and as any reasonable human being would do, Chavez offered him an even greater opportunity to access schoolboys under the umbrella of yet another organization known for harboring child sex abusers; the Archdiocese of Santa Fe.

169.    Chavez previously was employed as a school principal by the Archdiocese of Santa Fe overseeing Saint Michael's High School in Santa Fe and the Archdiocesan schools had a history of collaborating, coordinating and sharing funding with SFPS.

170.    Chavez left her position as Assistant Principal at Gonzales Community School to become the Principal at Santo Niño Regional Catholic School for the 2019-2020 school year.

171.    Defendant SFPS Superintendent Veronica Garcia expressed gratitude to Defendant Chavez for her "dedication and service" and claimed "Our world was made a bit brighter because [Chavez was] in it" when she made this transfer, although her "service" included the acts and omissions outlined above that perpetuated the abuse of an unknown number of SFPS schoolchildren by Apodaca.

172.    Upon information and belief, Chavez, who was a friend of Apodaca's at Gonzales Community School, was instrumental in the hiring of Apodaca at Santo Niño, in a role that provided him with increased responsibilities for the care and custody of schoolboys. Chavez was instrumental in securing this position for Apodaca despite being aware of the previous alarming reports and observations about Apodaca's behavior at Gonzales, as detailed above.

173.    A simple reference check by Santo Niño and the Archdiocese Defendants would have revealed that Apodaca was not eligible for rehire by a previous employer, and it would have prompted greater scrutiny of Apodaca before he was placed in a position of authority and control over young children.

174.    As a result of her experience at Gonzales Community School, Chavez was aware of Apodaca's very brief employment with PHS, where he was not eligible for rehire.

175.    Through her experience at Gonzales Community School, Chavez was also aware of concerns raised by others about Apodaca's conduct with schoolboys.

176.    Despite that knowledge, Santo Niño and the Archdiocese Defendants hired Apodaca and placed him in a position of authority and control over young children.

177.    Apodaca was hired to work at Santo Niño to assist with nursing and to serve as Santo Niño's Extended Care Program Director, providing childcare for young children, including elementary-age children, on school grounds.

178.    As part of his employment at Santo Niño, Apodaca was tasked with custodial responsibilities, including oversight of young children during the after-school program.

179.    Apodaca was emboldened with the increasing "power" provided to him by Chavez and he used his position and that "power" provided to him by his relationship with Chavez to sexually abuse schoolboys at Santo Niño. This included frequent occasions when Apodaca, in

plain sight, placed schoolboys on his lap in classrooms at Santo Niño during the after-school program.

180.    At Apodaca's request, Plaintiff was hired by Santo Niño to assist Apodaca in the after-school program. Plaintiff was still a minor at the time and the position was one of his first jobs and his first "real" paycheck.

181.    Santo Niño and the Archdiocese Defendants assure the public on their website that "Our school is extremely safe!" and that "our school is well informed and (is) actively dissuading…negative behaviors…" Said Defendants further assure the public that its school activities "are supervised by wonderful and committed teachers and parents."

182.    Santo Niño was not "extremely safe!"

183.    Santo Niño was not safe at all. Just as one of its former educators, Aaron Chavez, was being escorted to a lengthy prison sentence for molesting children, the Archdiocese Defendants, under the leadership of Chavez, were bringing in another criminal to prey on its schoolboys; Robert Apodaca.

184.    Santo Niño activities were not always supervised by "wonderful and committed" persons. To the contrary, Apodaca was there adding to the school's reprehensible history of child predation.

185.    While Santo Niño, Chavez and the Archdiocese Defendants were well informed that Apodaca and other employees and agents in positions of trust and authority were engaged in "negative behavior"– a category that most certainly includes childhood sexual abuse– they condoned and ratified that abuse, rather than taking steps to remove the threats that were posed by these predators.

186.    Indeed, in the course and scope of Plaintiff's employment with Santo Niño, Plaintiff, a minor, was sexually abused by his own supervisor, Robert Apodaca.

187.    One such incident occurred when Apodaca drove Plaintiff to Albuquerque for CPR certification as part of Plaintiff's job responsibilities. Santo Niño required Plaintiff to complete CPR certification as part of his employment.

188.    During that trip, Defendant Apodaca sexually abused Plaintiff by rubbing his shoulders, caressing his thighs and touching his private areas.

189.    Defendant Apodaca would also regularly take Plaintiff to lunch during work hours when he was supervising Plaintiff, and Apodaca would grope and molest Plaintiff in the car during those trips.

190.    Just as Apodaca's previous employer, SFPS, had a history of permitting and condoning child sexual abuse, Santo Niño and the Archdiocese Defendants had a recent history of failure to appropriately protect children from the sexual predators they employed. (The Archdiocese had more than a recent history; it had a lengthy history of nearly a century of protecting sexual predators in its ranks).

191.    At the time Apodaca was sexually abusing children in connection with his position at Santo Niño, the Archdiocese was engaged in bankruptcy proceedings that resulted from a lengthy history of fostering, sheltering, and protecting childhood sexual abuse by its leaders, agents, representatives, and employees. In those proceedings, approximately 400 individuals submitted claims related to sexual abuse committed by agents of the Archdiocese. Upon information and belief, several of those claims were associated with the conduct of Aaron Chavez while he taught at Santo Niño for many years even after early reports he was abusing children at the school.

192.    In 2016, Aaron Chavez was arrested and charged for acts of sexual abuse committed in the course and scope of his employment as a teacher with Santo Niño. Upon information and belief, the Archdiocese Defendants had previous reports of inappropriate conduct by Aaron Chavez towards students but permitted him to continue teaching at Santo Niño for many years, where he continued to abuse children right up until his arrest.

193.    In the fall of 2018, Aaron Chavez was tried and convicted in Santa Fe for sexually abusing multiple students while he was a teacher at Santo Niño and an employee, agent and representative of the Archdiocese Defendants.

194.    In 2019, the Archdiocese Defendants were engaged in legal actions related to the abuse Aaron Chavez committed at Santo Niño.

195.    In October 2019, Aaron Chavez was sentenced to prison for acts of child sexual abuse committed in the course and scope of his employment at Santo Niño.

196.    In this same timeframe and shortly thereafter, and during the Archdiocese bankruptcy case arising from a mountain of sexual abuse claims, Santo Niño and the Archdiocese Defendants were again sheltering and protecting another child sex abuser under their supervision and authority; Robert Apodaca.

197.    Despite a history of abuse that had economically impacted the Archdiocese Defendants and Santo Niño , requiring them to pay the victims hundreds of millions of dollars, Apodaca was sheltered and protected by Santo Niño and by Chavez and the Archdiocese Defendants.

198.    Defendant Chavez and the Archdiocese Defendants received reports of likely sexual abuse by Apodaca and responded just as SFPS had, by sweeping it under the rug, collaborating to protect Apodaca, avoiding reporting the matter to law enforcement as required by

law, and thereby condoning, ratifying, and accepting his conduct while enabling him to continue sexually abuse schoolboys at Santo Niño.

199.     In 2021, Chavez received a report from an alarmed Santo Niño staff member that Apodaca was engaged in sexually abusive behavior with a schoolboy in a dark, locked room. It was reported to Chavez that this staff member found a locked classroom where Apodaca was inside with small children. The witness relayed to Defendant Chavez that a student unlocked the door and when it was opened, the witness saw Apodaca touching a small boy seated on his lap.

200.     Chavez shared this report of obvious sexual abuse with the Archdiocese by informing Archdiocese Superintendent Susan Murphy and Archdiocese Victim Coordinator Annette Klimka.

201.     This report was remarkably like the prior reports Chavez had received about Apodaca while at SFPS, and Chavez and the Archdiocese Defendants reacted with the same callous disregard for the youth of Santa Fe that the SFPS Defendants had shown. Defendant Chavez, Superintendent Murphy and "Victim Coordinator" Klimka conspired together to not make a report to law enforcement or the Children, Youth & Families Department about the incident or do anything to rectify the situation or mitigate the danger faced by students at the hands of Apodaca.

202.     In explaining this decision, Annette Klimka, as representative and agent of the Archdiocese Defendants, stated the position of the Archdiocese and Santo Niño and declared they believed it was "reasonable" for Apodaca to have schoolboys seated on his lap behind locked doors.

203.     Said Defendants utterly disregarded the safety of Plaintiff and other young males who participated in Santo Niño's programs and activities, when they failed to take appropriate and

necessary corrective action following incidents of which they were aware or should have been aware, or to otherwise take reasonable steps to ensure the safety of those boys.

204. For Santo Niño and the Archdiocese Defendants, this was part and parcel of a longer pattern of conduct of sheltering and protecting child sex abusers, particularly child sex abusers who targeted young boys. Said Defendants purposefully and fraudulently concealed Apodaca's abusive conduct from students, parents, employees, and legal authorities.

205. As another contemporary example, Daniel Balizan was the pastor at Defendant Santa Maria during the timeframe material to this case. In that position, Balizan was a director of Santo Niño and an agent of the Archdiocese and Santa Maria. During that same time period, Balizan was engaged in criminal sexual activity with young boys and is currently subject to federal prosecution for sexual offenses against one minor boy, in the United States District Court for the District of New Mexico, Case No. 23 CR 945 MLG.

206. The Archdiocese Defendants, Santo Niño and Chavez were deliberately indifferent to the safety of the young boys, including Plaintiff, who were enrolled as students or were participating in activities at Santo Niño.

207. The failures, omissions, and actions of those Defendants permitted, endorsed, and ratified Apodaca's conduct, which was discriminatory, abusive, and constituted violations of federal and state law.

208. The failures, omissions, and actions of those Defendants caused Plaintiff to be harmed by the conduct of Apodaca.

### Defendant Apodaca Uses his Positions to Engage in Further Acts of Sexual Abuse of Plaintiff in Santa Fe

209. Apodaca gained the trust of parents and children at the schools of SFPS and at Santo Niño through his positions at those schools, through the authority with which the other Defendants

cloaked him, and because of the protection the other Defendants provided to him. This permitted him to openly groom young male students for abuse, to sexually abuse schoolboys, and to continue his pattern of abuse with impunity for years.

210.    Once Apodaca had used his position to gain extreme access to Plaintiff and to "mentor" him, Apodaca further relied on his position and the trust that came with it to convince Plaintiff and his parent to approve of Plaintiff working a summer job under Apodaca at the Gortham Scout Ranch in northern New Mexico, in the summer of 2019.

211.    Upon information and belief, Apodaca was the medical officer at the Scout Ranch, a position he gained by virtue of his status as a nurse aide with SFPS.

212.    Apodaca recruited Plaintiff to be his paid "assistant" at Gortham Scout Ranch while Plaintiff was a student under his medical care at Gonzales Community School. As noted above, at a meeting with Plaintiff in the Gonzales nurse's office to prepare for the summer job, and with administrative staff mere steps away, Apodaca molested Plaintiff in an apparent attempt to test and condition Plaintiff for far greater trauma.

213.    Eventually, Apodaca transported Plaintiff to the Scout Ranch and then falsely claimed Plaintiff was his cousin so that Plaintiff would stay alone with Apodaca in the same quarters.

214.    On multiple occasions at the Scout Ranch Apodaca sexually assaulted Plaintiff. In one instance, Plaintiff was congested and asked Apodaca for medicine. Although Plaintiff initially believed Apodaca provided him with Benadryl for allergies, Plaintiff quickly felt very strange. His vision became extremely blurry, and he had difficulty balancing and moving. Plaintiff tried to voice concern, but he was unable to communicate effectively. Plaintiff saw Defendant Apodaca pacing back and forth in the room and remembers a feeling of dread.

215.    Apodaca drugged Plaintiff.

216.    Apodaca then anally raped Plaintiff.

217.    Plaintiff's undergarments were left wet with semen.

218.    In the time Plaintiff knew Apodaca, Plaintiff observed him emerge from rooms where other young boys appeared to be deep in sleep. In hindsight it appears Apodaca also drugged and raped other young boys.

219.    Apodaca sexually abused Plaintiff on occasions throughout the summer of 2019.

220.    Apodaca also used the access and trust he garnered from his position as health care personnel with SFPS to sexually abuse children at other locations in Santa Fe. Apodaca would take the schoolboys he was "mentoring" to a private home in Santa Fe where he and his family "housesat," and he would sexually abuse them there.

221.    In the summer of 2020, Apodaca took Plaintiff to a home in Santa Fe located at 876 Camino de Jemez, which was owned by Defendant Landau.

222.    Upon information and belief, Apodaca and his family were providing compensated services for Landau, including services related to the property at 876 Camino de Jemez.

223.    Upon information and belief, Landau explicitly and specifically authorized Apodaca to stay in the home at 876 Camino de Jemez and utilize it for his own purposes in connection with the services provided to Landau by Apodaca and his family.

224.    Upon information and belief, Landau did not conduct any diligence as to Apodaca, his intentions, or his purpose for using her home located at 876 Camino de Jemez, nor did she provide any supervision of his activities.

225.    Apodaca took Plaintiff to Landau's home at 876 Camino de Jemez and claimed that he and Plaintiff would have to share a bedroom due to the inaccessibility of the second bedroom.

226.    Apodaca provided Plaintiff with alcohol at the home, and, upon information and belief, he also provided plaintiff with a narcotic substance, to ensure Plaintiff's compliance with his sexual desires.

227.    Once Plaintiff was intoxicated, Apodaca anally raped Plaintiff at 876 Camino de Jemez in Santa Fe, the home Landau provided and authorized Apodaca to utilize.

228.    Upon information and belief, Apodaca sexually abused multiple schoolboys from Gonzales Community School at this home. According to public records, at least one other schoolboy from Gonzales Community School reported being sexually abused by Apodaca at the "house where Mr. Apodaca house sat." As of the filing of this action, Apodaca has pleaded guilty to sexually abusing that other child.

**Summary of Sexual Abuse of Plaintiff by Defendant Apodaca**

229.    Apodaca was criminally charged with sexually abusing at least four boys in Santa Fe during the time he was acting as agent and employee of SFPS and Santo Niño.

230.    The criminal charges against Apodaca span the years 2017 through 2021.

231.    During this same time he was abusing other boys in Santa Fe – for which he was ultimately criminally charged – Apodaca was outwardly and unusually close with Plaintiff. This included Apodaca exhibiting physical displays of affection toward Plaintiff during school hours.

232.    In this situation, the SFPS Defendants were deliberately indifferent to the dangers Apodaca presented to Plaintiff.

233.    Over the course of approximately two years, Apodaca groped, molested and abused Plaintiff at various locations, including Gonzales Community School, Apodaca's vehicle, Gorham Scout Ranch, Landau's home and other locations.

234.    During these incidents Apodaca initiated unwanted sexualized touching of Plaintiff.

235.    During these incidents Apodaca rubbed Plaintiff's private areas and masturbated Plaintiff.

236.    During these incidents Apodaca anally raped Plaintiff.

**Continuing Cover-Up by Defendant SFPS**

237.    In July 2021 Apodaca was arrested and charged with sexually abusing a schoolboy to whom he gained access through his positions within Santa Fe's schools.

238.    There was public outcry concerning the many years Apodaca had worked as a nurse aide for SFPS.

239.    After being contacted by local media in September 2021, SFPS, through its agents and representatives, provided false and misleading information about what SFPS and its employees knew about Apodaca's behavior, and when they knew it. This false and misleading information was spread primarily by SFPS Superintendent Hilario "Larry" Chavez and by Gonzales Community School Principal Christopher Lopez.

240.    After local media inquired about the actions SFPS had taken to notify parents about Apodaca's arrest, which had occurred a few months earlier, SFPS finally placed an automated call to parents within the District.

241.    According to reports, in that automated call, Gonzales Principal Christopher Lopez spoke and claimed the school was "shocked and saddened" by news that Apodaca had been arrested.

242.    Gonzales Principal Christopher Lopez is the same Christopher Lopez who, when he was Plaintiff's teacher, joked via electronic mail about Apodaca referring to elementary and middle school students as "tail," which is a well-known and degrading reference to a person as a sexual object. That contemporaneous joke was not indicative of either shock or sadness.

40

243.    As Plaintiff's eighth-grade teacher while Apodaca was openly grooming seventh-grade and eighth-grade schoolboys, including Plaintiff, Chrisopher Lopez was in a unique position to view Apodaca's alarming behavior as it was happening, because Lopez was presumably acting as a guardian of those students during those times.

244.    Despite having undoubtedly observed grooming and likely abusive behavior by Apodaca directed towards his own students, including Plaintiff, when Lopez was a teacher, as the Gonzales Principal he misleadingly and/or falsely claimed "shock" and "sadness" during his recorded phone call to parents.

245.    Around the same time in September 2021, SFPS provided misleading and false statements to the public through Superintendent Hilario Chavez concerning what SFPS knew about Apodaca's conduct while he was employed by SFPS.

246.    According to public reports, Superintendent Chavez claimed that SFPS did not have prior knowledge of Apodaca's activities. Further, probably in an attempt to shift blame to the Archdiocese Defendants, Superintendent Chavez issued a public statement that "the issue had not surfaced" in Santa Fe Public Schools. This was misleading and false.

247.    The "issue" had certainly surfaced at Gonzales Community School. The conduct was so open and obvious that staff at Gonzales Community School found it humorous when Defendant Apodaca used a vulgar slang term related to sexual activity in connection with young children, and it was open and obvious to the security personnel who repeatedly raised concerns. Officials knew the "issue" had surfaced because SFPS had direct reports of Apodaca's alarming behavior and inappropriate relationships with schoolboys in real time while he worked at SFPS. The "issue" had surfaced, but SFPS ignored it and an unknown number of young children were sexually assaulted as a result.

248.    The misleading and false statements from Principal Lopez and Superintendent Chavez unreasonably and unnecessarily denigrated the experience of Plaintiff and wrongly concealed from Plaintiff the failures of the adults responsible for protecting him at Santa Fe Public Schools. This in turn deprived Plaintiff of the opportunity to seek timely and complete mental health services related to the sexual abuse, resulting in prolonged suffering and a denial of his ability to gain safety or happiness. It also contributed to a denial of his bodily integrity, a denial of his ability to enjoy life and liberty, and a denial of his right to seek and obtain safety and happiness. Finally, the misleading and false statements hindered Plaintiff's ability to obtain positive educational outcomes and diminished his future opportunities.

## CLAIMS FOR VIOLATIONS OF CIVIL RIGHTS, VIOLATIONS OF TITLE IX, VIOLATIONS OF THE NEW MEXICO TORT CLAIMS ACT, NEGLIGENCE AND OTHER TORTIOUS CONDUCT AND RACKETEERING

### COUNT I
### (42 U.S.C. § 1983 – Defendant Apodaca)

249.    The preceding paragraphs are incorporated as if fully stated herein.

250.    Plaintiff was a member of a particular closed and limited group, that being male students at Gonzales Community School.

251.    Female students were similarly situated to Plaintiff and other male students.

252.    Plaintiff has the right to bodily integrity under the Fourteenth Amendment to the United States Constitution, which protected Plaintiff from the unwanted, coercive, and/or illegal touching and sexual activity of Apodaca.

253.    Apodaca deprived Plaintiff of his substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution by grooming him and repeatedly abusing him physically, sexually, mentally, and emotionally.

254.    Plaintiff has rights of equal protection of law under the United States Constitution.

42

255.     Apodaca deprived Plaintiff of said rights when, for Apodaca's own gratification and sexual purposes, he physically, mentally, emotionally, and sexually abused Plaintiff because of his gender.

256.     Apodaca abused other male students at Gonzales Community School, and SFPS was on notice of said conduct.

257.     Apodaca did not abuse female students at Gonzales Community School.

258.     In his position with SFPS, Apodaca was a state actor who violated Plaintiff's civil rights.

259.     In his interactions with Plaintiff, Apodaca was carrying out the functions and duties of his position as nurse aide in the SFPS Office of Student Wellness which, among other things, directed Apodaca to foster connections with students, provide counseling services to students in connection with trauma, stress, anxiety and depression, and work with students on developing personal and social growth and academic success.

260.     According to official written SFPS policy, Apodaca's sexualized actions towards students, including Plaintiff, were "always connected" to his employment and position as an employee of SFPS.

261.     Apodaca carried out, in an impermissible manner, the functions assigned to him by the SFPS Defendants.

262.     Apodaca engaged in actions and omissions which were egregious, outrageous, and fraught with unreasonable risk. Those actions harmed Plaintiff, who was a member of a particular, limited, and closed group; namely, male students at Gonzales Community School.

263.     Apodaca was not, during the times of his actions, involved in a situation demanding split-second judgments. Instead, Apodaca had time for thoughtful deliberation.

264.    Apodaca's conduct shocks the conscience.

265.    Apodaca's conduct was a direct and proximate cause of Plaintiff's injuries and damages.

266.    Apodaca acted intentionally, recklessly, willfully, and with callous disregard for Plaintiff's constitutional rights. As his conduct was motivated by malice or evil intent, Plaintiff is entitled to an award of punitive and exemplary damages against Apodaca in an amount to be determined at trial.

267.    Plaintiff's constitutional rights, which Apodaca violated, were clearly established prior to Apodaca's employment with SFPS generally, and prior to his assignment to Gonzales Community School specifically, and any reasonable school officer, administrator, teacher, or staff member would have been aware that the conduct described in this Complaint would violate Plaintiff's constitutional rights.

## <u>COUNT II</u>
### (42 U.S.C. § 1983 – Defendants Flint and Chavez, in their individual capacity)

268.    The preceding paragraphs are incorporated as if fully stated herein.

269.    Defendants Flint and Chavez coordinated closely in the management and oversight of Gonzales Community School and communicated concerning reports of misconduct and disciplinary matters.

270.    Defendants Flint and Chavez were on notice of Apodaca's behavior toward male students.

271.    Defendants Flint and Chavez failed to address Apodaca's alarming behavior toward male students, even though it was open and obvious.

272.    Defendants Flint and Chavez failed to take any action following reports of Apodaca's alarming behavior toward male students.

273.    Defendants Flint and Chavez failed to stop Apodaca's sexual abuse of male students even after they had actual knowledge of his behavior, both reported to them and observed by them.

274.    Defendants Flint and Chavez failed to report Apodaca's alarming conduct to law enforcement or other authorities such as CYFD, thereby enabling, condoning, and ratifying Apodaca's repeated sexual, physical, mental, and emotional abuse of male students, including Plaintiff.

275.    Through those failures, Flint and Chavez deprived Plaintiff of his substantive due process right to bodily integrity under the Fourteenth Amendment to the United States Constitution.

276.    Through the same actions and omissions, Flint and Chavez deprived Plaintiff of his right to equal protection of law under the United States Constitution.

277.    The acts and omissions of Flint and Chavez enabled Apodaca to physically, sexually, mentally, and emotionally abuse Plaintiff, and prevented Plaintiff from receiving appropriate and necessary medical treatment, including mental health care, and appropriate and necessary educational and wellness support and treatment.

278.    Upon information and belief and based upon their acts and omissions, Defendants Flint, Chavez and Apodaca agreed to act together to violate the civil rights of certain male students, including Plaintiff, as set forth herein and the acts and omissions set forth in this Complaint were done in furtherance thereof.

279.    In their positions with SFPS, Flint and Chavez were state actors who violated Plaintiff's civil rights.

280.    Said Defendants were carrying out the functions and duties of their positions as Principal and Assistant Principal with SFPS.

281.    Said Defendants carried out, in an impermissible manner, the functions assigned to them by the SFPS Defendants.

282.    The actions and omissions of Flint and Chavez were egregious, outrageous, and fraught with unreasonable risk, and those actions and omissions harmed Plaintiff, who was a member of a particular, limited, closed group; namely, male students at Gonzales Community School.

283.    Flint and Chavez were not, at the time, involved in situations demanding split-second judgments. Instead, they had time for thoughtful deliberation.

284.    Through their affirmative actions, Flint and Chavez made Plaintiff vulnerable to Apodaca's abuse.

285.    The actions of Flint and Chavez put Plaintiff at substantial risk of serious, immediate, and proximate harm.

286.    Flint and Chavez knew of the risk that Apodaca would sexually abuse Plaintiff; the risk was obvious.

287.    Flint and Chavez acted in reckless disregard of the risk to Plaintiff through their actions and omissions, which included the following: their repeated disregard for reports of alarming behavior, grooming and abuse of boys at Gonzales by Apodaca; their active efforts to avoid reports or a paper trail of Apodaca's alarming behavior; their insistence on placing Apodaca in a position of authority, power, control, with a unique likelihood for abuse; their lack of supervision of Apodaca in that position coupled with the knowledge they must have had

concerning the unique vulnerabilities of Plaintiff, some of which were included in the information they obtained through the 504 plan process.

288.    The conduct of Flint and Chavez shocks the conscience.

289.    The conduct of Flint and Chavez directly and proximately caused Plaintiff's compensable injuries and damages.

290.    Flint and Chavez acted intentionally, recklessly, willfully, and with callous disregard for Plaintiff's constitutional rights. As their conduct was motivated by malice or evil intent, Plaintiff is entitled to recover an aware of punitive and exemplary damages against Flint and Chavez in an amount to be determined at trial.

291.    Defendants Flint and Chavez are liable for all abuse committed by Apodaca towards Plaintiff as their acts and omissions created the danger and risk to Plaintiff of ongoing sexual abuse as Plaintiff was a vulnerable student within the school they supervised and operated that was often alone with Apodaca in the nurse's office for extended periods and which Apodaca exhibited outward and obvious signs of grooming and abuse, including physical displays of affection towards this middle school child during school hours. In addition, Defendants Flint and Chavez were aware of reports of abusive and disturbing behavior of Apodaca directed at male students at Gonzales Community School and still fostered, encouraged, and ensured Plaintiff would be placed in a position of increasing reliance and exposure to this abuser.

292.    In addition, Defendants Flint and Chavez are liable for all abuse committed by Apodaca towards Plaintiff because it was foreseeable that Plaintiff would suffer additional and ongoing abuse as a result of the acts and omissions of Flint and Chavez that enabled, encouraged, ratified, authorized and otherwise permitted Apodaca to escalate his abuse of Gonzales Community School students.

293. Plaintiff's constitutional rights, which Flint and Chavez violated, were clearly established prior to their acts and omissions described above, and any reasonable school officer, administrator, teacher, or staff member would have been aware that the conduct described in this Complaint would violate the constitutional rights of male students at Gonzales Community School, including Plaintiff.

### COUNT III
### (42 U.S.C. § 1983 –SFPS Defendants)

294. The preceding paragraphs are incorporated as if fully stated herein.

295. SFPS, Flint and Chavez ("SFPS Defendants") had a duty to exercise due care in the supervision of their staff, teachers, and contractors. In addition, the SFPS Defendants had a duty to properly screen, license, hire, train, monitor, supervise, and discipline staff, teachers and others employed or licensed by SFPS.

296. The SFPS Defendants failed to adequately screen Apodaca prior to his employment, in particular his renewed employment commencing at Gonzales Community School, and they failed to take necessary actions with respect to his employment during his tenure as a health care worker and nurse aide at SFPS.

297. The SFPS Defendants failed to adequately train and supervise Apodaca during his tenure as a nurse aide at SFPS.

298. These failures caused Plaintiff to be physically, sexually, mentally and emotionally abused. The SFPS Defendants knew or should have known of the predatory actions of Apodaca prior to and during his employment with SFPS at Gonzales Community School, when Defendant Apodaca began abusing Plaintiff.

299. The SFPS Defendants were deliberately indifferent to the constitutional rights of Plaintiff, as exemplified by their utter failure to protect Plaintiff, to report Defendant Apodaca to

law enforcement, or to conduct any reasonable inquiry or investigation after learning of apparent abusive conduct, which included keeping a schoolboy without justification in a dark, shuttered, and locked room. Their deliberate indifference to Plaintiff's rights was also apparent in their failure or refusal to take any remedial or disciplinary action against Apodaca, and in their failure or refusal to ensure that Plaintiff received appropriate medical and mental health care. This deliberate indifference by the SFPS Defendants caused Plaintiff to suffer injury and damages.

300.     The actions and deliberate omissions of the SFPS Defendants were the result of custom or policy which permitted, condoned or ratified the physical, sexual, mental and emotional abuse of students, reflecting deliberate indifference to Plaintiff and other male students.

301.     The actions and deliberate omissions of the SFPS Defendants were the result of a custom or policy to disregard written policies concerning reports of misconduct by SFPS staff directed towards students.

302.     The actions and deliberate omissions of the SFPS Defendants were the result of a custom or policy to knowingly retain employees that were a danger to students in positions of authority and access to students.

303.     These customs or policies are seen through the indifference of SFPS to Gary Gregor's sexual assault of students, the protection provided to Apodaca by the SFPS Defendants while he was abusing multiple students at Gonzales, and the misleading and/or false statements provided by Superintendent Chavez and Principal Lopez downplaying, hiding, and denying SFPS's role in the continued abuse perpetrated by Apodaca.

304.     As a direct and proximate consequence of the SFPS Defendants' defective customs or policies regarding hiring and supervision as stated above, Plaintiff was deprived under color of

law of the rights, privileges and immunities secured by the United States Constitution, including the right under the Fourteenth Amendment to be free from intrusions into his bodily integrity.

305.    As a direct and proximate consequence of the deprivation of Plaintiff's rights, Plaintiff suffered the resultant injuries and damages described in this Complaint.

## COUNT IV
**(Title IX – Defendant SFPS)**

306.    The preceding paragraphs are incorporated as if fully stated herein.

307.    Upon information and belief, SFPS received federal funding and financial assistance during the times described in this Complaint.

308.    SFPS owns, controls, operates and administers public schools within Santa Fe, including Gonzales Community School.

309.    SFPS had a duty under Title IX, 20 U.S.C. § 1681, to provide an educational environment in which no student, including Plaintiff, should be excluded from education, denied the benefits of education, or discriminated against on the basis of sex.

310.    Plaintiff was a male student enrolled at SFPS during the times described in this complaint, and he remained an SFPS student until 2023.

311.    The sexual abuse perpetrated on Plaintiff by Apodaca while Apodaca was an SFPS employee and while Plaintiff was a student at SFPS was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to the educational opportunities or benefits provided by SFPS at Gonzales Community School and the SFPS schools that Plaintiff attended afterwards.

312.    SFPS had actual or constructive knowledge that Apodaca was harassing, assaulting, grooming and abusing male students, including Plaintiff.

313.    SFPS was deliberately indifferent to Apodaca's inappropriate relationships and illegal conduct with Plaintiff and other male students.

314.    SFPS had the authority and the ability to rectify or remedy the hostile, harassing, assaultive and abusive environment that Plaintiff and other male students faced at Gonzales Community School, but it failed to do so.

315.    Apodaca and the SFPS Defendants directed the abusive conduct towards male students, and Plaintiff was subjected to unequal treatment and discrimination by said Defendants on the basis of sex.

316.    Upon information and belief, SFPS failed to provide adequate instruction or education to Gonzales Community School students, faculty, or staff about sexual abuse, or to enforce any policies to prohibit or discourage the sexually abusive and hostile environment that Apodaca created for Plaintiff.

317.    At all times described in this Complaint, SFPS, acting through its officials, administrators, and employees, maintained customs and policies that permitted or condoned sexual abuse of students by members of the SFPS staff, including, but not limited to, a policy and/or custom to ignore reports of concerning behavior and to instruct witnesses not to make such reports.

318.    As a result of these customs and policies, Plaintiff was subjected to invasive, severe, and objectively offensive sexual, physical, emotional and mental abuse by Apodaca during school hours and activities. The sexual assaults and batteries on Plaintiff were the natural and inevitable consequence of the lack of supervision and the lack of training of SFPS nursing staff.

319.    Upon information and belief, SFPS failed to properly and adequately instruct administrators, supervisors, employees, and contractors how to respond to inappropriate behavior, including grooming and sexual abuse, by SFPS employees towards students enrolled at Gonzales Community School. SFPS has not developed or promulgated adequate policies addressing issues of sexual abuse by a staff member against a student. The deliberate indifference of SFPS, and its

51

officials, administrators, and employees, to the acts of sexual abuse, as well as its failure to adopt, publish, and inculcate appropriate policies concerning such abuse and harassment, deprived Plaintiff of benefits under Title IX, and subjected Plaintiff to discrimination on the basis of his sex – male – under an educational program or activity receiving federal financial assistance, all in violation of Title IX.

320.    The discriminatory conduct of SFPS that hindered Plaintiff's educational opportunities described above and elsewhere in this Complaint continued through false and/or misleading statements from SFPS supervisory personnel inaccurately suggesting that Apodaca had not engaged in abusive behavior within SFPS and that SFPS officials had no inclination that Apodaca was a child predator even though SFPS officials had silenced a concerned security officer that raised questions about Apodaca's inappropriate contact with students at Gonzales while Apodaca was stationed at Gonzales. Said conduct includes statements by the Superintendent and Principal of Gonzales Community School discussed below.

321.    SFPS's conduct was egregious and created unreasonable risk to Plaintiff and other members of the class of male students that attended Gonzales Community School.

322.    Defendant SFPS's conduct shocks the conscience and was intentional, reckless, and willful, and exhibited callous indifference to the rights of Plaintiff.

323.    As a direct and proximate consequence of the discrimination and violation of Title IX, Plaintiff suffered compensable injuries and damages.

### COUNT V
### (Defendant SFPS – NMSA 1978, § 41A-4-1, *et. seq.*)

324.    The preceding paragraphs are incorporated as if fully stated herein.

325.    SFPS is a public body as defined by NMSA 1978, § 41-4A-2 because it is a school district.

326.    At all times material hereto, SFPS, the SFPS Defendants, and others acting in concert with them were acting on behalf of, under color of, or within the course and scope of the authority of SFPS.

327.    Upon information and belief, SFPS administrators and sexual abusers within SFPS, including Gary Gregor and Robert Apodaca, have agreed to violate the civil rights of students of SFPS through acts such as those set forth in this Complaint and have acted in furtherance thereof through acts of abuse and violating civil rights and defrauding the people of Santa Fe as to the dangers present, encouraged, ratified and condoned by SFPS administrators. Acts in furtherance thereof include misleading and/or false statements provided by SFPS administrators, including Superintendent Chavez and Principal Lopez, concerning Robert Apodaca, in which said administrators denied, downplayed or otherwise suggested SFPS was entirely unaware of Apodaca's abusive behavior when that behavior was obvious and SFPS received specific reports from a security officer concerning that abusive behavior.

328.    The Bill of Rights of the Constitution of New Mexico grants the right to equal protection of laws and prohibits the denial of equal rights on account of a person's sex. *See* N.M. Const. art. II, § 18.

329.    As outlined above, the actions of the SFPS Defendants and others acting in concert with them, including the false public statements Superintendent Chavez and Principal Lopez made about Apodaca, violated Plaintiff's rights described in article II, section 18.

330.    The Bill of Rights of the Constitution of New Mexico explicitly states that all political power and authority of public institutions derives from and is vested in the people, and further provides for the right to a government and its bodies instituted solely for the good of the people. *See* N.M. Const. art. II, § 2.

331.    The Bill of Rights of the Constitution of New Mexico provides for the sole and exclusive right of the people to control the state government and its subsidiaries and subdivisions, including SFPS. *See* N.M. Const. art. II, § 3.

332.    The Bill of Rights of the Constitution of New Mexico provides all persons with the right to enjoy life and liberty and to seek and obtain safety and happiness. *See* N.M. Const. art II, § 4.

333.    Inherent in these rights is the right of citizens like Plaintiff to the honest services of government.

334.    The way SFPS and the SFPS Defendants and others conducted themselves, including their false representations about their prior knowledge of Apodaca's conduct as an SFPS employee, violated Plaintiff's right to the honest services of government protected by the New Mexico Bill of Rights as set forth above.

335.    These false and misleading representations by SFPS and its agents and employees served to revictimize the survivors of Apodaca's sexual violence. This itself represents a violation of Plaintiff's civil rights protected by the New Mexico Constitution, including his right to life and liberty and his right to seek and obtain safety and happiness, because it severely and negatively impacts a survivor's safety and happiness when governmental entities misleadingly and/or falsely deny accountability in public, conceal the truth from survivors of sexual violence committed by public actors, and work to dodge and deny accountability for their role in the survivors' victimization. It unreasonably creates psychological difficulties, exacerbates mental health issues, damages relationships, including familial relationships, and significantly hinders any healing for survivors. This dynamic is well-understood by any reasonable educator in this day and age.

336.     These false and misleading representations by SFPS and its agents and employees further violated the right to the honest services of government inherent in §§ 2 and 3 of the New Mexico Bill of Rights because they were deliberately misleading and/or false statements about vital government functions and governmental failures to provide the most basic of services; providing a safe environment for children.

337.     The same representations were part and parcel of a continuing course of conduct and conspiracy amongst SFPS agents and personnel that created and exposed Santa Fe schoolchildren to sexual predators that were sheltered, protected, permitted, condoned, authorized, ratified and encouraged by SFPS and its administration. This continuing course of conduct, which included the conduct of Defendants Apodaca, Flint and Chavez described above, proximately caused Plaintiff injuries and violated his due process right to bodily integrity, and his rights to be free of unreasonable seizure and to safety and to pursue happiness.

338.     Those actions serve to silence survivors like Plaintiff, and those actions violated Plaintiff's civil rights, as set forth in §§2, 3, 4, 10 and 18 of the New Mexico Bill of Rights.

339.     The actions of SFPS and the SFPS Defendants, acting in concert with other SFPS agents and representatives, proximately caused Plaintiff injuries.

340.     SFPS, as the public body, is liable for said violations of Plaintiff's civil rights pursuant to NMSA 1978, § 41-4A-3(c) as outlined herein.

## COUNT VI
### (Defendants SFPS, Flint and Chavez – NMSA 1978, § 41-4-6)

341.     The preceding paragraphs are incorporated as if fully stated herein.

342.     SFPS is a governmental entity as defined by NMSA 1978, § 41-4-3.

343.     Flint and Chavez, as Principal and Assistant Principal of Gonzales Community School, were public employees as defined by NMSA 1978, § 41-4-3.

344.    SFPS operated Gonzales Community School where Plaintiff attended, as well as other public schools in Santa Fe, and Flint and Chavez served as Principal and Assistant Principal of Gonzales Community School.

345.    During all their activities, SFPS, and Flint and Chavez—who were acting within the scope of their employment with SFPS—had the duty to exercise due care for the safety of others, including Plaintiff. Due care means the care ordinarily exercised by a reasonable, prudent and qualified person in their position, and considering the nature of the activity.

346.    The SFPS Defendants had a duty to Plaintiff and similarly situated students to exercise reasonable care in the maintenance and operation of Gonzales Community School.

347.    The SFPS Defendants had a further duty to supervise their employees, contractors, and agents to ensure that they did not act negligently in the operation or maintenance of the buildings.

348.    Supervision includes the obligation to adopt and inculcate reasonable and proper operational policies and procedures concerning the safe operation of Defendant SFPS's educational facilities, including appropriate policies and procedures concerning employee training, adequate monitoring and regulation of their employee's activities, and other such policies and procedures as are reasonably necessary to ensure adequate safety in the operation and maintenance of Defendant SFPS's educational facilities, such as Gonzales Community School, and to avoid unsafe, dangerous, or defective conditions on the premises.

349.    The SFPS Defendants, in maintaining and operating Gonzales Community School in a safe condition, had a duty to supervise staff, including nursing staff, to protect minor students, including Plaintiff, from abuse, battery and harassment from other persons, including Apodaca.

350.    Plaintiff was invited onto SFPS grounds as a student and remained an invitee on SFPS property throughout his childhood, including the period between 2017 and 2023.

351.    As a student and invitee, Plaintiff was required to interact with Apodaca, when the SFPS Defendants knew or suspected that Apodaca was dangerous to young male students.

352.    SFPS, acting through its administrators, supervisors, employees and contractors, had the duty to adopt and implement proper safety policies and procedures to protect its students, including Plaintiff, from abuse, sexual assault, battery and harassment from other persons, including Apodaca.

353.    SFPS, acting through its administrators, supervisors, employees and contractors, had the duty to investigate and act upon suspicions or reports of sexual grooming, battery, abuse or harassment by SFPS employees or agents against any student attending SFPS's schools, including Gonzales Community School.

354.    The SFPS Defendants did not maintain adequate policies and procedures to mitigate the unsafe, dangerous or defective conditions associated with Apodaca and the risks he presented.

355.    The SFPS Defendants failed to exercise reasonable care in maintaining a safe premises at Gonzales Community School by ignoring warning signs, readily observable alarming behavior, and reports of alarming behavior of Defendant Apodaca toward male students, including Plaintiff.

356.    The SFPS Defendants failed to use ordinary care to protect Plaintiff and other male students from the danger posed to them by Apodaca.

357.    The SFPS Defendants breached their duties of care toward Plaintiff and others.

358.    SFPS Defendants further breached their duty of care by failing to properly screen, hire, train, monitor, supervise, and discipline employees of SFPS and Gonzales Community

School, such as Apodaca. The SFPS Defendants also breached their duty by failing to enact or enforce appropriate policies, procedures and protocols concerning safe staff-student interactions, and by otherwise failing to take appropriate and reasonable supervisory actions to correct the potential problems and prevent the harm and injuries incurred by Plaintiff.

359.    The SFPS Defendants breached their duties by negligently allowing Plaintiff onto SFPS premises without taking appropriate steps and implementing appropriate practices and procedures reasonably necessary to assure safety to Plaintiff when the risk and danger to Plaintiff was foreseeable, including while he was attending Gonzales Community School.

360.    Defendants SFPS, Flint and Chavez are liable for failing to maintain Gonzales Community School as a safe premises for students, including Plaintiff.

361.    SFPS is liable for all injuries and damages caused to Plaintiff by the actions of its employees and agents, including Flint, Chavez and Apodaca, pursuant to the doctrines of vicarious liability, *respondeat superior* and aided-in-agency.

362.    The conduct of the SFPS Defendants was a direct and proximate cause of the injury to Plaintiff and damages arising therefrom.

## COUNT VII
**(Defendant Apodaca – NMSA 1978, § 41-4-6)**

363.    The preceding paragraphs are incorporated as if fully stated herein.

364.    While acting within the scope of his duties as a nurse aide and in the operation of nursing facilities at Gonzales Community School, Apodaca had a duty to exercise ordinary care toward others, including students such as Plaintiff.

365.    As a minor student under the guardianship and care of Apodaca, a representative of the SFPS health care staff, Plaintiff was unable to consent to Apodaca's actions.

366.    Apodaca had a duty to protect Plaintiff from preventable harm to his health and wellbeing while he was under Apodaca's care as a health care representative of SFPS, including while he was within SFPS facilities.

367.    Apodaca breached this duty by manipulating, sexually grooming, and abusing the Plaintiff.

368.    Apodaca exposed Plaintiff to a known and foreseeable risk to his health and wellbeing and, in fact, did harm Plaintiff's health and wellbeing.

369.    Apodaca's negligence proximately caused Plaintiff injury and damages.

**COUNT VIII**
**(Archdiocese Defendants and Defendant Chavez – Negligence)**

370.    The preceding paragraphs are incorporated as if fully stated herein.

371.    The Archdiocese Defendants and Chavez failed to adequately screen, hire, supervise, place and retain Apodaca. Their failure to do so precipitated the sexual abuse of Plaintiff.

372.    While he was employed by the Archdiocese Defendants and supervised by Chavez as their agent, Apodaca openly and notoriously molested numerous children. Regardless of whether those Defendants knew specific details about Apodaca's abuse of children, there was a known danger of pedophilia from the Defendants' employees and agents, including from staff at Santo Niño, that posed a threat to children. Nevertheless, and even after they were aware of the danger he posed to children, these Defendants hired and retained Apodaca, and then failed to adequately supervise him, after entrusting him with the care and custody of small children and after giving him supervisory authority over child employees such as Plaintiff.

373.    The Archdiocese Defendants and Chavez voluntarily undertook custodial responsibilities of children, including children employed under the supervision of their agents and employees, like Plaintiff.

374.    The Archdiocese Defendants and Chavez as their agent had a duty to protect children in their care and under their authority, including Plaintiff, from harm.

375.    Those Defendants had a duty to keep school activities and premises safe for Plaintiff, a minor employee, and to notify students, parents and minor employees of the danger of pedophilia within Archdiocese entities, including Santo Niño. They also had the duty to ensure through adequate supervision that children like Plaintiff were not being sexually abused by school staff, including Apodaca, under the guise of instruction or supervision.

376.    Those Defendants had a duty to use reasonable care to provide a safe work environment for their employees, including Plaintiff.

377.    As a direct result of the combined actions or omissions by the Archdiocese Defendants and by Chavez as their agent, children, including Plaintiff, were abused by Apodaca.

378.    But for the combined actions and omissions of the Archdiocese Defendants and by Chavez as their agent, Plaintiff would not have been sexually abused by Apodaca in his role as a staff member at Santo Niño.

379.    The Archdiocese Defendants and Chavez, as their agent, owed a duty of care to supervise their employees, including Apodaca, to ensure that they were not engaging in inappropriate conduct with children, including minor employees, who were under their supervision and care.

380.    These Defendants breached their duty of care and were negligent in hiring, retaining, and supervising Apodaca, especially given that Chavez, as an agent of the Archdiocese

Defendants, knew of other reports and instances of Apodaca's alarming behavior in other school settings.

381.    These Defendants breached their duty to protect Plaintiff as a minor child in their care and supervision, because Apodaca was able to sexually abuse Plaintiff in connection with Plaintiff's employment by the Archdiocese Defendants, and in connection with Apodaca's position of authority over Plaintiff in that employment.

382.    Said Defendants breached their duty to supervise employees by providing inadequate supervision of Apodaca in his employment at Santo Niño and by otherwise failing to take appropriate and reasonable supervisory actions to correct the potential problems and prevent the harm Plaintiff suffered.

383.    Said Defendants knew or should have known that Apodaca was unfit for a position that involved the care, custody, and authority over minor boys.

384.    Said Defendants knew or should have known of Apodaca's sexual abuse of children but did nothing to warn Plaintiff or to prevent future abuse by Apodaca. Instead, the Defendants knowingly placed Plaintiff under the authority of Apodaca.

385.    In granting Apodaca extraordinary power over Plaintiff, these Defendants had a responsibility and a duty to protect Plaintiff, which Defendants breached by placing Plaintiff in an unreasonably dangerous position.

386.    The negligence of the Archdiocese Defendants and of Chavez as their agent created unsafe premises and sanctioned activities where Plaintiff was abused by Apodaca.

387.    It was reasonably foreseeable that negligent hiring and training practices regarding persons entrusted with care, custody and supervision of minors could result in abuse of minors,

including Plaintiff, a minor working under Apodaca's supervision and authority. (The Archdiocese Defendants had decades of experience proving this).

388.    The Archdiocese Defendants are liable for abuse committed by Apodaca towards Plaintiff in connection with Plaintiff's employment under Apodaca's supervision as well as abuse during the same time frame due to their acts and omissions that created a danger and risk of sexual abuse, including their placement of Apodaca in a position of authority and supervision over Plaintiff coupled with the awareness of Apodaca's abusive behavior and the dangers of sexual abusers to minors from employees of the Archdiocese Defendants.

389.    In addition, the Archdiocese Defendants are liable for all abuse committed by Apodaca towards Plaintiff because it was foreseeable that Plaintiff would suffer additional abuse as a result of the acts and omissions of the Archdiocese Defendants and their agents, including Defendant Chavez, which enabled, encouraged, ratified, authorized and otherwise permitted Apodaca to continue and/or escalate his abuse of minors affiliated with the Santo Niño aftercare program.

390.    Upon information and belief, the Archdiocese Defendants, through their agents, including Defendant Chavez, "Victim Coordinator" Klimka and Superintendent Murphy, and Defendant Apodaca conspired and agreed to facilitate sexual abuse of children and to violate mandatory reporting laws related thereto and the actions complained of herein were in furtherance of said agreement.

391.    Said conspiracy was a proximate cause of injury and damage to Plaintiff through the abuse of Plaintiff by Apodaca and the cover-up of the same by the Archdiocese Defendants.

392.    The negligence of the Archdiocese Defendants and Chavez as their agent was the proximate cause of the harm Plaintiff suffered by Apodaca, and of the resulting injuries and damages.

393.    The conduct of the Archdiocese Defendants and of Chavez as their agent, was willful, intentional, wanton, or taken in utter disregard for the safety and well-being of others, including Plaintiff; therefore, these Defendants are liable for punitive damages.

## COUNT IX
**(Archdiocese Defendants – Vicarious Liability – Aided-in-Agency)**

394.    The preceding paragraphs are incorporated as if fully stated herein.

395.    The Archdiocese Defendants had the right and ability to control Apodaca's conduct.

396.    The Archdiocese Defendants are vicariously liable for the harm that Apodaca caused to Plaintiff.

397.    Apodaca acted as an agent of the Archdiocese Defendants, so they are vicariously liable for his actions, including his abuse of Plaintiff.

398.    Apodaca's duties as an employee of the Archdiocese Defendants included supervision and oversight over minor employees, including oversight over subordinate employees and ensuring appropriate certifications for the minor employees he supervised.

399.    Defendant Apodaca abused Plaintiff during his execution of those duties, including while Apodaca was ensuring that Plaintiff obtained the certification required for his employment under Apodaca.

400.    The Archdiocese Defendants granted Apodaca authority and control over minors, including minor employees like Plaintiff, and Apodaca then utilized that power to harm Plaintiff.

401.    Apodaca was able to sexually abuse Plaintiff because of his position as a trusted staff member and supervisor at Santo Niño, and because of the duties, responsibilities, authority and access he enjoyed. With the ability to be alone with Plaintiff, and to maintain close contact with Plaintiff under the guise of employment and supervision, Apodaca abused Plaintiff while Plaintiff was under his care and supervision as employer.

402.    The abuse of Plaintiff was combined directly with Apodaca's duties as an employee with Santo Niño, and it was sanctioned, condoned or otherwise encouraged by the Archdiocese Defendants.

403.    Apodaca wielded authority and power vested in him by the Archdiocese Defendants as a leader of after-school programs for minor children and as a supervisor over minor employees like Plaintiff, and he used that authority and power to abuse Plaintiff. Apodaca relied on his supervisory authority over Plaintiff, his subordinate, such that his actions were aided by his employment, affiliation, and authority with the Archdiocese Defendants.

404.    The Archdiocese Defendants are liable for the conduct of Defendant Apodaca under the theory of "aided-in-agency" regardless of the scope of Apodaca's employment.

## COUNT X
### (The Archdiocese Defendants – Breach of Fiduciary Duty)

405.    The preceding paragraphs are incorporated as if fully stated herein.

406.    The Archdiocese Defendants knew that Plaintiff was a minor who was vulnerable to injury and who would suffer injury and harm if he was not properly protected and supervised as their minor employee.

407.    The Archdiocese Defendants assumed duties as Plaintiff's fiduciary and caretaker when they chose to provide employment to Plaintiff, a minor, working under the supervision of Apodaca.

408.    In doing so, the Archdiocese Defendants took away the ability of Plaintiff's guardians to protect him from harm, thereby assuming responsibility for his protection.

409.    The Archdiocese Defendants breached their fiduciary duty to Plaintiff when they failed to adequately monitor and supervise Apodaca and to protect Plaintiff from injury and harm at his hands. The breach included the failure to take any action to protect Plaintiff and other minor children, despite having reasons to know that Apodaca was engaging in alarming conduct with children.

410.    As a direct and proximate result of this breach of fiduciary duty, Plaintiff suffered injury and damages described herein.

## COUNT XI
### (The Archdiocese Defendants – Common Law Fraud)

411.    The preceding paragraphs are incorporated as if fully stated herein.

412.    The Archdiocese Defendants defrauded Plaintiff and his guardians with representations that Santo Niño was an "extremely safe!" environment, and with assurances that all school activities were "supervised by wonderful" individuals. The representations were made despite knowledge of, or with deliberate disregard for, the real and imminent dangers that Apodaca and others posed to the safety of children. These Defendants defrauded Plaintiff and his guardians by making these representations with knowledge that safety policies would not be followed or appropriately implemented, or with deliberate disregard for the same.

413.    The Archdiocese Defendants intended for their misrepresentations about safety and supervision to deceive others, including Plaintiff and his guardians, into wrongly believing that they were committed to providing a safe environment and that they would not permit persons who were dangerous to children to have continued access to them. This intent is evidenced by the inclusion of the language cited herein and its prominence in representations to the public and

Plaintiff, coupled with statements espousing the alleged efforts of the Archdiocese Defendants to root out sexual predators and protect children from abuse, even while their Director of Aftercare Programs was abusing children at the school.

414.    Plaintiff and his guardian relied on said false and misleading representations concerning safety and were deliberately and maliciously led to believe that while Plaintiff was employed there, he would be safe in the care of Apodaca and the Archdiocese Defendants. As a result of those false and misleading representations, Plaintiff was induced to provide his time and services.

415.    Plaintiff suffered injury and damages as a result of the fraud committed by the Archdiocese Defendants when they made false representations about the safety of Santo Niño.

<u>**COUNT XII**</u>
**(The Archdiocese Defendants – Negligent Misrepresentation)**

416.    The preceding paragraphs are incorporated as if fully stated herein.

417.    The representations made by the Archdiocese Defendants were untrue and said Defendants failed to exercise ordinary care in communicating the representations.

418.    The Archdiocese Defendants intended to communicate the representations concerning school "safety" and the quality of their staff to Plaintiff and others, and they intended for the Plaintiff to rely on those representations in deciding to participate as a minor in activities at Santo Niño.

419.    It was reasonably foreseeable that Plaintiff would be harmed if the representations concerning school safety and staff quality were incorrect or misleading.

420.    Plaintiff relied on said representations in agreeing to be employed by those Defendants with Apodaca as his supervisor.

421.    Plaintiff suffered injury and damages as a direct and proximate result of Defendants' negligent misrepresentations.

<u>**COUNT XIII**</u>
**(The Archdiocese Defendants – NMSA 1978, § 30-42-1, *et. seq.* - Racketeering)**

422.    The preceding paragraphs are incorporated as if fully stated herein.

423.    The Archdiocese Defendants are all capable of holding a legal or beneficial interest in property.

424.    Santo Niño Regional Catholic School is an enterprise as defined by the Racketeering Act, specifically NMSA 1978, § 30-42-3(C).

425.    The Archdiocese Defendants, through their agents and representatives, took money belonging to others in the form of tuition payments from parents, by means of fraudulent conduct, practices or representations asserting the safety of Santo Niño and associated persons in violation of NMSA 1978, § 30-16-6 as stated herein. The tuition payments funded purportedly safe operations, including an after-school program under the leadership of Apodaca, but those operations were actually very dangerous because Apodaca was sexually abusing children there, a fact the Archdiocese Defendants, through their agents and representatives, knew or should have known.

426.    Each such act of fraudulent inducement of payment for tuition and fees was chargeable or indictable under the laws of New Mexico and punishable by imprisonment for more than one year.

427.    The conduct of the Archdiocese Defendants amounts to racketeering as defined by NMSA 1978, § 30-42-3(A).

428.    Numerous incidents of such racketeering were committed between 2007 and 2021, in the form of the fraudulent inducement of tuition payments from parents, including for after-

school activities supervised by Apodaca. Said incidents of racketeering occurred with each inducement of tuition payments for students at Santo Niño Regional Catholic School and in connection with use of after-school programing at Santo Niño.

429.    Multiple incidents occurred within five (5) years of each other. For instance, there was fraudulent inducement of payments on false assurances of safety to parents in 2007 and 2008 when Aaron Chavez abused at least one student at Santo Niño. Similar fraud in connection with tuition payments occurred following more direct reports of sexual misconduct by Aaron Chavez in 2012. The defendants continued to collect tuition payments based on false statements about safety in 2016, another year when Aaron Chavez was molesting children at the school. Finally, tuition was collected from parents of students in the Santo Niño after-school program in or around 2020 and 2021, while Apodaca was molesting children in connection with his role there as the program director.

430.    As stated above, the Archdiocese Defendants, its agents and others, including Chavez, engaged in a pattern of racketeering as defined by NMSA 1978, § 30-42-3(D).

431.    Said Defendants, their agents, and others received proceeds that were derived, directly or indirectly, from this pattern of racketeering activity in which the Defendants used or invested, directly or indirectly, any part of those proceeds in the establishment of an interest in or operation of an enterprise, which was Santo Niño Regional Catholic School and other Archdiocese of Santa Fe enterprises.

432.    Chavez and Apodaca and others were each employed by an enterprise, Santo Niño, and participated, directly or indirectly, in the conduct of Santo Niño's affairs by engaging in a pattern of racketeering activity, including the fraudulent inducement of payment for services.

433.    The Archdiocese Defendants and their agents and representatives, including Chavez, Archdiocese "Victim Coordinator" Klimka, and others, conspired with and amongst each other to violate the Racketeering Act, specifically NMSA 1978, § 30-42-5(A) through (C).

434.    Plaintiff sustained injury to his person as a result of the pattern of racketeering activity.

## COUNT XIV
### (The Archdiocese Defendants and Defendant Chavez – NMSA 1978, § 30-8-8)

435.    The preceding paragraphs are incorporated as if fully stated herein.

436.    The Archdiocese Defendants and Defendant Santo Niño, which is currently still operated by Chavez, have a continuing course of conduct of sheltering, condoning, ratifying, and otherwise sanctioning child sexual abuse committed by adults in positions of authority over children who are in their custody and care.

437.    Santo Niño Regional Catholic School, as it is operated and maintained by the Archdiocese Defendants and Defendant Chavez, operates, without lawful authority, in a manner injurious to the public health, safety, morals and welfare of the people of Santa Fe, and in particular to minor schoolchildren and their families, because of the continuing course of conduct of sheltering, condoning, ratifying and otherwise sanctioning child sexual abuse by adults in positions of authority over children in their custody and care.

438.    As stated above, the Archdiocese Defendants refused to report and stop the sexual abuse of Santo Niño schoolchildren by Aaron Chavez and Robert Apodaca, and so those Defendants and Chavez as their agent have knowingly created and maintained operations that are injurious to the public health, safety, morals and welfare of the people of Santa Fe, in particular schoolchildren.

439.    Santo Niño Regional Catholic School as operated by the Defendant Santo Niño, the Archdiocese Defendants and Chavez, is a public nuisance as defined by NMSA 1978, § 30-8-1.

440.    Plaintiff is entitled to bring this action to abate that public nuisance pursuant to NMSA 1978, § 30-8-8(B) and is entitled to costs and fees associated with this action pursuant to NMSA 1978, § 30-8-8(C).

### COUNT XV
**(Defendant Landau – Vicarious Liability)**

441.    The preceding paragraphs are incorporated as if fully stated herein.

442.    Landau employed Apodaca and his family to provide services, including watching over and caring for the residence she owns at 876 Camino de Jemez, Santa Fe, New Mexico, in a gated community near Fort Marcy.

443.    As part of the duties of that employment, Landau provided Apodaca and his family access and use of the home at 876 Camino de Jemez and Landau expected the home would be temporarily occupied and used as a home by Apodaca and his family as a service to Landau to provide the outward appearance of an occupied home believed to assist in warding off burglary attempts.

444.    Apodaca was an agent of Defendant Landau.

445.    Upon information and belief, Landau gave Apodaca explicit authorization to remain in that home for overnight stays as part of Apodaca's employment duties.

446.    Upon information and belief, Landau provided explicit authority for Apodaca to remain overnight at her Santa Fe home on one particular date in June 2020.

447.    On that occasion, Apodaca took Plaintiff to Landau's home at 876 Camino de Jemez.

448.    According to Apodaca, only one bedroom was available for them to use, so Apodaca told Plaintiff that they would have to share the room.

449.    Alcohol was readily available that day in Landau's home.

450.    Apodaca proceeded to provide Plaintiff, then a middle school student, with excessive amounts of Landau's alcohol until Plaintiff was intoxicated and unable to escape, thus falsely imprisoning Plaintiff through deceit by confining Plaintiff with no authority and without his consent.

451.    Having incapacitated Plaintiff with Landau's alcohol, Apodaca anally penetrated Plaintiff without his consent.

452.    Plaintiff was a student at Gonzales Community School at the time, and according to public reports, at least one other schoolboy from Gonzales was also sexually abused by Apodaca in Landau's home. Upon information and belief, Landau's home at 876 Camino de Jemez in Santa Fe, New Mexico, was the scene of numerous child sexual assaults that Apodaca committed in the course and scope of performing duties for Landau.

453.    When Apodaca abused Plaintiff at Landau's home, he was acting as Landau's agent or employee because he was to perform certain work and services and because she had the right to control the manner in which the details of those services were performed.

454.    Apodaca's actions, as described above were fairly and naturally incidental to the employment duties of Apodaca and his family and were done while Apodaca engaged in that work with the view of furthering her interests, including her interest in presenting the appearance of a fully occupied home, and did not arise entirely from the external, independent and personal motives of Apodaca.

455.    Apodaca's actions were not unexpected.

456.    Therefore, Landau is liable for the damages Apodaca caused to Plaintiff.

## COUNT XVI
### (Defendant Landau – Negligence/Premises Liability)

457.    The preceding paragraphs are incorporated as if fully stated herein.

458.    As the owner of the home at 876 Camino de Jemez in Santa Fe, New Mexico, Defendant Landau had control over that property, including control over who had access to the property and control over how those with access could use the property.

459.    Plaintiff was a visitor of Landau on the premises of 876 Camino de Jemez in Santa Fe, New Mexico.

460.    Landau owed a duty to use ordinary care to keep the premises safe for use by Plaintiff.

461.    Landau owed a duty to avoid creating or permitting an unsafe condition to exist on the premises.

462.    Landau failed to use ordinary care to keep the premises safe and thereby permitted a condition which was dangerous to young males, including Plaintiff.

463.    As the owner of the home and with control over its access and use, Defendant Landau had a duty to use due care and consider the consequences of allowing another person to access and use the home so as not to create an unreasonable risk of harm to others.

464.    Defendant Landau knew or should have known that Apodaca intended to or was likely to use access to the home to conduct himself in a manner so as to create an unreasonable risk of harm to others.

465.    Landau breached her duty of care in part because alcohol was made readily available to minors and because minors were being exposed to alcohol and non-familial adults, such as Apodaca.

466.    Landau breached her duty of ordinary care by permitting Apodaca to use the premises to commit acts of sexual abuse against Plaintiff and, upon information and belief, against at least one other child.

467.    Landau breached her duty of ordinary care by providing access to Apodaca and his family even though she knew or should have known that Apodaca intended to or was likely to use the home to create an unreasonable risk of harm to others.

468.    Landau knew or should have known that Apodaca and his family would create an unreasonable risk of injury to children, including Plaintiff.

469.    Landau failed to use ordinary care in hiring, retaining, and/or supervising Apodaca and his family.

470.    Landau failed to use ordinary care in providing access to her home to Apodaca.

471.    Through her acts and omissions and negligence in hiring, retaining, and supervising Apodaca and his family, Landau caused Plaintiff to be raped by Apodaca in the home located at 876 Camino de Jemez in Santa Fe.

472.    Apodaca did use Landau's home to create an unreasonable risk of harm to others, causing serious injuries and damages to Plaintiff as alleged herein, and at least one other boy.

473.    Landau's negligence was the proximate cause of Plaintiff's injuries.

## **DAMAGES**

474.    The preceding paragraphs are incorporated as if fully stated herein.

475.    As a proximate result of the conduct of Defendants:

    a.    Plaintiff endured physical pain and injury.

    b.    Plaintiff suffered and continues to suffer from emotional distress.

c. Plaintiff's relationships and ability to function in an academic and professional environment were severely diminished.

d. Plaintiff's developmental processes were severely disrupted and damaged.

e. Plaintiff's constitutional rights were violated.

f. Plaintiff's educational opportunities were significantly hindered.

g. Plaintiff's future potential was diminished as a wage-earner, potential partner, parent, and member of society generally.

476.    Plaintiff is entitled to recover an award of full compensatory damages in amounts to be determined by the jury at trial.

477.    The conduct of Defendants involved intentional misconduct, recklessness, gross negligence or callous indifference to Plaintiff's rights, or was motivated by malice, evil motive, or intent, and thus Plaintiff is entitled to recover awards for punitive and exemplary damages separately against individual defendants for §1983 claims in amounts to be determined at trial.

478.    The conduct of the Defendants was willful, intentional, wanton, or taken in utter disregard for the safety and well-being of others, including Plaintiff, and thus Plaintiff is entitled to recover award for punitive damages separately against Defendants to the extent they are not deemed state actors under Plaintiff's tort claims.

WHEREFORE, Plaintiff demands the following relief against Defendants:

A.    Award of compensatory damages against all Defendants, jointly and severally.

B.    Award of punitive damages against the Defendants jointly and severally.

C.    Award prejudgment and post-judgment interest on any amounts awarded to Plaintiff.

D.     The costs of bringing this action, including reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; NMSA 1978, § 42-4A-5; NMSA 1978, § 30-42-6(D); and NMSA 1978, § 30-8-8(C).

E.     Injunctive relief requiring Santa Fe Public Schools to adopt and inculcate policies and procedures to protect children, including but not limited to engaging a qualified and court-approved equity consultant to review and recommend revisions to the policies and procedures related to the reporting, investigation and addressing of harassment and other sexual violence against students, requiring SFPS impartial personnel investigate, address and respond appropriately to every harassment incident whether reported by a student, witness, parent or any other individual, observed by any employee or otherwise brought to the SFPS attention by other means, tracking of all reports in a SFPS-wide system available to all building supervisory personnel, and other relief the Court deems appropriate.

F.     Abatement of the public nuisance that is Santo Niño Regional Catholic School in Santa Fe.

G.     Relief pursuant to NMSA 1978, § 30-42-6, including, but not limited to, divestment of the Archdiocese Defendants and Defendant Chavez of any interest, direct or indirect, in Santo Niño Regional Catholic School, dissolution or reorganization of Santo Niño Regional Catholic School, and restrictions on the future activities of said Defendants.

H.     Treble damages against the Archdiocese Defendants pursuant to NMSA 1978, § 30-42-6(D)(4).

I.     Trial by jury on all issues so triable.

J.      Such other and further relief as the Court may deem appropriate under the
circumstances.

Respectfully submitted,

_____
PAUL LINNENBURGER
MAGGIE H. LANE
WENDELL LANE
Lane + Linnenburger + Lane LLP
P.O. Box 6622
Albuquerque, New Mexico 87197
Ph:  505.226.7979
paul@attorneyslane.com
maggie@attorneyslane.com
wendell@attorneyslane.com

and

IAN F. KING
The King Law Firm
1011 Lomas Blvd. NW
Albuquerque, New Mexico 87102
Ph:  505.242.4442
ifk@nmkinglaw.com