**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

JOHN DOE,

     Plaintiff,

v.                                      Civ. No. 23-1025 GBW/JFR

SANTA FE PUBLIC SCHOOLS, *et al.*,

     Defendants.

**ORDER GRANTING ARCHDIOCESE DEFENDANTS' MOTION TO DISMISS
COUNTS IX, X, XIII, AND XIV**

THIS MATTER is before the Court on the Archdiocese Defendants' Motion to

Dismiss Counts IX, X, XIII and XIV of Plaintiff's First Amended Complaint (*doc. 5*), and

the parties' accompanying briefing (*docs. 29, 36*).  Having reviewed the briefing and

being otherwise fully advised regarding relevant case law, the Court will GRANT the

Motion to Dismiss.

## I.    PROCEDURAL BACKGROUND

Plaintiff John Doe brings a variety of state and federal claims against Santa Fe

Public Schools ("SFPS"), Robert Apodaca, Candice Flint, Robin Chavez, and Anne

Landau, as well as the Roman Catholic Church of the Archdiocese of Santa Fe and a

number of Catholic parishes (collectively, the "Archdiocese Defendants").  *Doc. 1-2* at

42-72.  These claims are based on sexual abuse that Apodaca inflicted on Doe while Doe

1

was a student of SFPS and a part-time employee of the Archdiocese Defendants.  *See generally id.*

Plaintiff Doe filed the operative First Amended Complaint for Damages for Violation of Civil Rights, Title IX, Racketeering, and Other Tortious Conduct ("Complaint") in state court on October 19, 2023.  *Doc. 1-2.* at 1.  Defendant SFPS removed the case to federal court on November 20, 2023, *doc. 1*, and the Archdiocese Defendants ("Defendants") filed the instant Motion to Dismiss ("Motion") on November 21, 2023, *doc. 5*.  In the Motion, Defendants request that the Court dismiss the following claims against them: (1) Vicarious Liability – Aided-in-Agency (Count IX); (2) Breach of Fiduciary Duty (Count X); (3) Racketeering under N.M. Stat. Ann. § 30-42-1, *et seq.* (Count XIII); and (4) Public Nuisance under N.M. Stat. Ann. § 30-8-8 (Count XIV).  *See generally doc. 5*.  Plaintiff responded to the Motion on December 17, 2023.  *Doc. 29*.  Briefing on the Motion was complete on January 10, 2024, *doc. 37*, with the filing of Defendants' reply, *doc. 36*.

## II.   LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  This standard does not require "detailed factual allegations," but it does require more than "labels and

conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  When ruling on a 12(b)(6) motion, the court

must "assume the truth of all well-pleaded facts in the complaint, and draw all

reasonable inferences therefrom in the light most favorable to the plaintiffs."

*Leverington*, 643 F.3d at 723 (quoting *Dias v. City & Cnty. Of Denver*, 567 F.3d 1169, 1178

(10th Cir. 2009)).  However, the court need not accept the truth of any legal conclusions.

*Iqbal*, 556 U.S. at 678.

The plausibility standard "does not impose a probability requirement."

*Twombly*, 550 U.S. at 556.  Rather, "a well-pleaded complaint may proceed even if it

appears 'that a recovery is very remote and unlikely.'"  *Id.* at 556 (quoting *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236 (1974)).  The complaint must only be "enough to raise a right to

relief above the speculative level . . . on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)."  *Id.* at 555.  However, "[w]here a

complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops

short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  In other words, the well-pleaded facts

must "permit the court to infer more than the mere possibility of misconduct";

otherwise, the plaintiff has not shown entitlement to relief.  *Id.* at 679.

### III.   FACTUAL BACKGROUND

The following section provides an overview of the relevant facts of this case as alleged in Plaintiff's Complaint (*doc. 1-2*).  As noted above, for the purposes of a motion to dismiss, the Court "assume[s] the truth of all well-pleaded facts in the complaint, and draw[s] all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington*, 643 F.3d at 723.

The facts of this case center around sexual abuse that Plaintiff, a minor child at all relevant times, endured at the hands of Robert Apodaca, a staff member at Gonzales Community School in the Santa Fe Public School ("SFPS") system and later at Santo Niño, a Catholic school.  According to the Complaint, Apodaca worked as a nurse aide in various SFPS schools between 2012 and 2018 except for a brief period in 2016.  *Doc. 1-2* ¶ 34.  Apodaca also left SFPS sometime in 2018 in order to work as a nurse technician for Presbyterian Health Services ("PHS"), but his position there "ended abruptly[,] and PHS determined that he was not eligible for rehire." *Id.* ¶ 40-41.  After his position at PHS ended, Apodaca was re-hired by SFPS to work as a nurse aide at Gonzales Community School during the 2018-2019 and 2019-2020 school years.  *Id.* ¶ 50.

Plaintiff alleges that he first came into contact with Apodaca during the 2016-2017 school year when Apodaca was a nurse aide at Kearny Elementary School and Plaintiff's mother worked as an administrator at Kearny.  *Id.* ¶ 107.  Although Plaintiff was then a student at Gonzales Community School, Apodaca "gain[ed] greater access to

Plaintiff by claiming to mentor and tutor Plaintiff" and "provid[ing] adult male guidance to Plaintiff" while Plaintiff's parents were going through a divorce. *Id.* ¶ 108. When Apodaca later worked at Gonzales Community School during the 2018-2019 and 2019-2020 school years, Plaintiff was a seventh and eighth grade student at Gonzales. *Id.* ¶ 115. During these two years, Apodaca engaged in a variety of grooming and sexually abusive behaviors with Plaintiff, including allowing Plaintiff to stay in his nurse's office for long periods of the day, providing snacks and treats to Plaintiff, engaging in sexualized conversations with Plaintiff, transporting Plaintiff to and from school and school activities in his personal vehicle, physically wrestling with Plaintiff and other boys at the school, molesting Plaintiff in the nurse's office, rubbing and massaging Plaintiff's shoulders and private areas, and assaulting Plaintiff in his vehicle. *Id.* ¶¶ 115-121, 128-132.

At some point during the 2018-2019 school year while Apodaca worked at the nurse's office at Gonzales Community School, a school security officer approached the nurse's office and observed that the lights were off, the blinds were closed, and the door was locked. *Id.* ¶¶ 89-91. Sometime later, when the security officer passed by the nurse's office again, the door opened, and Apodaca and a young boy (not Plaintiff) emerged from the dark office. *Id.* ¶¶ 96-97. The security officer informed the school principal, Candace Flint, and the school vice principal, Robin Chavez, about what she had seen, but the officer was told not to file a formal report by Flint and Chavez. *Id.* ¶¶

94, 99-101.  Afterward, neither Flint nor Chavez followed up on the report or took any action on the basis of the report.  *Id.* ¶¶ 103-04.  At other times during Apodaca's employment at Gonzales Community School, the same security officer "repeatedly expressed concern to Flint and Chavez about Apodaca's relationship with schoolboys" based on the "locked door incident" and "the totality of what the security officer observed about Apodaca's behavior."  *Id.* at ¶¶ 140-41.

For the 2019-2020 school year, Robin Chavez moved from her position as vice principal at Gonzales Community School to a position as principal of Santo Niño, a Catholic school controlled by the Archdiocese Defendants.  *Id.* ¶ 170.  Sometime later, presumably for the 2020-2021 school year, Apodaca was hired at Santo Niño "to assist with nursing and to serve as Santo Niño's Extended Care Program Director" where he provided after-school childcare for students on school grounds.  *Id.* ¶ 177.  At Apodaca's request, Plaintiff, who was still a minor, was hired to assist Apodaca with the Extended Care Program at Santo Niño even though Plaintiff was never a student at that school.  *Id.* ¶ 180.  At some point during Plaintiff's employment at Santo Niño, Apodaca drove Plaintiff to Albuquerque for CPR certification which was required as part of Plaintiff's employment with Santo Niño.  *Id.* ¶ 187.  During this car trip, Apodaca rubbed Plaintiff's shoulders, caressed his thighs, and touched his private areas.  *Id.* ¶ 188.  At other times during Plaintiff's employment at Santo Niño, Apodaca

"regularly [took] Plaintiff to lunch" where he "would grope and molest Plaintiff in the car." *Id.* ¶ 189.

In 2021, while Apodaca was still employed at Santo Niño, a staff member encountered Apodaca touching a young boy (not Plaintiff) who was seated in his lap inside of a locked, dark classroom with other young children present. *Id.* ¶ 199. The staff member reported the incident to Principal Chavez who then reported it to Archdiocese Superintendent Susan Murphy and Archdiocese Victim Coordinator Annette Klimka. *Id.* ¶ 200. Chavez, Murphy, and Klimka "conspired" not to report the incident to law enforcement or the Children, Youth & Families Department. *Id.* ¶ 201. From the facts alleged, it is unclear what happened with Apodaca after this incident, including whether he remained employed at Santo Niño, but the Complaint does allege that in July 2021, Apodaca was arrested and charged with sexually abusing a child. *Id.* ¶ 237.

In addition to Apodaca's sexual misconduct against Plaintiff which took place during school hours at Gonzales Community School or while Plaintiff was working under Apodaca's supervision in the afterschool program at Santo Niño, Plaintiff alleges that Apodaca assaulted him at other times and locations. Specifically, Plaintiff alleges that in the summer of 2019, Apodaca assaulted Plaintiff multiple times while they both

worked at the Gorham Scout Ranch in Santa Fe, New Mexico.[1]  *Id.* ¶ 214.  Then, in the

summer of 2020, Apodaca sexually abused Plaintiff at a private home in Santa Fe

owned by Defendant Anne Landau, while Landau was not present at the property.  *Id.*

¶¶ 221, 227.

Lastly, Plaintiffs allege that Santo Niño and other schools and entities in the

Archdiocese had a history of employing sexual predators even before Apodaca's

employment.  For example, in 2018, Aaron Chavez, a former teacher at Santo Niño, was

convicted at trial for committing sexual abuse against students while he was a teacher.

*Id.* ¶ 193.  In addition, at the time of Apodaca's employment at Santo Niño, the

Archdiocese was "engaged in bankruptcy proceedings" in which "approximately 400

individuals submitted claims related to sexual abuse committed by agents of the

Archdiocese."  *Id.* ¶ 191.  Despite this history, Plaintiff alleges that the Archdiocese

Defendants falsely touted the safety of Santo Niño by "assur[ing] the public on their

website" that the school is "extremely safe!" and "well informed and actively

dissuading . . . negative behaviors," and that the school activities "are supervised by

wonderful and committed teachers and parents."  *Id.* ¶ 181.

---

[1] It appears from the Complaint that the Gorham Scout Ranch is affiliated with the Boy Scouts and not with any of the Defendants in this case.  *Doc. 1-2* ¶ 155.  Although it may be possible that Apodaca's employment at the Gorham Scout Ranch was connected to his employment at SFPS, *see id.* ¶ 211, the Court assumes that any incidents that took place at the Gorham Scout Ranch do not implicate the Archdiocese Defendants given that Plaintiff does not raise these incidents in his response to the instant Motion to Dismiss, *see generally doc. 29*.

## IV.   ANALYSIS

## A. Vicarious Liability

The Archdiocese Defendants first move to dismiss Plaintiff's "Vicarious Liability

– Aided in Agency" claim (Count IX) in which Plaintiff argues that "Apodaca acted as

an agent of the Archdiocese, so [the Archdiocese Defendants] are vicariously liable for

[Apodaca's] actions, including his abuse of Plaintiff." *Doc. 1-2* ¶ 397.  In his response to

the Motion, Plaintiff purports to bring three theories of vicarious liability including

"course and scope of employment," "ratification," and "aided-in-agency." *Doc. 29* at 6-

7.  The Court will address each theory in turn.

### i. Course and Scope Theory of Vicarious Liability

Under New Mexico law, an employer may be liable for the intentional torts of an

employee if the torts were committed "in the course and scope of employment."

*McCauley v. Ray*, 453 P.2d 192, 201 (1968).[2]  In *Miera v. George*, the New Mexico Supreme

Court found that an act is within the course of employment if:

> (1) it be something fairly and naturally incident to the business, and if (2) it be
> done while the servant was engaged upon the master's business and be done,
> although mistakenly or illadvisedly, with a view to further the master's interests,
> or from some impulse of emotion which naturally grew out of or was incident to
> the attempt to perform the master's business, and did not arise wholly from

---

[2] As Defendants note, Plaintiff did not explicitly raise the course and scope of employment theory in his
Complaint.  *See doc. 1-2* ¶¶ 394-404; *see also doc. 36* at 3.  However, Plaintiff's claim is labeled "vicarious
liability" and the course and scope of employment theory is the traditional way that an employer can be
found vicariously liable for the tortious acts of its employees.  As a result, the Court will address
Plaintiff's arguments under this theory in full.

some external, independent, and personal motive on the part of the servant to do
the act upon his own account.

237 P.2d 102, 105 (N.M. 1951).  An intentional tort may also be within the course or
scope of employment if "the act was not unexpectable in view of the duties of the
servant" even if the act was "unauthorized" by the employer.  *Gonzales v. Sw. Sec. &*
*Prot. Agency, Inc.*, 665 P.2d 810, 811 (N.M. Ct. App. 1983) (citing Restatement (Second) of
Agency § 245 (Am. Law Inst. 1958)).

The Court does not find that Apodaca's sexual misconduct against Plaintiff while
Plaintiff and Apodaca were working at Santo Niño were acts done within the scope of
Apodaca's employment as the Santo Niño afterschool program director.  Plaintiff's
allegations against Apodaca include that Apodaca inappropriately touched Plaintiff
during a work-related car trip and that Apodaca "grope[d] and molest[ed]" Plaintiff in
the car when Apodaca took Plaintiff to lunch.  *Doc. 1-2 ¶¶ 187-189; see also doc. 29* at 4.
Apodaca's criminal behavior of engaging in sexual misconduct with a minor employee
simply cannot be construed as "fairly or naturally incident" to his position as a
supervisor to children in an afterschool program.  Indeed, courts in New Mexico and
elsewhere have previously concluded that sexual misconduct with minors is not
conduct within the scope of employment.  *See, e.g., Tercero v. Roman Cath. Diocese of*
*Norwich, Conn.*, 48 P.3d 50, 58 (N.M. 2002) (sexual abuse by a priest of a minor "was
never within the scope of [the priest's] employment"); *John R. v. Oakland Unified Sch.*

*Dist.*, 769 P.2d 948, 956-57 (Cal. 1989) (a teacher's sexual molestation of a student is not within the teacher's scope of employment); *Boykin v. Dist. of Columbia*, 484 A.2d 560, 564 (D.C. 1984) (sexual assault of a special education student by a school staff member was outside the scope of employment because the conduct was not an "outgrowth of any action undertaken in the employer's behalf"); *Randi F. v. High Ridge YMCA*, 524 N.E.2d 966, 969 (Ill. App. Ct. 1988) ("[A]s a matter of law, [a teacher's aide at a daycare] was not acting within the scope of her employment but solely for her own benefit when she assaulted and sexually molested" a child at the daycare.").

It is also unreasonable to conclude that Apodaca was acting, even mistakenly, with the intent to further the interests of the Archdiocese Defendants or that his actions were derived from an impulse of emotion that was incident to his job duties.  Apodaca's abuse against Plaintiff allegedly lasted for years and included instances that took place well outside the purview of Apodaca's employment with the Archdiocese Defendants or even SFPS, including when Apodaca assaulted Plaintiff at a private home during the summer.  *Doc. 1-2* ¶¶ 221, 227.  These are not actions of someone who believes that his conduct is within his job duties or that he is furthering the purpose of an afterschool program.  Rather, it is the conduct of someone who is acting "wholly from some external, independent, and personal motive" to carry out his criminal sexual desires. *Miera*, 237 P.2d at 105.

Plaintiff's arguments that Apodaca's actions were within the scope of his employment are unavailing.  First, Plaintiff argues that if courts have found that sexual harassment or misconduct is "generally" outside the scope of employment, "there must be occasions when it *is* within the scope of employment." *Doc. 29* at 8 (emphasis in original) (quoting *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 71 (N.M. 2004) ("Intentional torts arising from sexual harassment are generally considered to be outside the scope of employment.")).  Although Plaintiff does not point the Court to any examples of cases where a court found that sexual harassment or sexual assault was within the scope of employment, the Court notes that these cases do exist.  *See Farragher v. City of Boca Raton*, 524 U.S. 775, 795-796 (collecting cases where courts held that a sexual assault was within the scope of employment); *Sims v. Montgomery Cnty. Comm'n*, 766 F. Supp. 1052, 1075 (M.D. Ala. 1990) (finding sexual harassment within the scope of employment).  However, none of these cases are binding authority on this Court.  Instead, the Court relies primarily on *Tercero* in which the New Mexico Supreme Court found that a priest's sexual abuse of a minor student was not within the scope of his employment.  48 P.3d at 58 ("[S]exual misconduct of a priest cannot be a part of a priest's duties, nor customary within the business of the church.") (citation omitted).  Applying the *Tercero* holding to the facts of this case, the Court similarly finds that sexual misconduct is never a part of the duties of an afterschool program director, and it not part of the business of running a school.  Plaintiff contends that *Tercero* does not apply to the facts

12

of this case because *Tercero* involved "clergy abuse" while the instant case involves "employment abuse." *Doc. 29* at 8 n.3.  However, the Court does not see a meaningful distinction between the employment duties of a priest and the employment duties of an afterschool program director such that the latter could include acts of sexual misconduct.  Sexual misconduct no more furthers the goal of a school conducting an afterschool program than it furthers the goals of a church.  *See Miera*, 237 P.2d at 105.

Second, Plaintiff argues that Apodaca's actions were in the scope of his employment because his behavior, including his use of force against Plaintiff, was not "unexpectable." *Doc. 29* at 10 (quoting *Gonzales*, 665 P.2d at 811).  Plaintiff first contends that Apodaca's actions were not unexpectable because he "was in a position of custodial care of minor boys." *Id.*  In *Gonzales*, the court found that security guards' use of tortious force against the plaintiff was "not unexpectable" because they had been given "authority to keep the peace" as well as "instrumentalities provided by [the employer]," such as handcuffs and a nightstick, which "facilitated" the tortious force.  665 P.2d at 812.  By contrast, Apodaca's authority obviously did not extend to sexual contact with minors and he was given no "instrumentalities" as part of his job that helped him accomplish the sexual misconduct.[3]  Although some use of force by a school staff

---

[3] Plaintiff may argue that Apodaca used his employer's permission to transport Plaintiff in Apodaca's personal vehicle as an instrumentality that facilitated the sexual misconduct.  However, unlike the sole purpose of handcuffs and nightsticks which is to threaten or inflict force on another individual, the principal and most common purpose of transporting a student in a vehicle is not to inflict force against the student.  Giving an employee additional or heightened access to an individual against whom the

member, such as performing emergency medical maneuvers on a student or breaking up a student fight, may be considered "not unexpectable," criminal sexual activities that serve no purpose other than to satisfy the staff member's sexual desires are "unexpectable" in any job, particularly a job that involves the care of minors.  Plaintiff also contends that Apodaca's actions were "not unexpectable" because Apodaca's supervisors had "ample knowledge of Apodaca's history of inappropriate contact with minor boys." *Doc. 29* at 10.  The relevant standard for this theory of liability, however, is not whether the employer could or should have expected that the employee would engage in inappropriate or criminal behavior but rather whether the employer could reasonably expect that an average employee might engage in the behavior as a part of their job.  Most employers, particularly school employers, do not reasonably expect that their employees might engage in criminal sexual activities while performing their job, and the Court finds no exception to that general rule in the instant case.

Based on the foregoing reasoning, Plaintiff's theory of vicarious liability that Apodaca's acts were in the course and scope of his employment fails.

### ii.  *Ratification Theory of Vicarious Liability*

As Defendants note, Plaintiff's Complaint makes no mention of ratification as one theory for Plaintiff's vicarious liability claim and instead raises it for the first time in

---

employee uses tortious force is not the same as giving an employee a specific tool designed to inflict that force.

his response to the instant motion.  *Doc. 29* at 10-11.  In addition to this problem, the Court disagrees that ratification is a viable theory of vicarious liability.  In New Mexico, "[r]atification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent."  *Bd. of Cnty. Comm'rs of Cnty. of Bernalillo v. Chavez*, 178 P.3d 828, 832 (N.M. Ct. App. 2007).  Under a ratification theory, a principal is liable based on the action *of the principal*.  Vicarious liability, by contrast, is "indirect legal responsibility."  *Kinetics, Inc. v. El Paso Prods. Co.*, 653 P.2d 522, 527 (N.M. Ct. App. 1982).  That is, a principal is vicariously liable merely because of the nature of its relationship with the agent rather than any action that the principal did or did not take.  Ratification is thus a form of direct, rather than vicarious, liability.  *See, e.g.*, 57B Am. Jur. 2d Negligence §1043 ("[T]he employer is *directly* liable for its own conduct if it . . . ratifies the employee's conduct after it learns of the action.") (emphasis added).

Even if the contested claim brought allegations of direct liability via ratification, the Court is not persuaded that Plaintiff has made a case for ratification.  Plaintiff argues that the Archdiocese Defendants ratified Apodaca's acts of sexual misconduct because they knew (through Principal Chavez) about his previous misconduct at SFPS and Presbyterian Health Services ("PHS") and because Chavez, Klimka, and Murphy declined to report the incident at Santo Niño when Apodaca was found in a locked room with a child on his lap.  *Doc. 29* at 11.  However, as noted above, ratification occurs when a principal adopts or confirms an unauthorized action that was taken by

an agent *on behalf of* the principal. *Chavez*, 178 P.3d at 832. Plaintiff does not allege that Apodaca committed criminal sexual misconduct on behalf of Defendants or to further any goals of Defendants. Rather than a claim of vicarious liability, Plaintiff's ratification argument is functionally a negligent hiring/retention claim – that is, the Archdiocese Defendants (either through Principal Chavez or another employee) knew or should have known about Apodaca's past misconduct at Santa Fe Public Schools and PHS, but they hired and retained him anyway. Without expressing any opinion at this time as to the merits of such a claim, the Court notes that Plaintiff has brought a separate negligent hiring claim against the Archdiocese Defendants, *see doc. 1-2* ¶¶ 370-93 (Count VIII), and Plaintiff may still pursue this line of argument under that claim.

### iii. *Aided-in-Agency Theory of Vicarious Liability*

Finally, Plaintiff alleges that the Archdiocese Defendants are vicariously liable under an "aided-in-agency" theory because Apodaca "wielded authority and power vested in him by the Archdiocese Defendants as a leader of after-school programs for minor children and as a supervisor over minor employees like Plaintiff, and he used that authority and power to abuse Plaintiff." *Id.* ¶ 403. Defendants argue that Apodaca did not have "the kind of 'substantial authority' over Plaintiff" that is required for liability under the aided-in-agency theory. *Doc. 5* at 5.

The aided-in-agency theory of vicarious liability first appeared in the Second Restatement of Agency which stated, in relevant part:

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment unless:

 . . .

(d) the servant . . . was aided in accomplishing the tort by the existence of the agency relation.

Restatement (Second) Agency § 219 (Am. Law Inst. 1958).  Although this theory of liability was removed from the Third Restatement, *see* Restatement (Third) of Agency § 7.08 (Am. Law Inst. 2006), and many state courts have declined to adopt it, *see, e.g.*, *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 231 (Mich. 2006), the New Mexico Supreme Court adopted the theory in *Ocana v. American Furniture Company*, 91 P.3d at 71.  In *Ocana*, the plaintiff, Ocana, sued her ex-employer after her supervisor at the ex-employer sexually harassed her.  *Id.* at 64.  The court found that an employer can be vicariously liable for a supervisor's torts if the supervisory authority "aided [the supervisor] in the commission of his torts," empowered the supervisor to "make decisions affecting subordinate employees," and gave the supervisor "the ability to injure the subordinate employee."  *Id.* at 71.  However, the court dismissed Ocana's claim of aided-in-agency liability after it found that she "failed to present any evidence showing that [her supervisor's] conduct occurred as a result of an abuse of his supervisory status" or that the supervisor "was able to commit his alleged acts by virtue of his supervisor status."  *Id.* at 72.

Then, in *Spurlock v. Townes*, the New Mexico Supreme Court held that a prison employer was vicariously liable under the aided-in-agency theory for sexual assaults

committed by one of the prison guards against several inmates.  368 P.3d 1213, 1219

(N.M. 2016).  The court cautioned that "the [aided-in-agency] theory should not apply

to all situations in which the commission of a tort is facilitated by the tortfeasor's

employment" because "most workplace tortfeasors are aided in accomplishing their

tortious objective by the existence of the agency relation." *Id.* at 1217 (quoting *Burlington*

*Indust., Inc. v. Ellerth*, 524 U.S. 742, 760 (1998)).  Indeed, "[m]ore than the mere existence

of the employment relation must aid in commission of the harassment."  *Id.*  (quoting

*Ellerth*, 524 U.S. at 760).  However, the court held that a prison guard "has by reason of

his employment substantial power or authority to control important elements of a

vulnerable tort victim's life or livelihood."  *Id.* (quoting *Ayuluk v. Red Oaks Assisted*

*Living, Inc.*, 201 P.3d 1183, 1199 (Alaska 2009)).  For example, a prison guard has

> authority to enter [the prisoners'] residential block unescorted and unannounced,
> to remove [prisoners] from their cells or from their work stations, to move
> [prisoners] around the facility including to out-of-the-way areas, to exercise his
> authority at any hour of the day or night, and to bestow favors or impose
> sanctions for inmate behavior.

*Id.* at 1218.  Using this authority, the prison guard "coerce[d] Plaintiffs, who were

inmates entrusted to his care, into submitting to sexual assault and false

imprisonment."  *Id.*

    In the instant case, the Court finds that Apodaca did not have "substantial

authority" by reason of his employment such that Apodaca was aided in committing

torts against Plaintiff.  Plaintiff alleges that Apodaca's position as the director of the

Santo Niño afterschool program gave him "extraordinary authority" to "ensure Defendants hired Plaintiff to serve under Apodaca's command," "make decisions and control subordinate employees," and transport Plaintiff for work purposes. *Doc. 29* at 12. However, although Plaintiff refers to Apodaca as his "supervisor," *doc. 1-2* at ¶ 6, it is not clear how much authority Apodaca actually exercised over Plaintiff. Plaintiff argues that Apodaca "ensure[d]" that Defendants hired Plaintiff, but this description strongly implies that Apodaca did not have the authority to hire Plaintiff himself. There are also no allegations that Apodaca had the power to reprimand or fire Plaintiff. Plaintiff states that Apodaca could "make decisions and control subordinate employees," but Plaintiff provides no such examples of when Apodaca made decisions related to Plaintiff. Plaintiff's only example of Apodaca's use of control is when Apodaca drove Plaintiff in a car to lunch and to Albuquerque for CPR training, but any control Apodaca had over Plaintiff in the car was not "by reason of his employment." *Spurlock*, 368 P.3d at 1217. Driving Plaintiff places, including to the mandatory CPR training, was no more part of Apodaca's employment than giving a coworker a ride to a work event is part of an office job.

Even if Apodaca was given supervisory authorities by Defendants (like the power to reprimand or fire) or if Plaintiff perceived Apodaca to have supervisory authorities, Apodaca's level of authority and control did not exceed that of an average supervisor-employee relationship, and it certainly did not rise to the level described in

*Spurlock*.  All employees feel compelled to comply with the demands of their

supervisors because, by definition, a supervisor has the power to enforce those

demands.  Plaintiff has not alleged that the director position of the afterschool program

was granted any additional or special authority over the assistant position beyond that

of an ordinary supervisor role.  As the court acknowledged in *Spurlock*, the use of the

aided-in-agency theory of liability "risks an unjustified expansion of employer tort

liability for acts of employees" such that the widely accepted rule that employers are

not liable for torts committed by employees outside the scope of their employment

could be entirely swallowed by the aided-in-agency exception.  368 P.3d at 1217

(citation omitted).  If the supervisor-employee relationship between Apodaca and

Plaintiff fits within the aided-in-agency exception, then the Court struggles to think of a

set of facts in which an employer would not be liable for the torts of a supervisor merely

because the supervisor exercised some degree of authority over the employee.

To the contrary, the aided-in-agency exception applies only in unusual

circumstances, such as those in *Spurlock*, when a supervisor or other employee is

granted enormous power to control the movements and decisions of subordinates, even

against their will.  *Id.* at 1218.  Plaintiff has not alleged that Apodaca's position as

director allowed him to control Plaintiff's movements or require him to complete

actions against his will.  Instead, the instant facts are much closer to those of *Ocana* in

which the supervisor was able to commit sexual harassment against an employee not

because of any specific authority but simply because the supervisor had ready access to the employee.  91 P.3d at 72.  Similarly, Apodaca's ability to commit sexual misconduct against Plaintiff was due to the "mere existence of the employment relation" as well as Apodaca's access to Plaintiff in the job setting and not to any authority or power granted to him by Defendants.  *Spurlock*, 368 P.3d at 1217.

The Court is sympathetic to the argument that Plaintiff was particularly vulnerable and susceptible to Apodaca's control during his employment because he had been subject to Apodaca's abuse for many years.  Indeed, it is quite possible that Apodaca's sexual grooming and abuse of Plaintiff made Plaintiff feel as if he had no power to refuse Apodaca which could give Apodaca substantial control over Plaintiff. However, the standard for aided-in-agency liability is not whether the supervisor had, for whatever reason, significant control or influence over the subordinate employee. The standard is whether the employer "bestowed" the supervisor with certain power or authority that gave him control over the subordinate employee and "aided him in the commission of his tort."  *Ocana*, 91 P.3d at 71.  For example, in *Spurlock*, the means for the prison guard to control prisoners, such as the guard's ability to force prisoners' movements, was expressly authorized by his employer.  368 P.3d at 1218.  By contrast, any means of control that Apodaca had over Plaintiff through sexual grooming and abuse was certainly not expressly authorized by Defendants.

Finally, the Court is not persuaded that Apodaca was aided in agency merely because Plaintiff was a minor with "general inexperience."  *Doc. 29* at 12.  Similar cases out of Vermont and California provide guidance for this issue.  Like New Mexico, both Vermont and California have adopted the aided-in-agency theory in some circumstances such as the law enforcement context.  *See Doe v. Forrest*, 853 A.2d 48, 69 (Vt. 2004) (aided-in-agency theory of liability applied to a situation in which a police officer sexually assaulted a woman while he was on duty); *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1347 (Cal. 1991) (when "a police officer on duty misuses his official authority by raping a woman whom he has detained, the public entity that employs him can be held vicariously liable").  Importantly, however, the courts of those states have declined to extend the aided-in-agency theory to cases with factual circumstances similar to those of the instant case.  In *Doe v. Newbury Bible Church*, the Vermont Supreme Court held that the aided-in-agency theory did not apply to a pastor of a church who fondled a minor student at the church's school, including once in the pastor's car when the pastor drove the student home from soccer practice.  933 A.2d 196, 197 (Vt. 2007).  The court held that "although a pastor's position within the church gives him some authority or power over parishioners, especially children who attend a church school, that power is simply not the same as police power."  *Id.* at 199.  Similarly, in *John R.*, the California Supreme Court declined to find the school district liable under

an aided-in-agency-like theory[4] for a teacher who engaged in sexual acts with a minor

student.  769 P.2d at 956-57.  Even though "in the eyes of a child, a teacher's authority

can be very great," the court held that a "teacher's authority . . . is simply not great

enough to persuade us that vicarious liability should attach."  *Id.* at 955-56.  In addition,

the court found that the authority of a police officer with a "uniform, badge and

firearm" and ability to impose "criminal sanctions" "plainly surpasses that of a teacher

over a student."  *Id.* at 956.

Given the parallels between New Mexico law and Vermont and California law as

well as the New Mexico Supreme Court's previous favorable reliance on the *Forrest*

decision in *Spurlock*, *see* 368 P.3d at 1218, this Court determines that New Mexico courts

would find the reasoning of *Newbury Bible* and *Forrest* persuasive.  As both *Newbury

Bible* and *Forrest* acknowledged, children, by virtue of their age, may feel heightened

pressure to comply with the authority of adults in positions of power.  However,

individuals in law enforcement, such the prison guard in *Spurlock*, carry an

extraordinary level of authority which exceeds that of a typical authority figure in a

child's life.  Apodaca's authority over Plaintiff was no greater than that of a teacher or a

pastor, and it definitively did not surpass or even equal that of a law enforcement

---

[4] The *John R.* court technically decided liability under the course and scope of employment theory, *see* 769
P.2d at 953, but the court's discussion of whether the "tort is a consequence of the employer's conferring
of official authority on the employee" mirrors the aided-in-agency reasoning as described in *Ocana* and
*Spurlock*.

officer.  Thus, Plaintiff's minor status did not convert Apodaca's normal level of supervisory authority into the "substantial power or authority" necessary for a finding of liability under the aided-in-agency theory.  *Id.* at 1217.

Based on the foregoing reasons, the Court finds that Plaintiff has failed to show, as a matter of law, that the Archdiocese Defendants are vicariously liable for Apodaca's actions under the course and scope of employment, ratification, or aided-in-agency theories.  As a result, the Court will dismiss Plaintiff's Count IX with prejudice.

## B.  Breach of Fiduciary Duty

Defendants next move to dismiss Plaintiff's claim that Defendants breached their fiduciary duty to Plaintiff when they permitted Apodaca to sexually abuse Plaintiff during Plaintiff's and Apodaca's employment at the Santo Niño afterschool program. Defendants argue that courts across the country have ruled that an employer-employee relationship, without more, does not create a fiduciary duty.  *Doc. 5* at 7.  Plaintiff responds that Defendants fail to point to any New Mexico state law which holds that there is no fiduciary duty between employers and their employees.  *Doc. 29* at 13.  In addition, Plaintiff argues that New Mexico has a variety of state law protections for minor employees which would suggest that employers have a fiduciary duty to their minor employees in New Mexico.  *Id.* at 14.

Under New Mexico law, "[a] fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is

bound to act in good faith and with due regard to the interests of one reposing the confidence." *Allsup's Convenience Stores, Inc. v. North River Ins. Co.*, 976 P.2d 1, 15 (N.M. 1998) (citation omitted).  A fiduciary is "a person having duty, created by his undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Moody v. Stribling*, 985 P.2d 1210, 1216 (N.M. Ct. App. 1999) (citing Black's Law Dictionary 625 (6th ed. 1990)); *see also Azar v. Prudential Ins. Co. of Am.*, 68 P.3d 909, 926 (N.M. Ct. App. 2003) ("An essential feature and consequence of a fiduciary relationship is that the fiduciary becomes bound to act in the interests of its beneficiary and not itself.") (citation omitted).

The Court does not find that the average employer-employee relationship, such as the one Defendants had with Plaintiff, creates a "special confidence" in which the employer is "bound" to act in the best interests of the employee.  *See Allsup's*, 976 P.2d at 15.  Plaintiff alleges that while he was still a minor, he was hired by Santo Niño to assist Apodaca with Santo Niño's after-school program called the Extended Care Program.  *Doc. 1-2* ¶¶ 177, 180.  There are no allegations that Plaintiff's employment was anything other than an ordinary, after-school job and no allegations that Defendants, through Santo Niño, made any promises or agreements to Plaintiff that would create a fiduciary obligation.

Although New Mexico courts have not explicitly decided that no fiduciary duty exists in the ordinary employer-employee context, New Mexico decisions regarding the

25

existence of fiduciary duties in other contexts support this conclusion.  For example, New Mexico courts have found that business partners have a fiduciary duty to one another because the "status of partnership" creates an obligation for each partner to act in the best interest of the partnership.  *Covalt v. High*, 675 P.2d 999, 702 (N.M. Ct. App. 1983) (cited favorably by *GCM, Inc. v. Ky. Cent. Life Ins. Co.*, 947 P.2d 143, 149 (N.M. 1997)).  In the insurance context, insurers have fiduciary duties to their clients when the insurance policy gives the insurer the power to make financial and legal decisions on behalf of the client, such as settling or litigating claims.  *Azar*, 68 P.3d at 926.  Notably, New Mexico courts have determined that a buyer-seller relationship does not create fiduciary duties because neither a buyer nor a seller has any obligation to act in the best interest of the other party.  *Id*.  Like a buyer-seller relationship, an employer-employee relationship is transactional – an employer seeks labor, and an employee seeks wages. The inherent nature of an employer-employee relationship does not, by itself, create a situation in which the employer is making legal or financial decisions on behalf of the employee, and it does not create any obligation for the employer to place its employee's interests above its own.  *See id*.

Critically, Plaintiff points to no case law, either in New Mexico or elsewhere, in which a court found a fiduciary duty in an ordinary employer-employee relationship. In fact, as Defendants point out, numerous courts across the country have expressly declined to find such a duty.  *See doc. 5* at 7-8; *see, e.g., Combs v. PriceWaterhouse Coopers,*

*LLP*, 382 F.3d 1196, 1200 n.2 (10th Cir. 2004)(holding that "employers do not generally owe fiduciary duties to employees under Colorado law").  Plaintiff contends that Defendants are incorrect when they rely on out-of-jurisdiction cases to argue that a fiduciary duty cannot exist in the employer-employee context because, under New Mexico law, a fiduciary relationship "can exist in almost any context." *Doc. 29* at 14 n.6 (citing *Moody*, 985 P.2d at 1216).  However, the holding in *Moody* simply means that New Mexico law does not categorically exclude particular types of relationship from potentially creating a fiduciary duty.  A party must still show that the relationship creates a "special confidence" in which one actor is "bound to act in good faith with due regard to the interests of one reposing the confidence." *Allsup's*, 976 P.2d at 15.  As explained, Plaintiff has failed to make that showing in this context.

The Court also disagrees with Plaintiff that his status as a minor creates special circumstances that give rise to a fiduciary duty.  Notably, Plaintiff points to no authority in New Mexico or elsewhere which finds that the mere act of hiring a minor child as an employee creates a fiduciary duty between the employer and the minor employee.  Instead, Plaintiff argues that "there are numerous provisions of New Mexico law that provide enhanced protections for child workers" such as requiring work permits for child employees, prohibiting child employment in certain positions, and criminalizing violations of child labor laws. *Doc. 29* at 14.  However, the existence of additional statutory labor protections does not create a common law fiduciary duty.  There is a

vast difference between requiring an employer to follow wage, hour, and permit regulations and requiring an employer to take on fiduciary responsibility for the minor such as making legal and financial decisions in the best interest of the minor. Contrary to Plaintiff's argument, enhanced labor protections do not imply that the employer/minor employee relationship is one of "trust and confidence," but rather the opposite – minor employees are at a heightened risk of exploitation by employers and thus require additional safeguards from the state. In addition, New Mexico law explicitly provides for a fiduciary duty between parties in other contexts. *See, e.g.*, N.M. Stat. Ann. § 59A-12-22(A) (1978) (requiring that funds received by a person who is required to be licensed under the Insurance Code be held in a fiduciary capacity). If New Mexico legislators had intended for child labor protections to create a fiduciary duty between employers and minor employees, they would have included such a provision in the child labor statutes.

Based on its own review of the case law, the Court does not find that Plaintiff's status as a minor creates special circumstances that would give rise to a fiduciary duty between a school district employer and a minor employee. In addition to case law supporting the finding that an employer-employee relationship does not automatically create a fiduciary duty, there is case law holding that there is no fiduciary duty between teachers or school districts and students. *See Doe v. City of Belen Sch. Dist.*, 2000 WL 36739615, *7 (D.N.M. Aug. 10, 2010) (declining to find that a teacher has a fiduciary

28

duty to a student under New Mexico state law and collecting cases from other jurisdictions which make the same holding); *C.A. v. William S. Hart Union High Sch. Dist.*, 117 Cal. Rptr. 3d 283, 292 (Cal. Ct. App. 2010) (*rev'd on other grounds in C.A. v. William S. Hart Union High Sch. Dist.*, 270 P.3d 699 (Cal. 2012)) ("[Plaintiff] does not cite, and we have not found, any authority stating that a fiduciary relationship exists between a school district and an individual student.").  The relationship between a school district or a teacher and a student is arguably one of greater trust and confidence than that of a school district employer and minor employee.  Unlike a minor employee who is not required to work at a particular job, students are required to attend school by law, and they have limited choice in where they may go and who they may interact with during the day.  Parents and guardians entrust their children to school, teachers, and staff for a portion of every school day.  If the law does not recognize a fiduciary duty in the relationship between schools or teachers and students, it also does not recognize a fiduciary duty in the more distant and anonymous employer-minor employee relationship, even when the employer is a school district.

In the occasions when courts have found a fiduciary duty between a school and a student, the school exerted a high level of control over the student that was not present between the Archdiocese Defendants and Plaintiff.  For example, in *Jumbo v. Alabama State University*, the court found that the university-defendant's ability to hold several international students' sponsorship money and direct the use of the funds gave the

university "overmastering influence" over the students which could create a fiduciary

duty.  229 F.Supp.3d 1266, 1273 (M.D. Ala. 2017); *see also*, *Murray-Shanks v. Rabun Gap-*

*Nacoochee Sch., Inc.*, 2014 WL 12516253, at *4 (N.D. Ga. Feb. 4, 2014) (finding that the

school's status as a boarding school was a "significant" factor in determining whether

the school had a fiduciary duty to the student-plaintiff because the student "essentially

lived on [the school] property" and the school "held itself out and functioned as a larger

facet of its students' lives than a mere educational institution").  In contrast to these

examples, the Archdiocese Defendants' only relationship with Plaintiff was as his

employer, and the mere act of hiring Plaintiff as a minor employee did not allow the

Archdiocese Defendants to exert excessive control over Plaintiff.

Because the Court does not find that Defendants, as a school district employer,

had any fiduciary duty to Plaintiff as a student employee as a matter of law, the Court

will dismiss Plaintiff's claim for breach of fiduciary duty against the Archdiocese

Defendants (Count X) with prejudice.

## C.  Racketeering

To prove a civil claim of racketeering under New Mexico law, Plaintiff must

show that he "sustain[ed] injury to his person, business or property by a pattern of

racketeering activity."  N.M. Stat. Ann. § 30-42-6(A) (1978).  A pattern of racketeering

activity exists if a defendant has "engag[ed] in at least two incidents of racketeering

with the intent of accomplishing any of the prohibited activities set forth in" § 30-42-

4(A)-(D).  N.M. Stat. Ann. § 30-42-3(D) (1978).  Incidents of racketeering (also referred to

as "predicate acts") are defined in § 30-42-3(A) and include a variety of criminal acts.

The prohibited activities set forth in § 30-42-4 broadly include using proceeds from

racketeering to operate, control, or participate in an enterprise, or conspiring to do those

acts.  N.M. Stat. Ann. § 30-42-4(A)-(D) (1978).

Defendants move to dismiss Plaintiff's civil racketeering claim under New

Mexico law (Count XIII).  Defendants argue two main issues.  First, they argue that

Plaintiff has failed to allege that Defendants committed predicate criminal acts which

could give rise to a racketeering claim.  *Doc. 5* at 10.  Second, Defendants argue that

even if Plaintiff had alleged facts to prove that Defendants committed sufficient

predicate acts for a racketeering claim, Plaintiff has failed to show that Plaintiff's injury

was proximately caused by these predicate acts.  *Id.*

Plaintiff's racketeering claim fails because he has not established that the

Archdiocese Defendants engaged in a pattern of racketeering.  Most critically, Plaintiff

is unable to establish that the Archdiocese Defendants committed at least two predicate

acts.  Because Plaintiff cannot establish that Defendants committed any predicate acts,

the Court will not address Defendants' second argument regarding whether Plaintiff's

injuries were proximately caused by Defendants' acts.

Plaintiff argues that he has alleged two kinds of predicate acts: fraud and

kidnapping.  Plaintiff's first example of a predicate act is that Defendants committed

fraud when they misrepresented that Plaintiff would be safe from harm while working

under Apodaca at the afterschool program, and then took Plaintiff's time and services.

*Doc. 29* at 21.  Plaintiff also alleges that Defendants committed fraud when they took

tuition money from students, including Plaintiff, after making misrepresentations that

the Santo Niño school was "extremely safe!" and full of "wonderful" staff who were

working to stop "negative behaviors" even though Defendants knew that Apodaca

posed a serious threat to the safety of Plaintiff and other students.[5]  *Id.* at 18-19.

Plaintiff's second example of a predicate act is that Apodaca kidnapped Plaintiff when

he drove Plaintiff from Santa Fe to Albuquerque for work-related purposes, but then

committed a sexual offense against Plaintiff in the vehicle.  *Id.* at 21.

      The Court does not find that Plaintiff's allegations would constitute fraud within

the meaning of civil racketeering.  An act of fraud can be a predicate act under New

Mexico racketeering law if it meets the criteria of criminal fraud as defined in § 30-16-6

of the New Mexico criminal code.  *See* N.M. Stat. Ann. § 30-42-3(6) (1978).  Under § 30-

16-6, "[f]raud consists of the intentional misappropriation or taking of anything of value

that belongs to another by means of fraudulent conduct, practices or representations."

N.M. Stat. Ann. § 30-16-6(A) (1978).  In order to commit criminal fraud, a defendant

must make a misrepresentation of fact with the intent of deceiving another individual

---

[5] Plaintiff also alleges that Defendants committed fraud when they made similar statements about the safety of the school while Aaron Chavez, another teacher who committed acts of sexual misconduct against students, was employed at Santo Niño as late as 2016.  *Doc. 29* at 22.

into relying on the misrepresentation.  *See* Crim. UJI 14-1640 NMRA (setting forth the elements of fraud under New Mexico law); *see also State v. Garcia*, 384 P.3d 1076, 1080 (N.M. 2016); *Werner v. City of Albuquerque*, 229 P.2d 688, 690 (N.M. 1951) (holding that civil fraud requires "a false representation of fact, present or past").  The misrepresentation of fact must actually cause the deceived individual to act in a way that he otherwise would not have acted.  *Garcia*, 384 P.3d at 1080.

The only misrepresentations alleged by Plaintiff were made on the Santo Niño website where Defendants stated that the school was "extremely safe" and full of "wonderful" staff.  Plaintiff alleges that these statements were false because Defendants knew that Apodaca presented a threat to student safety.   Even assuming the falsity of these statements, they fall well short of the kind of statements which can support civil, let alone criminal, fraud.

Certainly, it is apparent that these statements were intended by the school to encourage or even induce parents to send their children to Santo Niño and pay tuition money.  However, the statements are not a misrepresentation of fact because they are not facts. *Garcia*, 384 P.3d at 1080.  Whether the Santo Niño school, as a whole, is "extremely safe" or full of "wonderful" staff who are working to stop "negative behaviors" is a matter of individual interpretation.  Although Plaintiff may argue that Apodaca's presence destroyed the safety for the entire school, others might argue that the presence of one bad actor did not detract from the general safety that students in the

school enjoyed.  A reasonable person would not read Santo Niño's statements to mean that no harm could ever befall a student at the school or that the statements created any legal obligation for Defendants.  In fact, it is absurd to conclude that two sentences on the school's website would create criminal liability for the school for every possible harm that occurs related to any activity of the school.

Regardless of how different individuals may interpret the statements, the "extremely safe" and "wonderful" staff statements are more akin to puffery than to facts which can be intentionally misrepresented.  *See, e.g.*, *Renfro v. Champion Petfoods USA, Inc.*, 475 F. Supp. 3d 1242, 1247 (D. Colo. 2020) (relying on Colorado state law that defines false representations of fact and finding that "when statements are so general or devoid of specific factual content that they are incapable of empirical verification they can't, as a matter of law, give rise to liability").  Although New Mexico courts have not provided explicit guidance regarding the relationship between puffery and fraud, the New Mexico Court of Appeals recently suggested that a vague statement by a financial institution that it would "protect [the plaintiff's] family's financial security" may qualify as "non-actionable puffery" given that it likely did not "deceive a reasonable person into believing that [the financial institution] had any concrete obligation" based on the statement.[6]  *Dollens v. Wells Fargo Bank, N.A.*, 356 P.3d 531, 537 (N.M. Ct. App. 2015); *see*

---

[6] In *Dollens*, the court was assessing whether the bank's statement qualified as a false or misleading representation under the New Mexico Unfair Practices Act, not fraud law.  356 P.3d at 537.  While not identical, the elements of an Unfair Practices Act claim bear similarities to those of fraud, including that

*also* 37 Am. Jur. 2d Fraud and Deceit § 41 (Observing that under fraud law, "[p]uffing is permissible only where an ordinary person would not be deceived by the exaggerated claims, and the ordinary person must recognize the puffery for what it is and realize that they are not expected to rely on the claims made") (citing *Potamkin Cadillac Corp. v. Towne Cadillac Corp.*, 592 F. Supp. 801, 802 (S.D. N.Y. 1984)).  Defendants' broad online statements that Santo Niño was "extremely safe!" and full of "wonderful" staff are even less verifiable and concrete than a statement by a bank to an individual customer that the bank would protect the customer's financial security.  As a result, Defendants statements cannot be the basis of criminal fraud liability.

With respect to Plaintiff's allegations of kidnapping, the Court does not find that the alleged instance of kidnapping qualifies as a predicate act under state racketeering law.[7]  Relevant to this case, kidnapping is defined as "the unlawful taking, restraining, transporting or confining of a person by force, intimidation or deception, with intent . . . to inflict death, physical injury or a sexual offense on the victim."  N.M. Stat. Ann. § 30-4-1(A)(4) (1978).  A kidnapping can occur "when an association begins voluntarily but

---

the defendant must make a representation that is false or misleading in order to deceive another into taking a certain action.  *Id.* As a result, the Court finds this authority useful in its determination of whether Defendants committed fraud when they stated that Santo Niño was "extremely safe!" and full of "wonderful staff."

[7] The Court notes that Plaintiff does not specifically allege in the Complaint that Apodaca kidnapped Plaintiff or that the kidnapping qualifies as a predicate act for Plaintiff's racketeering claim against Defendants.  *Doc. 1-2* ¶¶ 422-434; *see also doc. 36* at 12.  However, in order to determine whether Plaintiff could bring a plausible racketeering claim in an amended complaint, the Court will assess Plaintiff's arguments that Apodaca's kidnapping of Plaintiff constitues a predicate act.

where the defendant's real purpose is something other than the reason the victim

voluntarily associates with the defendant." *State v. Sanchez*, 6 P.3d 486, 497 (N.M. 2000)

(citation omitted) (holding that the defendant's act of entering a car "under the false

premise of needing a ride" when he actually intended to murder the car's driver

supported the element of deception under kidnapping law). Assuming that Apodaca

intended to sexually assault Plaintiff during the car ride between Santa Fe and

Albuquerque, his actions could meet the elements of kidnapping even if Plaintiff

voluntarily entered the car. However, in order to qualify as a predicate act under

racketeering law, the kidnapping must have been done "with the intent of

accomplishing any of the prohibited activities" set forth in § 30-42-4. N.M. Stat. Ann. §

30-42-3(D) (1978). Apodaca's alleged act of kidnapping could not have accomplished

any of the prohibited activities considering that Apodaca did not attempt to acquire

proceeds from the kidnapping that he could use to invest in or establish an enterprise (§

30-42-4(A)), he did not try to use the kidnapping to acquire interest or control in an

enterprise (§ 30-42-4(B)), the kidnapping was not a form of participating in the conduct

of an enterprise's affair (§ 30-42-4(C)), and the kidnapping was not a conspiracy to do

any of the above actions (§ 30-42-4(D)). *See* N.M. Stat. Ann. § 30-42-4 (A)-(D) (1978).

Because Plaintiff has not alleged any facts which would plausibly establish that

Apodaca had the intent to commit a prohibited act of racketeering, the kidnapping does

not qualify as a predicate act.

Plaintiff's allegations regarding criminal fraud and kidnapping as predicate acts for racketeering suffer from another fundamental flaw – even if Plaintiff could allege facts that establish the commission of a predicate criminal act, Plaintiff cannot establish that Defendants committed them with the requisite intent to engage in racketeering. Plaintiff argues that he alleges intent when he states that the Archdiocese Defendants "conspired with and amongst each other to violate the Racketeering Act" and that the Archdiocese Defendants used fraud in operating and controlling Santo Niño because both acts "necessarily include[] intent."  *Doc. 29* at 20 (citing *doc. 1-2* ¶ 433).  However, "bare assertions" which "amount to nothing more than a formulaic recitation of the elements" such as the allegation that Defendants intended to violate the Racketeering Act are "conclusory and not entitled to be assumed true."  *Iqbal*, 556 U.S. at 681. Further, New Mexico racketeering law requires that a defendant have the intent to commit racketeering *in addition to* the intent to commit the predicate acts.  N.M. Stat. Ann. § 30-42-3(D) (1978) (defining pattern of racketeering activity as engaging in at least two [predicate acts] *with the intent* of accomplishing racketeering activities) (emphasis added); *see also Naranjo v. Paull*, 803 P.2d 254, 264 (N.M. Ct. App. 1990) ("The intent component of the definition of "pattern of racketeering activity" would be useless if it encompassed nothing more than the intent necessary to commit each of the two incidents of racketeering required by the definition.").  As a result, Plaintiff's assertion

that Defendants intended to commit fraud does not show that Defendants had the required intent to engage in racketeering.

In short, Plaintiff's allegations do not support a plausible claim that Defendants intended to engage in racketeering activities by carrying out a concerted effort to commit crimes in order to further the financial success of the school.  Throughout his response, Plaintiff appears to make the implicit argument that the Archdiocese Defendants' unwillingness to take sufficient action to prevent staff like Apodaca from harming students while still extracting tuition dollars and employment services out of students qualifies as intent to commit racketeering.  *Doc. 29* at 20-21.  However, even a knowing unwillingness to take action against Apodaca is simply not enough to prove that Defendants had a specific intent to engage in criminal activities with the purpose of increasing their collection of tuition dollars or use of employment services from students.  Similarly, with respect to the kidnapping claim, it is not clear that any of the Archdiocese Defendants even knew that Apodaca had assaulted Plaintiff in his vehicle. The mere facts that Apodaca was an agent of the Archdiocese Defendants and that the alleged kidnapping occurred on a car ride related to Apodaca's and Plaintiff's employment with the Archdiocese Defendants is not sufficient to show that Defendants had the intent to use the kidnapping to further their own supposed racketeering activities.

Based on Plaintiff's inability to show that Defendants committed any predicate acts or that they had an intent to commit racketeering, the Court will dismiss Plaintiff's racketeering claim against the Archdiocese Defendants with prejudice.

### D. Public Nuisance

Defendants move to dismiss Plaintiff's Count XIV under which Plaintiff argues that Santo Niño Regional Catholic School is a public nuisance under New Mexico law and Plaintiff brings an "action to abate that public nuisance."[8]  *Doc. 1-2* ¶ 440. Defendants argue that New Mexico law requires a plaintiff to bring a public nuisance claim by verified complaint and in the name of the state of New Mexico, and that he may not bring this claim "solely on his own behalf" as he has done here.  *Doc. 5* at 11. Plaintiff responds that the language of the statute is unclear, that it contains "numerous qualifying phrases," and that a "reasonable interpretation" of the statute would permit an individual, non-state plaintiff to bring an action to abate a public nuisance.  *Doc. 29* at 23.  Plaintiff adds that Defendants have not "challenged the sufficiency of the allegations of the Complaint in establishing a public nuisance," and that, if necessary, Plaintiff can change the caption and request a verification in order to bring the claim properly.  *Id.* at 24.

Under N.M. Stat. Ann. § 30-8-8 (1978), a party may bring

---

[8] It is unclear from the Complaint if Plaintiff is seeking to abate the entire operation of Santo Niño Regional Catholic School, the employment of Robin Chavez as the principal of Santo Niño, or some other action(s) by the Archdiocese Defendants.  *See doc. 1-2* ¶¶ 435-440.

> [a] civil action to abate a public nuisance . . . by verified complaint in the name of the state without cost, by any public officer or private citizen . . . against any person, corporation, or association of persons who shall create, perform or maintain a public nuisance.

The Court disagrees that the language of the statute could be reasonably interpreted to permit a sole private individual to bring an action for abatement of public nuisance in their own name. The various phrases in the provision are not "qualifying phrases" but rather provide mutually exclusive and additional requirements that a plaintiff must meet before bringing a civil action under the statute. The only potentially confusing aspect of the statute is that the action must be brought "in the name of the state" even though a "private citizen" may bring the action. However, these provisions are not contradictory. *See, e.g.*, *City of Albuquerque v. State of New Mexico*, 808 P.2d 58, 60 (N.M. Ct. App. 1991) (an action for abatement of a public nuisance which was brought by plaintiffs "both in their individual capacities and as private attorneys general acting in the name of the State of New Mexico, pursuant to NMSA 1978, Section 30-8-8").

In the context of the statute and the overall purpose of public nuisance law, it makes sense that an action for the abatement of a public nuisance must be brought by or on behalf of the state. Although N.M. Stat. Ann. § 30-8-8 allows for a civil action, the statute itself is contained within New Mexico's criminal code, and the creation of a public nuisance is a criminal offense. *See* N.M. Stat. Ann. § 30-8-1 (1978); *see also Titus v. City of Albuquerque*, 252 P.3d 780, 787 (N.M. Ct. App. 2011). The state is the sole entity

that may bring a criminal charge.  Even if a private individual wishes to bring a civil

action to abate a public nuisance, the "complainant[] [is] acting for the citizenry in

general." *Schwartzman, Inc. v. Atchinson, Topeka & Santa Fe Ry. Co.*, 857 F.Supp. 838, 851

(D.N.M. 1994) (holding that § 30-8-8 does not provide for the recoverability of damages

because the purpose of the statute is to protect the public, not provide a private right to

damages from public nuisances).  Indeed, the purpose of public nuisance law is to

protect "rights held in common by the public," a task normally entrusted to the state.

*City of Albuquerque v. State of New Mexico*, 808 P.2d at 61.

Because Plaintiff has not brought his action to abate a public nuisance in the

name of the state or in a verified complaint in accordance with N.M. Stat. Ann. § 30-8-8,

the Court will dismiss Count XIV without prejudice.

## V.    CONCLUSION

For the foregoing reasons, the Archdiocese Defendants' Motion to Dismiss

Counts IX, X, XIII and XIV of Plaintiff's First Amended Complaint (*doc. 5*) is

GRANTED.  Counts IX, X, and XIII are DISMISSED WITH PREJUDICE and Count XIV

against the Archdiocese Defendants is DISMISSED WITHOUT PREJUDICE.  Counts

VIII, XI, and XII against the Archdiocese Defendants as well as all claims against the

other Defendants remain.

IT IS SO ORDERED.

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**