IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN DOE,

     Plaintiff,

v.                                 Civ. No. 23-1025 GBW/JFR

SANTA FE PUBLIC SCHOOLS, *et al.*,

     Defendants.

## ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE HIS THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS, TITLE IX, AND OTHER TORTIOUS CONDUCT

THIS MATTER is before the Court on Plaintiff's Motion for Leave to File His Third Amended Complaint for Damages for Violations of Civil Rights, Title IX, and Other Tortious Conduct. *Doc. 112.* Having considered the Motion, the attendant briefing (*doc. 114*), and the parties' oral arguments (*doc. 118*), the Court will DENY the Motion because Plaintiff's proposed amendments are futile.

## I.    BACKGROUND

Plaintiff John Doe brings a variety of state and federal claims against Santa Fe Public Schools ("SFPS"), Robert Apodaca, Candice Flint, Robin Chavez, and Anne Landau, as well as the Roman Catholic Church of the Archdiocese of Santa Fe and a number of Catholic parishes (collectively, the "Archdiocese Defendants"). *Doc. 82 at 48 -74.* These claims are based on sexual abuse that Apodaca inflicted on Doe while Doe was a minor child. *See generally id.* The factual underpinnings of Plaintiff's claims

1

against Defendant Landau, as alleged in his Second Amended Complaint for Damages for Violation of Civil Rights, Title IX, and Other Tortious Conduct ("operative Complaint"), *doc. 82*, are recounted in the Court's October 18, 2024, Order Granting Anne Landau's Motion to Dismiss ("October 18 Order") and will not be repeated here, *see doc. 111* at 2-3.

Plaintiff Doe filed the operative Complaint on June 4, 2024, *doc. 82*, after the Court dismissed several of Plaintiff's claims against the Archdiocese Defendants on May 15, 2024, *doc. 71*. On June 10, 2024, Defendant Landau filed a Motion to Dismiss requesting the dismissal of all claims against her for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). *Doc. 85*. As part of Plaintiff's response to Defendant Landau's Motion to Dismiss, he requested leave to amend his complaint in the alternative to dismissal if the Court had concerns about the operative Complaint's sufficiency. *Doc. 93*. In line with his alternative request, Plaintiff attached a proposed [Third] Amended Complaint for Damages for Violation of Civil Rights, Title IX, and Other Tortious Conduct to his response. *Doc. 93-1*.

On October 18, 2024, the Court granted Defendant Landau's Motion to Dismiss, dismissing Plaintiff's Vicarious Liability claim (Count XI) with prejudice and Negligence/Premises Liability claim without prejudice. *Doc. 111*. Pertinent here, the Court determined that the operative Complaint does not adequately plead sufficient facts to establish a plausible claim for premises liability or negligent hiring and

retention against Defendant Landau.  *See id*. at 17-24.  Specifically, the Court found that Plaintiff failed to plausibly allege how Defendant Landau knew or reasonably should have known that Apodaca posed a foreseeable risk to Plaintiff or was unfit to perform house-sitting services for her.  *Id*.  Further, the Court denied Plaintiff's alternative request for amendment because it found that the new factual allegations in the attached [Third] Amended Complaint for Damages for Violation of Civil Rights, Title IX, and Other Tortious Conduct, *doc. 93-1*, did not lift any of his negligence claims against Defendant Landau past the plausibility bar, *doc. 111* at 24-25.  Nonetheless, the Court permitted Plaintiff until October 25, 2024, to file a motion to amend should he believe he could assert sufficient facts to state a plausible claim of negligence against Defendant Landau.  *Id.* at 25.

On October 25, 2024, Plaintiff filed the instant Motion to Amend ("Motion"). *Doc. 112*.  Defendant Landau filed her response on November 8, 2024.  *Doc. 114*. Plaintiff's reply would have been due on November 22, 2024, but none was filed. Therefore, briefing on the Motion is complete.  *See* D.N.M.LR-Civ. 7.1(b).  The Court held a hearing on the Motion on December 3, 2024.  *See doc. 118*.

Plaintiff asserts that the Court should grant him leave to file his Third Amended Complaint for Damages for Violation of Civil Rights, Title IX, and Other Tortious Conduct ("proposed Complaint"), *doc. 112-1*, because it addresses the pleading deficiencies identified in the operative Complaint by alleging sufficient facts to establish

how and why Defendant Landau should have known about the potential danger posed

by Apodaca. *See generally doc. 112*. Defendant Landau contends that Plaintiff's

proposed Complaint is futile, as it still does not plausibly allege that she should have

known that Apodaca was dangerous. *See doc. 114* at 6-12. For the reasons outlined

below, the Court agrees with Defendant Landau and finds that the proposed Complaint

is futile because it does not plausibly allege how Defendant Landau knew or reasonably

should have known that Apodaca posed a foreseeable risk to others or was unfit to

perform house-sitting services for her.

## II.    LEGAL STANDARDS

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading once

as a matter of course if certain temporal conditions are met. Fed. R. Civ. P. 15(a)(1).

Otherwise, as in the case here, the party seeking to amend its pleading must obtain

either the written consent of opposing parties or leave of the Court. Fed. R. Civ. P.

15(a)(2).

The decision to grant leave to amend a complaint is within the Court's discretion.

*Castanon v. Cathey*, 976 F.3d 1136, 1144 (10th Cir. 2020). However, "[t]he [C]ourt should

freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may deny

leave to amend "upon a showing of undue delay, undue prejudice to the opposing

party, bad faith or dilatory motive, failure to cure deficiencies by amendments

previously allowed, or futility of amendment." *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).

An amendment is "futile" if the complaint, as amended, would be subject to dismissal. *Jefferson Cnty. Sch. Dist. No. R-1 v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999). Thus, when determining whether an amendment is futile, the court analyzes the proposed amendment as if it were before the court on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Little v. Portfolio Recovery Associates*, LLC, 548 Fed. App'x 514, 515 (10th Cir. 2013). To avoid dismissal, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 723 (10th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This standard does not require "detailed factual allegations," but it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When ruling on a 12(b)(6) motion, the court must "assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Leverington*, 643 F.3d at 723 (quoting *Dias v. City & Cnty. Of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)). However, the court need not accept the truth of any legal conclusions. *Iqbal*, 556 U.S. at 678.

The plausibility standard "does not impose a probability requirement." *Twombly*, 550 U.S. at 556. Rather, "a well-pleaded complaint may proceed even if it

appears 'that a recovery is very remote and unlikely.'"  *Id.* at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  The complaint must only be "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555.  However, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  In other words, the well-pleaded facts must "permit the court to infer more than the mere possibility of misconduct"; otherwise, the plaintiff has not shown entitlement to relief.  *Id.* at 679.

### III.  PLAINTIFF'S NEW ALLEGATIONS

Plaintiff's new allegations in his proposed Complaint are grounded in four categories of factual assertions.  First, Plaintiff alleges that Defendant Landau "knew Apodaca and met him on many occasions, starting when he was a child."  *Doc. 112-1* ¶ 429.  Second, Plaintiff alleges that the rules and requirements for Defendant Landau's homeowners' association ("HOA") show how she "should have ensured she was aware of who was being provided access to the community and her home through her, and [how] she should have known of their reasons for entering and the activities they engaged in while there."  *Id.* ¶ 451; *see generally id.* ¶¶ 434-59.  Specifically, Plaintiff references the gate system utilized for access to Defendant Landau's community, liability rules imposed by the community on owners for damages caused by any

individual they allow to access the community, and HOA rules pertaining to limits on short-term tenancies of residences within the community. *Id*. ¶¶ 434-52. With respect to the gate system, Plaintiff asserts that the HOA rules prohibit owners from granting unrestricted gate access to non-owners. *Id*. ¶ 443. Plaintiff further alleges that any non-owner seeking entry to the community must contact the owner through the gate system, which is designed to communicate with the owner's preprogrammed telephone, enabling the owner to authorize the gate's opening only while on the preprogrammed telephone line. *Id*. ¶¶ 441-42. Plaintiff contends that these facts pertaining to the gate system show that Defendant Landau should have known of every time Apodaca accessed the community. *Id*. ¶ 445. Third, Plaintiff also alleges that concerns of potential criminal activity occurring within or around Defendant Landau's community would have led "a reasonable homeowner" to "take steps to keep a closer eye on their property and the activities occurring in or around [their] home when they were not present." *Id*. ¶¶ 453-49. Fourth, Plaintiff alleges that Defendant Landau should have conducted a background check of Apodaca before providing him access to her home in Summer 2020. *Id*. ¶¶ 468-73. Plaintiff alleges that a background check would have disclosed to Defendant Landau "sources of information that could have revealed concerning facts" about Apodaca. *Id*. ¶ 469.

Plaintiff argues that all of these new factual allegations, taken together, establish plausible claims against Defendant Landau. To do so, based on the Court's October 18

Order regarding premises liability, Plaintiff must make a plausible showing that

Defendant Landau knew or should have known of Apodaca's dangerousness or that he

would use her home to intentionally harm Plaintiff. *See doc. 111* at 17-21. Similarly, as

to negligent hiring/supervision, Plaintiff must make a plausible showing that Defendant

Landau knew or should have known that Apodaca was unfit to perform house-sitting

services for her. *Id.* at 22-24.

IV.   **ANALYSIS OF PREMISES LIABILITY**

    **A.**   **Duty**

The Court's October 18 Order dismissing Plaintiff's premises liability claim was

based on the absence of a plausible argument regarding foreseeability. However, some

of Plaintiff's new allegations, which he contends address this deficiency, raise questions

concerning the scope of the applicable duty. Particularly, the scope of the applicable

duty issue arises when considering Plaintiff's allegations regarding information which

"an appropriate background check" of Apodaca would have revealed to Defendant

Landau. *Doc. 112-1* ¶ 469. Plaintiff does not allege that Defendant Landau conducted a

background check that revealed information supporting the conclusion that Apodaca

was dangerous. *See doc. 93* at 11 ("The Complaint alleges that Landau performed no

diligence as to Apodaca or his fitness, including a failure to conduct a reference check of

prior employers."). Thus, the impact of these allegations relies on two steps: (1)

Defendant Landau should have conducted "an appropriate background check" on

Apodaca prior to letting him house-sit her home, and (2) if she had, she would have learned information sufficient to conclude he may be dangerous as a house-sitter. The Court will address the second step in further detail below; however, the first step requires an analysis of the scope of the applicable duty.

"Whether the defendant owes a duty to the plaintiff, is a legal question for the courts to decide." *Lujan v. New Mexico Dep't. of Transp.*, 341 P.3d 1, 4 (N.M. Ct. App. 2014). That legal question is one of "policy made with reference to legal precedent, statutes, and other principles comprising of the law." *Morris v. Giant Four Corners, Inc.*, 498 P.3d 238, 242 (internal quotation marks and citation omitted). As the Court has previously held, for the purposes of the premises liability claim, "Defendant Landau had a duty to exercise ordinary care to prevent Apodaca's harmful and intentional conduct against Plaintiff in her home." *Doc. 111* at 17. This duty, however, can be limited based on policy reasons unrelated to foreseeability considerations. *See Rodriguez v. Del Sol Shopping Ctr*, 326 P.3d 465, 468-69 (N.M. 2015).

So, the question becomes whether the duty of ordinary care under these circumstances imposes an obligation on a homeowner to conduct a background check on an individual prior to permitting them to house-sit their home.[1] The Court holds

---

[1] Alternatively, this issue could be framed as whether Defendant Landau had an independent duty to perform such a background check. As noted in the Court's October 18 Order, Plaintiff presents no authority for such an independent duty. *See doc. 111* at 24. For the same policy reasons explained below, the Court holds that no such independent duty exists.

that it does not.  First, the Court concludes that "ordinary care" simply does not encompass such an obligation.  That is to say, a homeowner, who is not running a business related to the house, conducting a background check on a potential house-sitter would be extraordinary.  Second, even assuming that, as an initial matter, the duty of ordinary case does impose an obligation on a homeowner to conduct a background check on an individual prior to permitting them to house-sit their home, the Court finds that policy considerations dictate that the duty be limited such that it does not.  As the Supreme Court of New Mexico recently explained, the "determination of duty focuses on policy considerations to determine the existence and scope of that duty.  This 'involves an analysis of the relationship of the parties, the plaintiff's injured interests and the defendant's conduct' to determine whether 'the plaintiff's interests are entitled to protection.'"  *Waterbury v. Nelson*, 557 P.3d 96, 100 (N.M. 2024) (citations omitted).  The "relationship" between Defendant Landau and Plaintiff was particularly remote, as Plaintiff was, at most, a guest of Defendant Landau's agent and had no alleged relationship with Defendant Landau herself.  Regarding Defendant Landau's conduct, she was a homeowner who allegedly compensated Apodaca for the simple task of basic house-sitting.  It is not alleged that she was running a business related to the home.  It is not alleged that she was receiving any benefit from the house-sitting other than the peace-of-mind and enhanced security which comes from having someone occasionally at one's house when one is away.  It is not alleged that Defendant

Landau asked or encouraged Apodaca to have guests at her home, let alone minors. In short, Defendant Landau's conduct amounted to the exact conduct engaged in by countless homeowners who ask someone to temporarily house-sit their homes and give them the access to do so. Finally, the Court must consider the Plaintiff's injured interests. Undoubtedly, the injuries allegedly suffered by Plaintiff at the hands of Apodaca are horrific. Yet, the gravity of those injuries cannot justify placing an unreasonable duty on every person no matter the remoteness of their connection to the crime or tort. Here, the question is whether these injured interests justify imposing the duty of conducting a background check on every homeowner who utilizes a house-sitter.

When conducting the balancing under this policy analysis, a court must evaluate the practical implications of imposing the duty requested by a plaintiff. For example, in *Waterbury*, the New Mexico Supreme Court considered whether a lawyer owed a direct duty to a person who was an agent of a client but was not themselves a client of the lawyer. 557 P.3d at 98-102. "Policy [led that court] to conclude that [the lawyer] did not owe a duty to provide [her client's agent] with direct advice. . ." *Id*. at 103. This policy decision was grounded in the court's reasoning that:

> [t]o conclude otherwise would have significant policy implications for the legal profession by substantially enlarging attorneys' exposure to liability in interactions with non-clients. And, . . . extended to its logical extreme, a finding of duty here could expose estate planning attorneys, in particular, to greater liability for malpractice given the exponential number of beneficiaries and claims. Relatedly, there are policy considerations

11

>concerning malpractice insurance and other financial implications as a
>consequence of finding such a duty arises as to a non-client.

*Id*. Similar policy considerations justify limiting the duty of ordinary care to exclude

requiring a background check under these circumstances. Most homeowners who are

not running a business related to the home have no experience in the mechanisms of

conducting even a basic criminal background check. But, of course, under Plaintiff's

view, a basic criminal background check would not be sufficient because, in this case,

such a check would have revealed nothing. *See doc. 111* at 20. Instead, one of the

"concerning facts" would have only been revealed by discovering that Apodaca was

"not subject to rehire" by a "recent previous employer." *Doc. 112-1* ¶ 471. The other

"concerning fact[]" would have required requesting public reports from the Santa Fe

Police Department related to a traffic stop which did not result in charges, let alone a

conviction. Therefore, if the Court were to impose a duty to conduct what Plaintiff

considers to be an "appropriate background check," any homeowner utilizing a house-

sitter would have to (i) conduct a criminal background check of the individual in both

federal and state databases, (ii) contact all recent employers presumably after requiring

an employment application from the putative house-sitter, and (iii) make public record

requests of all police departments for areas in which the person has lived and worked.

Such a duty would be an extraordinary burden on ordinary homeowners seeking to

utilize a house-sitter.

Imposing such a burden on homeowners would strongly disincentive the use of house-sitters once New Mexican homeowners become aware of the extraordinary duty they would be taking on. Indeed, this newfound duty may also impact homeowners' insurance policies in the form of increased premiums or coverage exclusions. Disincentivizing the utilization of house-sitters would be contrary to the public interest given its obvious benefits. Without any involvement from law enforcement, having someone in the home enhances the security of otherwise unoccupied residences. It also lowers the risk of mail or package theft. Having someone monitor the home can eliminate or reduce the damages caused by accidents within the home (such as leaks or power outages) which can be catastrophic if left unattended. Disincentivizing this positive practice would be against public policy.

In conclusion, strong policy considerations counsel for not placing the duty on homeowners to conduct comprehensive background checks on acquaintance house-sitters if they are not running a business related to the property. Thus, the Court holds that, even assuming that "ordinary care" would otherwise encompass such a duty, policy considerations dictate that the scope should be limited to exclude any requirement to conduct comprehensive backgrounds checks on house-sitters.

Having reached this conclusion, the information which Defendant Landau would have learned from the comprehensive background check proposed by Plaintiff, but which she did not conduct, cannot augment the facts on which Plaintiff can rely to

plausibly claim that Defendant Landau knew or reasonably should have known that Apodaca posed a foreseeable risk to others or was unfit to perform house-sitting services for her.

### B.    Breach and Foreseeability

Having considered the limitations on the applicable duty, the Court will now consider whether Plaintiff's remaining new allegations address the deficiencies the Court has previously found in his claims against Defendant Landau. As the Court has explained, breach of duty determinations are usually reserved for the jury, but if no reasonable jury would find that the defendant breached the duty of ordinary care, a court may decide a breach of duty determination as a matter of law. *Rodriguez*, 326 P.3d at 473-74. Albeit irrelevant for duty determinations, foreseeability inquiries are of course central to breach of duty determinations. *Id*. at 467. Juries in New Mexico are instructed that "[a]s the risk of danger that should reasonably be foreseen increases, the amount of care required also increases." N.M. R. Civ. UJI 13-1603. "Foreseeability as it relates to breach of duty is a general analysis and does not require that the particular harm to the plaintiff have been anticipated." *Rodriguez*, 326 P.3d at 468 (citing *Spencer v. Health Force*, 107 P.3d 504 (N.M. 2002)). The question before the jury in determining if an owner breached its duty "is whether the foreseeable likelihood and severity of injuries that might have occurred due to the defendant's conduct warranted the

additional precautions argued by the plaintiff." *Rodriguez*, 326 P.3d at 468 (citing *Ford v. Bd. of Cnty. Comm'rs of Cnty. of Dona Ana*, 879 P.2d 766, 771 (N.M. 1994)).

As noted above, in the October 18 Order, when conducting its breach analysis for Plaintiff's premises liability claim, the Court held that no reasonable jury would find that Defendant Landau breached her duty of ordinary care to Plaintiff because the operative Complaint failed to plausibly allege how she knew or reasonably should have known that Apodaca posed a foreseeable risk to Plaintiff. *Doc. 111* at 17-21. After the Court's duty analysis, only a portion of Plaintiff's new allegations remain relevant to determine whether he has changed the plausibility calculus. Considering those new allegations, the Court concludes that he has not.

First, Plaintiff's new allegation that Defendant Landau knew Apodaca and met him on many occasions fails to plausibly demonstrate, alone or in conjunction with the other allegations, that she knew or reasonably should have known that Apodaca was a potentially dangerous person. Merely possessing knowledge of or maintaining a relationship with another individual does not imply a comprehensive understanding of their character or actions. Notably, Plaintiff does not allege that Defendant Landau had ever observed or become aware of Apodaca's dangerous propensities with children during the course of their purported relationship.

Second, the Court turns to the allegations surrounding the requirements of Defendant's HOA. The Court understands Plaintiff to argue that, from these

allegations, the Court can infer that Defendant Landau did comply with the HOA rules and therefore had **actual** knowledge that Apodaca was bringing Plaintiff to her home under suspicious circumstances.[2]  There is at least one fatal flaw to this argument.  Even assuming the Court could and should infer that Defendant Landau always fully complied with the HOA rules and that Apodaca was unable to gain entrance to the neighborhood outside of the formal HOA procedures, there is still no basis on which to plausibly infer that Defendant Landau would have known that Apodaca was bringing Plaintiff to her home.  As Plaintiff alleges, if the HOA "rules were followed, [Defendant] Landau should have known of every time Apodaca accessed the community."  *Doc. 112-1* ¶ 445.  However, none of the alleged HOA rules would have likely led to the knowledge of any passenger or guest with whom Apodaca was entering.  According to Plaintiff's allegations, visitor access through the gate system was only granted when the system contacted the homeowner's preprogrammed telephone line, allowing the homeowner to facilitate the visitor's entry.  *See id.* ¶¶ 440-42.  Plaintiff does not allege that the system involved any video confirmation of the driver seeking entrance, let

---

[2] While not clear, Plaintiff may be arguing that Defendant Landau had a duty to follow the HOA rules and thus should be deemed to have constructive knowledge of any information which compliance would have obtained even if she did not comply.  To the extent Plaintiff makes this argument, the Court holds that whatever duties Defendant Landau might have owed under the HOA rules are duties she owes only to the HOA and perhaps to the others within the HOA.  They are not duties she owes to the general public and therefore do not fall within her duty of ordinary care applicable to Plaintiff's claim.  Consequently, any information which Defendant Landau would have learned from the fully complying with the HOA rules, but failed to learn by not complying, cannot augment the facts on which Plaintiff can rely to plausibly claim that Defendant Landau knew or reasonably should have known that Apodaca was dangerous.

alone video which would reveal any and all passengers in the vehicle. Thus, even assuming complete compliance with the HOA rules, Defendant Landau would have been aware only of Apodaca's entrance to the community and not that he was accompanied by a minor. Moreover, the proposed Complaint makes no allegations that Defendant Landau was otherwise informed that Apodaca was bringing minors to her home while he was house-sitting.

Perhaps Plaintiff believes that his third category of new allegations sufficiently address this deficiency. He asserts that there was "potential criminal activity" around Defendant Landau's home such that a "reasonable homeowner would take steps to keep a closer eye on their property. . .when they were not present." *Id*. ¶¶ 454-56. Plaintiff contends that "it is common for non-resident owners in such situations to install readily available and affordable surveillance equipment, including doorbell cameras and simple do-it-yourself video and audio surveillance technology in and around the home." *Id*. ¶ 457. Plaintiff does not assert that Defendant Landau installed such surveillance. Surely, he is not suggesting that she had a duty to do so. Consequently, these "facts" assist him in his claim that Defendant Landau should have known of Apodaca's dangerousness only if one stacks inference upon inference. First, one must infer that Defendant Landau did indeed install surveillance equipment. Second, one must infer that she was reviewing surveillance footage from times when the house-sitter was present, despite the reasonable assumption that, if she reviewed

the footage at all, it would have been at times when the house was unoccupied, rather than when it was occupied and presumably secure. Third, one must infer that, during her review of the surveillance footage, she observed something which would have been so suspicious that it would have reasonably led her to the conclusion that Apodaca was dangerous. As this "argument requires the pyramiding or imposition of one inference upon another to establish the facts necessary to [his] case[,] [it] is not permissible and amounts to mere speculation." *Tyrell v. Dobbs Inv. Co.*, 337 F.2d 761, 765 (10th Cir. 1964). Indeed, if it were otherwise, the logical extreme of Plaintiff's contention would be breathtaking. Every homeowner with any reason to be concerned about the safety of their home or the surrounding property could be inferred to have knowledge of virtually anything happening at their home. This Court will not apply such an inference.

In conclusion, the Court holds that the new facts appropriately considered, both independently and together, when added to the allegations already made in the operative Complaint, fail to make a plausible claim that Defendant Landau knew or should have known of Apodaca's dangerousness or that he would use her home to intentionally harm Plaintiff.

Based on the Court's earlier duty analysis, this holding excludes the information which Defendant Landau could have learned from the comprehensive background check proposed by Plaintiff. Nevertheless, the Court holds, in the alternative, that—

adding into consideration the information which Defendant Landau could have learned from the comprehensive background check proposed by Plaintiff—Plaintiff's claim remains implausible because that information would not have led a reasonable person to conclude that Apodaca presented a foreseeable risk of harm to others.  The Court's October 18 Order held that Plaintiff "fail[ed] to allege what information would have put Defendant Landau on notice of Apodaca's concerning behavior with minor children had she conducted a formal background check before allowing him to watch her Santa Fe home in Summer 2020."  *See doc. 111* at 20.  Now, Plaintiff contends that three "available sources of information" could have provided Defendant Landau with pertinent facts about Apodaca prior to the summer of 2020.  *Doc. 112-1* ¶ 469.  First, Plaintiff references Apodaca's ineligibility for rehire at Presbyterian Healthcare Services ("PHS") in 2018.  *Id*. ¶ 471.  Second, Plaintiff points to internal reports of Apodaca's interactions and relationships with children at Gonzales Community School ("GCS"), which necessitated corrective action.  *Id*.  For this second piece of information, Plaintiff relies on a November 1, 2019, email from the GCS principal to Apodaca outlining his behavioral expectations, including avoiding one-on-one meetings with students in locked rooms, keeping the school's health office door unlocked and open unless absent, and referring students seeking counseling to the school counselor rather than providing counseling personally.  *Id*. ¶ 112.  Third, Plaintiff highlights a Uniform Crash Report from the Santa Fe Police Department stemming from a car accident that occurred on

19

January 20, 2019, which indicates that Apodaca was found traveling alone in a vehicle with an unrelated eleven-year-old boy.  *Id.* ¶ 472; *see also doc. 114-1*.[3]

These new allegations would not alter the Court's October 18 determination, as none of the three "available sources of information" would have led a reasonable person to conclude that Apodaca presented a foreseeable risk of harm to others.  To begin with, the Court addressed Apodaca's ineligibility for rehire in its October 18 Order.  *See Doc. 111* at 20 ("Apodaca's mere ineligibility for rehire at [PHS] in 2018 would not have put Defendant Landau on notice that Apodaca would intentionally harm a minor in her home.").  The Court's established opinion regarding Apodaca's ineligibility for rehire at PHS is further supported by the fact that he was later employed by a school—a position that clearly entailed working with and around children.

Next, even assuming that Defendant Landau could have obtained the November 1, 2019, email from the GCS principal to Apodaca outlining his behavioral expectations at GCS before she hired him to house-sit her home, the contents of that email still do not

---

[3] Defendant Landau attaches to her response a copy of the State of New Mexico Uniform Crash Report ("Report") that Plaintiff's allegation relies upon and argues that the Court should consider it because the Report is central to Plaintiff's claim.  *See doc. 114* at 7 (citing *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1129 (10th Cir. 2024)).  Plaintiff did not refute, in writing or at the hearing, that the Report is central to his claim or is inauthentic.  The Court agrees that the Report is central to Plaintiff's claim and will consider it for purposes of resolving this Motion.  *See McNellis* at 1128 n.3 ("Generally, the sufficiency of a complaint [under Rule 12(b)(6)] must rest on its contents alone. If a district court looks outside the contents of the complaint, it must convert the Rule 12(b)(6) motion to a motion for summary judgment, giving proper notice to the parties. But there are exceptions to this rule. Courts are permitted to review documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.") (internal quotations and citations omitted).

provide a sufficient basis for a reasonable person to conclude that Apodaca posed a

foreseeable risk of harm to others.  The Court recognizes that the email's content might

lead a reasonable person to question whether Apodaca's behavior with minors at GCS

was, at some point, concerning.  However, this initial reaction is dramatically

undermined by the fact that Apodaca remained employed at GCS through the end of

the school year and was subsequently hired by another school.  Considering that

Apodaca continued to work with children in an official capacity after the November 1,

2019, email, that email would not be near sufficient for a person in Defendant Landau's

position to conclude that Apodaca posed a foreseeable risk to children or others—much

less while house-sitting an unoccupied home.

      Finally, the Uniform Crash Report ("Report") indicating that Apodaca was

traveling alone in a car with an eleven-year-old boy unrelated to him would not lead a

reasonable person to conclude that Apodaca presented a foreseeable risk of harm to

others.  The Report that Plaintiff relies on merely indicates that Apodaca and the

unrelated eleven-year-old boy were in a car accident on January 20, 2019, and that the

boy's "parent arrived" and "refused any further medical attention."  *See doc. 114-1*.  The

Report provides no indication that the eleven-year-old boy was with Apodaca for any

inappropriate purpose.  The Court finds it unnecessary to exhaustively enumerate the

various legitimate reasons why an adult man, especially one who worked at a school at

the time, might be in the company of an unrelated minor.  However, it rejects Plaintiff's

alarmist interpretation, declining to assume that a reasonable person would interpret the Report as evidence of a "known danger and risk" associated with an adult man accompanied by an unrelated minor.  Relatedly, there are no allegations that Apodaca had a criminal record prior to the summer of 2020 or before he started house-sitting Defendant Landau's Santa Fe home.

Consequently, even assuming Defendant Landau had a duty to conduct a background investigation as imagined by Plaintiff, the information she allegedly would have found would not, independently or together with Plaintiff's other allegations, provide Defendant Landau a reasonable basis to conclude that Apodaca posed a foreseeable risk of harm to others.  For the reasons explained above, Plaintiff's proposed Complaint fails to make a plausible claim that Defendant Landau knew or reasonably should have known that Apodaca posed a foreseeable risk to others.  As such, the Motion is futile with respect to Plaintiff's Premises Liability claim against Defendant Landau.

## V.    ANALYSIS OF NEGLIGENT RETENTION OR HIRING

"Negligence in hiring or retention is based on the employer's negligent acts or omissions in hiring or retaining an employee when the employer knows or should know, through the exercise of reasonable care, that the employee is incompetent or unfit." *Lessard v. Coronado Paint & Decorating Ctr., Inc.*, 168 P.3d 155, 165 (citations omitted).  For a negligent hiring claim, "there must be evidence that the employee was

unfit, considering the nature of the employment and the risk he posed to those with whom he would foreseeably associate, and that the employer knew or should have known that the employee was unfit." *Id*. (quoting *Valdez v. Warner*, 742 P.2d 517, 519 (N.M. Ct. App. 1987). "The proper standard for determining whether an employer should be held liable for negligent supervision or retention of an employee is whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee who is entrusted with such position." *Cain v. Champion Window Co. of Albuquerque, LLC*, 164 P.3d 90, 96 (N.M. Ct. App. 2007) (citation omitted). "Whether the hiring or retention of an employee constitutes negligence depends upon the facts and circumstances of each case." *F & T Co. v. Woods*, 594 P.2d 745, 749 (N.M. 1979).

For the same reasons explained above, *supra* p. 14-22, Plaintiff's proposed Complaint fails to make a plausible claim that Defendant Landau knew or reasonably should have known that Apodaca was unfit to perform house-sitting services for her. As such, the Motion is futile with respect to Plaintiff's Negligent Hiring and Retention claim against Defendant Landau.

## VI.    CONCLUSION

Having found Plaintiff's Motion to for Leave to File His Third Amended Complaint for Damages for Violations of Civil Rights, Title IX, and Other Tortious Conduct (*doc. 112*) futile on all relevant claims, IT IS THEREFORE ORDERED that the Motion is DENIED.

Having given Plaintiff an opportunity to amend and advising him that, should it be denied, the remaining claims against Defendant Landau would be dismissed with prejudice, (*see doc. 111* at 25), IT IS FURTHER ORDERED that Plaintiff's Negligence/Premises Liability claim (Count XII) against Defendant Landau is DISMISSED WITH PREJUDICE.

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**