IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JOHN DOE,

     Plaintiff,

v.                                        Civ. No. 23-1025 GBW/JFR

SANTA FE PUBLIC SCHOOLS, *et al.*,

     Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the Archdiocese Defendants'[1] Motion for

Summary Judgment on Count VIII of Plaintiff's Second Amended Complaint (*doc. 186*),

Defendant Robin Chavez's Renewed Motion for Summary Judgment on Count VI of

Plaintiff's Second Amended Complaint (*doc. 187*), and Plaintiff's Motion for Summary

Judgment Against the Archdiocese Defendants as to Count VIII of the Second Amended

Complaint (*doc. 204*).

## I.    Background

This action was filed in the First Judicial District Court on August 22, 2023, and

removed on November 20, 2023. *Docs. 1, 1-1.* The operative Second Amended

---

[1] "Archdiocese Defendants" refers collectively to Defendants Roman Catholic Church of the Archdiocese of Santa Fe, Santo Niño Regional Catholic School, San Isidro Parish, Cristo Rey Parish, Shrine of Our Lady of Guadalupe Parish, St. Anthony of Padua Parish, St. Anne's Parish, St. John the Baptist Parish, Santa Maria de la Paz Catholic Community Parish, and the Cathedral Basilica of St. Francis of Assisi Parish. *See doc. 82* at ¶¶ 11–20.

Complaint was filed June 4, 2024.  *Doc. 82.*  All claims arise out of Plaintiff's sexual abuse by Defendant Robert Apodaca while Plaintiff was a student at Gonzales Community School (Gonzales) in 2018–2019, and a part-time employee at Santa Niño Regional Catholic School (Santa Niño) in summer 2020.

The Archdiocese Defendants and Chavez previously moved for summary judgment.  *Docs. 127, 131.*  The Court granted Plaintiff's Rule 56(d) motion for limited additional discovery as to Counts VI and VIII and denied both motions without prejudice on those claims.[2]  *Doc. 175* at 26.  The Court held that if Plaintiff adduced evidence of all the probable facts identified in his Rule 56(d) declarations, those facts could create a genuine issue about whether Chavez knew or reasonably should have known the risk posed by Apodaca.  *Id.* at 15, 25.

Following the additional discovery, the Archdiocese Defendants and Chavez filed renewed summary judgment motions.  *Docs. 186, 187.*  Plaintiff filed a cross motion for summary judgment on Count VIII.  *Doc. 204.*  All three motions are now before the Court.

## II.    Undisputed Facts

Based on the parties' briefing and the record as a whole, the Court finds the following material facts are undisputed for the purposes of summary judgment:[3]

---

[2] The Court granted Chavez's summary judgment motion as to Count II.  *Doc. 175* at 26.

[3] "AUMF" refers to the Archdiocese Defendants' Undisputed Material Facts (*doc. 186* at 3–5), "CUMF" to Chavez's Undisputed Material Facts (*doc. 187* at 2–6), and "PUMF" to Plaintiff's Undisputed

1.      Robert Apodaca began working for Santa Fe Public Schools (SFPS) in 2012 as a nurse aide.  AUMF 1; PUMF 6; *doc. 131-1*.

2.      Apodaca worked at Gonzales during some or all of the 2017–2018, 2018–2019, and 2019–2020 school years as a nurse aide.  AUMF 1; *doc. 131-1*.

3.      Robin Chavez was the assistant principal at Gonzales during the 2017–2018 and 2018–2019 school years.  AUMF 2; CUMF 1.

4.      Plaintiff attended Gonzales as a student in seventh grade during the 2017–2018 school year, and in eighth grade during the 2018–2019 school year.  *Doc. 211-1*[4] at ¶ 3.

5.      While Plaintiff was a student at Gonzales, Apodaca sexually abused him in the nurse's office almost daily.  PUMF 4; *doc. 211-1* at ¶¶ 13, 29.

6.      Chavez's employment at Gonzales ended in June 2019, at the end of the 2018–2019 school year.  CUMF 7; AUMF 3.

7.      Chavez began working at Santo Niño on July 1, 2019, as the principal.  AUMF 3; *doc. 193-1* at 3, 17:13–20.

8.      Soon after Chavez began working at Santo Niño, she invited Apodaca to apply for a position administering the after-school program.  *Doc. 193-1* at 5, 23:13–22.

_____

Material Facts (*doc. 204* at 2–14).  Where the Court cites one of the parties' material facts, it does so pursuant to Rule 56(e)(2) because the fact in question was not specifically disputed.  *See* Fed. R. Civ. P. 56(e)(2).  Where the Court cites to evidence in the record, it does so pursuant to Rule 56(c)(3), which permits consideration of "other materials in the record."  Fed. R. Civ. P. 56(c)(3).

[4] The originally submitted version of Plaintiff's declaration was unsigned.  *See doc. 194-3*.  The error was subsequently corrected and a signed version filed on the docket.  *See docs. 211, 211-1*.

9.      In August 2019, Apodaca completed a written application for employment with the after-school care program at Santo Niño.  *Doc. 131-4.*

10.      On August 14, 2019, Santo Niño obtained a Background Screening Report on Apodaca, which included results from the National Criminal Database and came back "clear."  *Doc. 131-6.*

11.      In August 2019, Santo Niño sent reference requests to the three references listed on Apodaca's application: Anita Hett, Apodaca's direct supervisor at SFPS; Heather Wolf-Espinoza, a "co-worker" at Gonzales; and Randy Saunders, Apodaca's supervisor at Boy Scouts of America, where Apodaca was a seasonal employee.  *Doc. 194-8 at 2–4.*  All three references recommended Apodaca "with enthusiasm."  *Id*.

12.      In fall 2019, Apodaca was hired at Santo Niño as a health aide, also referred to as the "school nurse," and as director of the after-school program.  PUMF 3; *doc. 193-1 at 6, 28:6–9; doc. 204-3.*

13.      In spring 2020, Apodaca was given a new position as director of the 2020 Santo Niño summer camp.  PUMF 3; *doc. 193-1 at 13, 55:10–17.*

14.      On May 19, 2020, Santo Niño obtained a background check of Apodaca from the New Mexico Children, Youth and Families Department (CYFD), which stated that Apodaca was "eligible to provide care in accordance with Title 8, Chapter 8, Part 3, Governing Background Checks and Employment History Verification."  *Doc. 131-8.*

15.     In June through July 2020, Plaintiff worked as a seasonal teen employee in Santo Niño's summer program.  AUMF 7; *doc. 131-9*.

16.     Plaintiff did not report sexual abuse or other misconduct by Apodaca to anyone else at Santo Niño while he was there.  AUMF 7; *doc. 131-10*.

17.     On April 26, 2021, a Santo Niño employee reported that she had seen Apodaca in a locked room with students, one of whom was sitting on his lap.  AUMF 8; *doc. 131-12*.

18.     On April 27, 2021, Apodaca was placed on administrative leave and did not return to work at Santo Niño at any time thereafter.  AUMF 8; *doc. 131-12* at 2.

19.     On August 18, 2025, Apodaca was found guilty of one count criminal sexual contact of a minor in the second degree (child under 13) and one count criminal sexual contact of a minor in the third degree (child under 13), and on September 19, 2025, he was sentenced to a total term of fifteen years' imprisonment.  *Doc. 193-7* at 15.

## III.    **Legal Standard**

Under Federal Rule of Civil Procedure 56(a), the Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case."  *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  The

non-moving party is then required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citations omitted).

In applying this standard, the Court must draw all "reasonable inferences" in favor of the non-moving party. *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir. 1998). Summary judgment is appropriate only "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## IV.    Defendant Chavez's Motion

Defendant Robin Chavez moves for summary judgment on Count VI, which asserts a tort claim under NMSA § 41-4-6, because Plaintiff cannot show she was aware of the "dangerous condition" created by Apodaca's presence at Gonzales. *See generally doc. 187*. Plaintiff argues there is a genuine dispute about whether Chavez knew or should have known of Apodaca's sexual misconduct. *See generally doc. 208*.

### A.    Evidence of Chavez's Knowledge

The parties agree the motion turns largely on Chavez's knowledge of Apodaca's misconduct. The relevant evidence,[5] viewed in the light most favorable to Plaintiff, is as follows.

#### a.    Visits to the Nurse's Office

Chavez was aware that an excessive number of students were visiting the nurse's office, and that certain students were visiting the nurse's office frequently. Anita Hett, the lead nurse at SFPS and Apodaca's direct supervisor, testified at deposition that she received a complaint from the administration about "a lot of students going to the health office." *Doc. 193-2* at 13, 84:7–85:6. She "took it as a crowd control issue" and told Apodaca to make sure every student had a pass because "[w]e never want a bunch of kids coming into the nurse's office at one time." *Id*. Although she could not remember "for sure," Hett believed it was Chavez who reported the issue to her. *Id*.

---

[5] Excluded from this summary are numerous immaterial facts. For example, while considerable argument is dedicated to establishing that Apodaca and Chavez were friends or friendly with one another, the Court finds the dispute is genuine but not material. No reasonable inference of Chavez's awareness that Apodaca was a child sexual predator, or her willingness to ignore the same, arises from the fact that the two of them were friends. Some of the other facts asserted by Plaintiff involve yet more tenuous inferences. For example, Plaintiff attaches an email with the subject line "When to see the Nurse?" in which Apodaca wrote, inter alia: "One day i [sic] will write a book about the stuff i [sic] see in the Health Office. It's going to be called 'Behind the Band-Aid- The tail [sic] of many ailments." *Doc. 193-25*. Christopher Lopez, Plaintiff's teacher, responded: "Tail . . . hahahahahahaha." *Id*. Plaintiff suggests that because "tail" is "a well-known slang term for sexual intercourse or a sexual partner, it is reasonable to infer that Lopez found humor in Apodaca's error because it spoke to his open and obvious grooming." *Doc. 208* at 6 n.2. Under no remotely plausible construction can it be suggested that Lopez recognized Apodaca's spelling error—which was accompanied by numerous other errors—as a humorous reference to actual, ongoing sexual abuse of minor students at Gonzales.

She testified:

> We don't like to have crowds of students coming all together because, usually, it's one student who's injured or ill.  But oftentimes, kids want to come en masse to the nurse's office.  And so that was something that was a problem district-wide with students just coming into the nurse's office en masse.  And to this day, I'm sure it's a problem.

*Doc. 186-5* at 2, 44:14–21.

Rebecca Vollmer, a school secretary, testified that she noticed one particular student going to the nurse's office a lot.  *Doc. 194-1* at 9–11, 32:24–34:12.  When Vollmer mentioned this to the student's stepfather, he stated that he was aware and Apodaca was a family friend.  *Id*.  Vollmer testified in 2024 that she "want[ed] to say" she reported the discussion to Chavez, *id*. at 20, 72:8–10, though in 2025 she testified she did not remember whether she told Chavez, *id*. at 11, 34:22–25.  She thought it was important for the administration to know because "the student wasn't in class and why was the student in the nurse's office when they should be in class."  *Id*. at 12, 35:22–25.

In addition to the general issue of frequent visits to the nurse's office, there is evidence that Chavez knew Plaintiff, specifically, was a frequent visitor.  Plaintiff states in his declaration that Chavez saw him at the nurse's office on "many mornings," because Plaintiff went there "almost every day" and Chavez was often in the nurse's office when he arrived.  *Doc. 211-1* at ¶¶ 13, 17, 34.  She "would walk out into the hall as soon as [Plaintiff] went in and the door would be closed behind her."  *Id*. at ¶ 35.  In addition, Chavez sometimes observed Plaintiff standing outside the nurse's office

8

knocking on the door; when she came by, Plaintiff would stop knocking and "hurry along." *Id*. at ¶ 28.

### b. Water Pouring Incident

Hett testified that she recalled receiving a complaint from either Chavez or Candice Flint,[6] the principal, about an incident on the playground where Apodaca "poured water or was going to pour water over a student's head, but the student thought it was orange juice because it was in an orange juice container." *Doc. 193-2* at 10; *see also id.* at 12. Hett testified that Apodaca said it was "a joke," but the child "was upset about it." *Doc. 193-2* at 12.

### c. Locked Door Incident(s)

The parties dispute Chavez's knowledge of an incident, or incidents, where Apodaca was found in the nurse's office with the door locked and a student inside. Michelle Romero, a security guard at Gonzales during the 2018–2019 and 2019–2020 school years, stated by affidavit that on one occasion she was called to the main office by Candice Flint and "told to go check the door to the nurse's office." *Doc. 194-4* at ¶ 18. Romero found the door locked, the lights off, and the blinds drawn, and no one answered when she knocked. *Id*. After reporting back to Flint, Romero walked past the

---

[6] In 2024, Hett testified that she "[thought] [the report] was from Robin . . . Chavez." *Doc. 193-2* at 12. In her subsequent deposition in November 2025, she first stated she did not "recall whether it was from Robin Chavez . . . or Candice Flint," *id*. at 10, but when reminded of her prior testimony, agreed, "I think it was Robin Chavez," *id*. In any event, for summary judgment purposes, the Court reasonably infers Chavez knew of the incident.

nurse's office again and observed that Apodaca "opened the door and a little boy came out." *Id.* at ¶ 20. The boy "looked scared and sad." *Id.* Romero went back to Flint to report what she saw and stated that she was "worried." *Id.* at ¶ 21. Romero thought she should write a report, but Flint told her not to. *Id.*

Flint testified at deposition that on November 1, 2019, there was a "locked door incident" involving Apodaca. *Doc. 193-13* at 6, 38:21–22. According to her version of events, "[t]he security guard" told Rebecca Vollmer, who in turn told Flint, that "Apodaca might be in the nurse's office with a locked door, and there might be students in there." *Id.* at 6, 39:1–9. Flint "immediately" grabbed her keys, went to the nurse's office, unlocked the door, and walked in. *Id.* at 6, 39:11–13. She found Apodaca standing near his desk and a student sitting in one of the chairs. *Id.* at 10, 75:17–18. Flint took Apodaca back to her office and had a discussion with Apodaca and Christopher Lopez, the assistant principal. *Id.* at 10, 75:20–76:6. Flint followed up with an email to Apodaca on November 1, 2019, which related "expectations for your behavior" and stated: "Do not meet alone with a student in a locked room." *Doc. 193-17.* Flint stated this incident was "the first occasion that anything of possible misconduct was reported to [her]" involving Apodaca. *Doc. 193-13* at 6, 40:1–2.

Vollmer testified at deposition in 2025 that she recalled an incident where Romero reported Apodaca was in the nurse's office with a boy. *Doc. 186-4* at 3, 42:23–43:4. She was reminded by counsel of prior deposition testimony that she relayed

10

Romero's report to "the principals" and that this "included Ms. Chavez."[7]  *Id*. at 3, 43:5–11.  Vollmer responded: "I don't recall who it was told to. I don't recall if it was told to Dr. Flint or Ms. Chavez or both."  *Id*. at 3, 43:13–15.  She testified that she did not recall who was assistant principal at the time.  *Id*. at 4, 51:24–52:3.

Allicia Chavez,[8] the other school secretary, testified that she recalled Apodaca being "spoken to by the principals" about keeping the door locked when a student was in the nurse's office.  *Doc. 193-12* at 11, 62:12–22.  She stated the conversation took place in Flint's office and Chavez was present.  *Id*. at 11, 63:1–3.  The door was closed and Allicia Chavez did not know "what the conversation was."  *Id*. at 11, 62:21–22. Additionally, Allicia Chavez recalled an incident where Romero came in and said the nurse's office door was closed with a student inside.  *Id*. at 12, 66:1–10.  Allicia Chavez told Romero to "go tell the principal."  *Id*. at 12, 66:10.  In response to questioning, Allicia Chavez explained that "the principal" meant "Dr. Flint and Robin Chavez."  *Id*. at 12, 66:20–22.  However, she did not recall whether both Flint and Chavez were present at the time.  *Id*. at 12, 66:23–25.

It is undisputed that on November 1, 2019, the date documented in Flint's email, Chavez no longer worked at Gonzales.  In fact, she had ceased working at Gonzales in

---

[7] Surprisingly, the referenced portion of Vollmer's prior deposition is not included in Plaintiff's exhibit, *see doc. 194-1* at 19–20, and the Court is not aware that it was filed elsewhere on the docket.

[8] To avoid confusion, Allicia Chavez is referred to by her full name.  All references to "Chavez" are to Defendant Robin Chavez.

June 2019 at the end of the previous school year.  CUMF 7; AUMF 3.  As there is no evidence to suggest that she was informed of it outside of her employment by Gonzales, there is no basis on which to impute to her knowledge of the November incident.  However, Plaintiff posits that there were at least two separate "locked door" incidents, one of which occurred while Chavez was assistant principal.  *See doc. 208* at 4 & n.1.  This version of events leaves some puzzling inconsistencies—such as why, for example, Romero's declaration describes only one incident.  But it is not the Court's role to weigh the evidence on summary judgment.  *See Anderson*, 477 U.S. at 249.  Therefore, drawing all reasonable inferences in Plaintiff's favor, the Court concludes there is evidence from which a reasonable juror could find that Chavez was aware of an incident where Apodaca was found in the nurse's office with the door locked and a student inside.

d.      Driving Plaintiff[9] to and from School

Plaintiff's declaration states that Apodaca drove him to and from school and that "Ms. Chavez must have known I was leaving with Robert because the administrative office was small and everyone could see and hear everything that happened in it."  *Doc. 211-1* at ¶ 21.  Vollmer also testified that on one occasion, she saw Apodaca leaving with Plaintiff at the end of the day, and she informed Apodaca it was something he could

---

[9] Plaintiff's brief states as an undisputed material fact that Apodaca also drove another boy named J.L. home from school.  *Doc. 208* at 6.  But it appears that the evidence cited in support of this proposition ("Doc. 193-12, (Tr. 3/20/24, Vol. 2, 69:23-25)") does not exist on the record before the Court, as page 69 is not included in the exhibit.  *See generally doc. 193-12*.  The Court therefore cannot consider it on summary judgment.  In any case, the inclusion of similar facts for an additional student would not alter the Court's determination.

"get in trouble for." *Doc. 186-4* at 2, 31:2–12.  Vollmer testified she gave him this warning because it was her understanding that employees were "not supposed to take students in your vehicle" due to "mainly, the liability." *Id.* at 2, 31:19–22.  Apodaca told her that it was approved by Plaintiff's parent.[10]  *Id.* at 2, 31: 13–16.  The Court finds it is reasonable to infer, on summary judgment, that Chavez was aware that Apodaca was transporting Plaintiff with the apparent approval of his parents.

e.  Flint's Knowledge

The record, viewed in the light most favorable to Plaintiff, shows Flint was aware of several indications of potential sexual misconduct.  Most notably, there is evidence that Flint was aware of an incident during lunch where Apodaca made sexual gestures and sounds behind a student.  Robert Padilla, a custodian at Gonzales during the 2018–2019 school year, observed Apodaca walking behind "one of the kids" and "saying 'umm' and . . . making . . . a gesture, like he wanted to hump the person from behind." *Doc. 193-10* at 4, 14:1–6.  Padilla reported the incident to Elaine Wood, the head custodian, then went to the principal's office and talked to Flint one-on-one.  *Id.* at 4, 15:22–16:4.  Flint said "she would take care of it" and did not ask Padilla to write a

---

[10] Plaintiff's declaration does not deny, indeed it does not address, that his parent(s) knew about and approved Apodaca's driving him to and from school.  However, Apodaca's response that a parent "approved it" accords with the Amended Complaint, which alleges that Apodaca "would provide transportation from school to Plaintiff's grandparent's home when Plaintiff's mother was unavailable" and "would transport Plaintiff to baseball practice." *Doc. 82* at ¶ 141.  Because there is no contrary evidence of record, the Court finds there is no genuine dispute that Plaintiff's parent gave permission for Apodaca to transport him in his personal vehicle.

report. *Id*. at 4, 16:21–24. There is no evidence that Flint discussed the incident with Chavez, or that either Padilla or Wood reported it to Chavez. *See id*.; *doc. 193-9 at 7, 39:16–20*. Indeed, there is no evidence that anyone else was made aware of the incident.

Romero's affidavit states that she, too, raised concerns of possible inappropriate conduct with Flint. She reported that she "was worried about Robert's relationship with little boys," but was "repeatedly told that it was not my business and that I should go about my job." *Doc. 194-4* at ¶ 23. Romero "understood the message to be that if I wanted to keep working at Gonzales, I needed to drop it." *Id*. She felt that her worries were "swept under the rug" by Flint. *Id*. at ¶ 25. There is no evidence from either Romero or Flint that Romero's concern about sexual abuse was ever communicated to Chavez.

Plaintiff argues that Flint's knowledge can be attributed to Chavez because they worked closely together, and it is therefore unbelievable that Flint would not have notified Chavez of "reports of pedophilia by a staff member." *Doc. 208* at 15–16. The Court disagrees. Importantly, the reports received by Flint fell far short of alleging "pedophilia." Given the actual content of the reports, Flint and Chavez's working relationship, standing alone, is insufficient to create a reasonable inference that Flint shared all of her knowledge about Apodaca's conduct with Chavez. In the absence of supporting evidence, the Court finds Plaintiff has made no genuine showing that

14

Chavez was aware of these reports.[11]

> f.      Physical Affection with Students

There is evidence that Apodaca sometimes linked arms with students around the school and showed similar signs of physical affection.  Plaintiff states in his declaration: "Robert showed physical affection towards me on the Gonzales campus in public, like putting his arm around me in a hug and walking side-by-side."  *Doc. 211-1* at ¶ 22. Romero likewise stated in her affidavit that Apodaca "would walk around school grounds with arms physically locked with a young boy."  *Doc. 194-4* at ¶ 6.

Absent from the record, however, is any evidence that Chavez actually observed or was informed about this behavior.  Plaintiff's declaration states: "I know it must have been obvious to all the other adults at Gonzales and Santo Niño, including . . . Ms. Chavez."  *Doc. 211-1* at ¶ 45.  He does not state that Chavez was actually present at any time when Apodaca put his arm around Plaintiff, nor—critically—does he provide any information about the frequency of this conduct.  If, for example, Plaintiff's declaration stated that Apodaca put his arm around Plaintiff daily for extended periods of time, the

---

[11] Hett's knowledge also cannot properly be attributed to Chavez.  Plaintiff's brief lists as a material fact that Esther Vigil, a nurse aide in training, saw Apodaca leave the office with a boy to examine his genitals.  *See doc. 208* at 4–5.  The boy told Apodaca he had something "down there" on his penis, and Apodaca said, "Let's go take a look at it."  *Doc. 193-14* at ¶ 10, 12–13.  Vigil told Apodaca he could not examine the boy's genitals, and Apodaca responded: "Yes I can.  I'm a nurse."  *Id*. at ¶ 14.  He then left the office with the boy for ten or fifteen minutes.  *Id*.  Vigil stated she "raised [her] concerns with Anita Hett" but did not believe anything was done.  *Id*. at ¶ 25.  Plaintiff does not argue that Chavez was aware of this incident, and there is no evidence that she was.  It is therefore immaterial to the question of Chavez's knowledge.

evidence might be sufficient to bridge the gap between pure conjecture and reasonable

inference.  But Plaintiff makes no representation about the frequency or length of these

physical displays of affection.  On this point, it is telling that Elaine Wood, the head

custodian who had an opportunity to observe Apodaca around students and stated that

she was concerned about his behavior, did not observe any "instances of physical

closeness" such as "arms around each other."  *Doc. 193-9* at 3, 17:10–13.  It therefore

cannot reasonably be inferred, based solely on Plaintiff's conclusory statement that it

"must have been obvious," *doc. 211-1* at ¶ 45, that Chavez was aware of the physical

contact between Apodaca and Plaintiff or other students.

### B.    Liability under Section 41-4-6

NMSA § 41-4-6, commonly called the "building waiver," waives governmental

immunity for

> damages resulting from bodily injury, wrongful death or property
> damage caused by the negligence of public employees while acting within
> the scope of their duties in the operation or maintenance of any building,
> public park, machinery, equipment or furnishings.

*Id*. § 41-4-6(A).  The waiver "is not limited to injuries resulting from a physical defect on

the premises." *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616 (N.M. 2013).

Rather, New Mexico courts "interpret Section 41-4-6(A) broadly to waive immunity

'where due to the alleged negligence of public employees an injury arises from an

unsafe, dangerous, or defective condition on property owned and operated by the

16

government.'"  *Id*. at 616–17 (quoting *Castillo v. Cnty. of Santa Fe*, 755 P.2d 48, 49 (N.M. 1988)).

Liability under the New Mexico Tort Claims Act (NMTCA) is "based upon the traditional tort concepts of duty and the reasonably prudent person's standard of care in the performance of that duty."  NMSA § 41-4-2(B).  Accordingly, building waiver claims are evaluated under a common law theory of premises liability.  *Sanders v. N.M. Corr. Dep't*, 562 P.3d 572, 582 (N.M. 2024).  "[T]he facts of a case will support a waiver . . . if they would support a finding of liability against a private property owner." *Encinias*, 310 P.3d at 618.  New Mexico law imposes a duty on property owners to protect visitors from "the harmful acts of third persons if, by the exercise of reasonable care, the proprietor could have discovered that such acts were being done or about to be done, and could have protected against the injury by controlling the conduct of the other patron."  *Id*. (quoting *Coca v. Arceo*, 376 P.2d 970, 973 (N.M. 1962)); *see also Valdez v. Warner*, 742 P.2d 517, 519 (N.M. Ct. App. 1987) ("The term 'third persons' includes employees acting outside the scope of their employment." (citations omitted)).

When assessing claims under § 41-4-6, the court determines duty as a threshold matter.  *Sanders*, 562 P.3d at 584 (citing *Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P.*, 326 P.3d 465, 474 (N.M. 2014)).  If the court finds the government had a duty to the plaintiff, it then determines the applicability of the building waiver to the established facts.  *Id*. at 584–85.  The plaintiff must show either (1) "an operational failure to respond to or

17

discover conditions which can pose a danger to a class of persons involved in or affected by an activity on the property," or (2) "a failure to create and/or to implement reasonably appropriate safety policies and operational procedures." *Id.* at 583 (quoting *Gebler v. Valencia Reg'l Emergency Commc'ns Ctr.*, 535 P.3d 763, 769 (N.M. Ct. App. 2023)). "These two scenarios are not mutually exclusive and the facts alleged by a plaintiff can include characteristics of both." *Vanhorn v. Carlsbad Mun. Sch. Dist.*, 545 P.3d 1182, 1187 (N.M. Ct. App. 2024).

There is no doubt that Chavez, as a school administrator, owed Plaintiff a duty of reasonable care, and there is likewise no doubt that Apodaca's presence created a dangerous condition for a class of persons at Gonzales. *See doc. 175* at 16–17. The dispositive question is whether Chavez knew or should have known about the danger Apodaca posed. While the government "does not 'have the duty to do everything that might be done,'" public employees "can be liable for the violent acts of a third party if the government reasonably should have discovered and could have prevented the incident." *Encinias*, 310 P.3d at 619 (quoting NMSA § 41-4-2(A)). In *Encinias*, the plaintiff was beaten by a classmate in an area that the school had cordoned off for food vendors. *Id.* at 614. Because the plaintiff produced an affidavit from an assistant principal stating that the area was considered a "hot zone" with a history of student violence, the New Mexico Supreme Court found there was a genuine issue of material fact as to the school's awareness of the danger. *Id.* at 617–18. The court emphasized

18

that "a single act of student-on-student violence does not render the premises unsafe," but rather, there must be "facts to suggest that the school, in the exercise of ordinary care, could have discovered that the violence was about to occur." *Id*. at 617.

Following the same principles, courts have consistently held that liability under § 41-4-6 is appropriate only if the employee "knew or should have known of the danger posed by the condition." *Green v. Padilla*, 484 F. Supp. 3d 1098, 1147 (D.N.M. 2020); *see, e.g.*, *Vanhorn*, 545 P.3d at 1188 (finding there was "evidence that the school knew or should have known that their failure to follow policies created a condition that was inherently dangerous to physically limited students" when the plaintiff was allowed out during recess after surgery, in violation of doctor's orders and school policy); *Kreutzer v. Aldo Leopold High Sch.*, 409 P.3d 930, 944 (N.M. Ct. App. 2017) (finding no waiver under § 41-4-6(A) when one student attacked another because, inter alia, "Plaintiffs did not adduce competent evidence . . . that ALHS knew or should have known that [the attacker] had a propensity for violence"); *Callaway v. N.M. Dep't of Corr.*, 875 P.2d 393, 399 (N.M. Ct. App. 1994) ("Plaintiff has stated a claim sufficient to waive immunity under Section 41-4-6 because Defendants knew or should have known that roaming gang members with a known propensity for violence had access to potential weapons in the recreation area . . . and that the danger to other inmates was

19

foreseeable.").[12]

On careful review of the record detailed above, the Court finds there is insufficient evidence that Chavez knew or should have known of Apodaca's propensity for sexual misconduct. The evidence supports Chavez's knowledge of the following facts: (1) a number of students, including Plaintiff, visited nurse's office frequently; (2) a student complained about a prank where Apodaca poured or pretended to pour water on his head; (3) Apodaca regularly drove Plaintiff to and from school with a parent's permission; and (4) on one occasion, Apodaca was talked to about having the door to the nurse's office locked with a student inside. The first three points are largely immaterial to Chavez's awareness that Apodaca was dangerous. The record shows that the frequent visits to the nurse's office were viewed as a "crowd control" issue and a class attendance issue, and that the problem was typical district-wide. *Doc. 186-5* at 2, 44:14–21; *doc. 193-2* at 13, 84:11–14; *doc. 194-1* at 12, 35:22–25. The water-pouring prank, though perhaps inappropriate and unprofessional as a general matter, has no

---

[12] The parties devote some argument to whether, and how, § 41-4-6's waiver applies to claims of negligent supervision. *See doc. 187* at 11–12; *doc. 208* at 17–18; *doc. 214* at 10. "[A] claim of negligent supervision, standing alone, is not sufficient to bring a cause of action within the waiver of immunity created by Section 41-4-6." *Vanhorn v. Carlsbad Mun. Sch. Dist.*, 545 P.3d 1182, 1185 (N.M. Ct. App. 2024) (quotation and citation omitted)). To fall within the scope of the building waiver, the defendant's negligent conduct must "itself . . . create the unsafe conditions." *Espinoza v. Town of Taos*, 905 P.2d 718, 722 (N.M. 1995). In other words, as this Court has previously held, the premises must be "reasonably known to be dangerous in the absence of the supervision that the plaintiff claimed was lacking." *T.R. v. Howard*, Civ. No. 20-276 GBW/JHR, 2023 U.S. Dist. LEXIS 198309, at *61 (D.N.M. Nov. 3, 2023). The Court therefore concludes—and the parties, based on their briefing, seem ultimately to agree—that the question of Chavez's negligent supervision is subsumed in the question whether she knew or should have known that Apodaca's presence was a dangerous condition.

reasonable connection with a propensity for sexual misconduct. And there is no evidence that driving a student to and from school with a parent's permission was against school policy or otherwise inappropriate,[13] or should have led Chavez to suspect that Apodaca was abusing students. Critically, there is no evidence that any concerns about sexual misconduct were ever raised with Chavez, or that she ever observed any inappropriate physical contact or language by Apodaca with students.

Thus, for supporting evidence of knowledge, the Court is left with the fact that Apodaca and a student were in the nurse's office with the door locked. While Flint's testimony establishes that it was inappropriate for the door to be locked, *see doc. 193-13* at 10, 76:17–77:4, there is no evidence that Apodaca was observed doing anything inappropriate with the student, that the student complained of misconduct, or that any concerns or suspicions of sexual misconduct were raised or expressed to Chavez. The Court finds this isolated incident, standing alone, was insufficient to put Chavez on reasonable notice of Apodaca's propensity for sexual misconduct.[14]

---

[13] Plaintiff cites NMAC 6.60.9.9 for the proposition that "[s]taff taking boys from school . . . is a violation of regulatory law." *Doc. 192* at 14. The cited code applies by its terms to "licensed educators," for whom it establishes standards of professional conduct. NMAC 6.60.9.9(A)(1). Plaintiff provides no evidence that Apodaca was a licensed educator. The Court therefore finds the regulation inapplicable.

[14] So finding, the Court notes no inconsistency with its prior ruling under Rule 56(d). At that time, Plaintiff conceded he could not show Chavez's knowledge of a "dangerous condition" on the available record, but identified a list of probable facts to be obtained through discovery. *Doc. 157* at 11. These included—most compellingly—Chavez's awareness that Apodaca "had boys sit in his lap," *doc. 157-1* at ¶ 30, which has not been shown. The Court notes, additionally, that it does not appear any additional evidence of Chavez's knowledge was uncovered through the limited additional discovery; rather, Plaintiff relies now on evidence that was previously available. Nevertheless, despite the prior representation of Plaintiff's counsel that this evidence was insufficient to survive summary judgment, *see doc. 157*, the Court has evaluated the evidence thoroughly and on its merits.

Plaintiff also argues Chavez is liable under § 41-4-6 because she "fail[ed] to implement school policies designed to protect students from sexual misconduct, abuse, assault and harassment by employees of the school." *Doc. 208* at 22. The cited policies generally state that "[t]he principal" is responsible for the organization and administration of the school; that various forms of sexual harassment are prohibited, including "inappropriate touching," verbal abuse, and sexual innuendo; and that the District shall communicate the sexual harassment policy to employees and students and shall "investigate allegations of sexual harassment/misconduct in a timely and thorough way." *Doc. 208-4* at 1–5. Whether Chavez violated the majority of these directives depends, of course, on whether she had any knowledge of Apodaca's sexual harassment or misconduct. Because the Court finds there is insufficient evidence to conclude that she did, the alleged violation of policy does not raise a genuine issue. Arguably, a failure to adequately communicate policies against sexual harassment could support liability if, because of that failing, sexual harassment was not properly reported to management. However, there is insufficient evidence in the record to establish that failures to report improper conduct by Apodaca permitted additional misconduct. Indeed, it appears that Flint, the principal and Chavez's superior at Gonzales, was aware of each discrete inappropriate incident relied upon by Plaintiff. Consequently, there is insufficient evidence to support liability for an alleged violation of policy under a theory that Chavez failed to communicate the sexual harassment

22

policy.

Finally, Plaintiff asserts Chavez violated SFPS Policy 222, which prohibits employees from "receiv[ing] compensation for private instruction or tutoring of a student" unless approved in writing. *Doc. 208-4* at 5. Plaintiff proffers no evidence that Apodaca tutored students for paid compensation; the cited exhibits state only that he "mentored" students and that he "help[ed] [Plaintiff] with [his] homework and schoolwork." *Doc. 194-3* at ¶ 16; *see doc. 208* at 6. Even if such evidence existed, the Court finds there is no logical nexus between the violation of a policy against paid tutoring and a propensity to sexually molest children. The element of proximate cause therefore cannot be established.

## C.    Credibility

Plaintiff argues that summary judgment should be denied based on Chavez's lack of credibility as a witness. He asserts that "Chavez's position rests entirely upon her own credibility and thus a genuine issue of fact is created by her lack of credibility." *Doc. 208* at 14 (citing *Helvie v. Jenkins*, 66 F.4th 1227 (10th Cir. 2023)); *see also doc. 192* at 33. In support, Plaintiff recites a litany of "specific facts" which allegedly "call Chavez's credibility into question and thus preclude summary judgment in her favor." *Doc. 208* at 14. These examples include: (1) false deposition testimony that she never allowed

23

Apodaca to present himself with the qualification of "RN,"[15] (2) failure to report

Apodaca's conduct to law enforcement after he was found with a child sitting in his lap

in April 2021, (3) failure to inform law enforcement about a subsequent email from

parents noting their child's "change in behavior" after visiting Apodaca during the

previous school year, and asking Chavez how the subject should be addressed with the

child, (4) expressing concern about her "legal jeopardy" and calling her attorney before

a search warrant was executed, (5) failure to independently report another student's

allegation of abuse by Apodaca after a teacher reported it to the New Mexico Children,

Youth, and Families Department (CYFD), (6) falsely assuring two students' parents that

she did not believe their children had been with Apodaca during the time period of

concern,[16] and (7) false deposition testimony that she and Apodaca were not close

friends.  *See doc. 193-1* at 6, 28:10–20; *doc. 194-10* at 3, 11, 14–16; *doc. 193-1* at 19, 82:5–9.

---

[15] Plaintiff attaches emails where Apodaca's signature identified him as "BSN/RN," *doc. 194-9* at 7, 9–11, and a letter from Apodaca cosigned by Chavez that identified him as "RN," *id.* at 5.  At deposition, Chavez was questioned and responded as follows:

> Q: Did you allow him to represent himself to members of the Santo Niño community as a registered nurse?
> A: I didn't—I don't think he did that.
> Q: If he did that, would you have allowed it or would he have done that on his own?
> A: I did not allow him to do that.

*Doc. 193-1* at 6, 28:10–20.

[16] Specifically, Chavez told one student's parents via email: "To my knowledge Mr. Apodaca was never alone with [the child] in that the doors to the offices remained open and there were other staff members present."  *Doc. 194-10* at 3.  A police report states that she spoke with another student's parent and they "both believe[d]" the child "was not around Robert during the time frame he disclosed," *id*. at 16.  Plaintiff posits these statements were false because Apodaca discussed allowing the first student "to come down to the front office to talk with me" in an email, *id*. at 7, and because the second student stated during a forensic interview that he was alone with Apodaca "in the heater room of Santo Niño," *doc. 193-7* at 27.  Plaintiff does not attach evidence showing that Chavez actually knew Apodaca was alone with the door closed with either child.

As an initial matter, it is by no means clear that any of the cited evidence establishes Chavez was untruthful. Most of the facts asserted involve questions of judgment or perspective rather than demonstrably false statements, some expose genuine disputes about Chavez's knowledge or awareness, and few if any are material to Plaintiff's claims. But in any event, and critically, Plaintiff cannot substitute assertions about Chavez's credibility for his burden to produce evidence supporting his claim. "Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion." *Alcala v. Ortega*, 128 F.4th 1298, 1306 (10th Cir. 2025) (quoting *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004)). "If the nonmoving party provides insufficient evidence to support its factual assertions, we may accept as true the moving party's version of the facts, as supported by the evidence." *Id.* (citing *Helvie*, 66 F.4th at 1235–36). In short, it is not enough for Plaintiff to implicate Chavez's credibility as a general matter; to defeat summary judgment, Plaintiff must produce evidence that actually supports his version of the facts.

It is true that under certain, limited circumstances, "[d]oubts as to the credibility of the [summary judgment] movant's affiants or witnesses may lead the court to conclude that a genuine issue of material fact exists." *Helvie*, 66 F.4th at 1235 (quoting Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 10A *Fed. Practice & Proc.* § 2726 (4th ed. update Apr. 2022)) (alterations in original). This situation may arise where

25

"the knowledge of the events or occurrences on which the action is based lies exclusively within the control of the party moving for summary judgment," and the relevant facts are therefore "incapable of being effectively controverted." *Id*. (quoting Wright & Miller, 10A *Fed. Practice & Proc.* § 2726); *see also Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980) (noting that "questions of intent, which involve intangible factors including witness creditability, are matters for consideration of the fact finder after a full trial," but affirming summary judgment because the plaintiff failed to show a genuine issue for trial). In *Helvie,* summary judgment depended on whether the defendant officer had observed a handgun in the door of Helvie's vehicle before or after his arrest. 66 F.4th at 1233. The officer stated he observed the firearm before the arrest, while Helvie stated by affidavit that the officer "must" have seen the firearm after he was already subdued. *Id*. The Tenth Circuit found Helvie "did not proffer sufficient circumstantial evidence from which a reasonable jury could find that [the officer's] statements that he saw the gun in the driver's door pocket as he was pulling Helvie from the truck were not credible." *Id*. at 1235–36. Accordingly, summary judgment was affirmed. *Id*. at 1236.

The difficulty with Plaintiff's position is twofold. First, this is not a case where the knowledge of relevant events and occurrences lies exclusively within Chavez's control. *C.f. id.* at 1235. The dispositive question is not one of intent but of Chavez's knowledge and awareness of Apodaca's misconduct, which may be established by

26

direct or circumstantial evidence from other sources, including Plaintiff's own testimony. *C.f. Prochaska*, 632 F.2d at 851. There were numerous other witnesses who could—and did—testify to whether Chavez was present at relevant times and to what she observed, was told, or did.

Second, as previously explained, Plaintiff has failed to produce evidence creating a triable issue of fact. It is not enough for Plaintiff to impugn Chavez's credibility with respect to non-material facts; he must also produce evidence, direct or circumstantial, to contradict her account of the material facts. *See Nat'l Am. Ins.*, 358 F.3d at 742 (affirming summary judgment where, "[i]nstead of presenting contradictory evidence, NAICO attempted to cast doubt upon the credibility of some of Am-Re's evidence"); *Helvie*, 66 F.4th at 1235–36 (affirming summary judgment where the plaintiff failed to produce evidence contradicting the defendant's statement). When evaluating a motion for summary judgment, the court "should not determine whether it believes the movant's evidence; rather, it must determine whether the nonmovant offered any specific facts that demonstrate the existence of a material fact to be tried." *Nat'l Am. Ins. Co.*, 358 F.3d at 743; *see also Celotex*, 477 U.S. at 323 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). Plaintiff has not done so here. The attack on Chavez's credibility is therefore insufficient to overcome summary judgment, and Chavez's motion will be granted for the reasons set forth above.

## V.    Archdiocese Defendants' Motion

Count VIII asserts a claim against the Archdiocese Defendants for negligent failure "to adequately screen, hire, supervise, place and retain Apodaca." *Doc. 82* at ¶ 400. The claim arises from Apodaca's abuse of Plaintiff while acting as his supervisor in the Santo Niño summer program. Plaintiff alleges Apodaca sexually abused him in his car when they went to lunch during work hours, and while driving him to Albuquerque for Plaintiff's required CPR certification. *Id*. at ¶¶ 205–08.

The Archdiocese Defendants and Plaintiff each move for summary judgment. *Docs. 186*, *204*. The Archdiocese Defendants argue there is no evidence to show they knew or should have known of Apodaca's dangerous propensities. *See doc. 186* at 8–12. Plaintiff contends the Archdiocese Defendants should have known Apodaca was unfit based on (1) Chavez's knowledge from her time at Gonzales, and (2) his application materials. *Doc. 204* at 17–25. In addition, Plaintiff asserts the Archdiocese Defendants are liable for negligent supervision independent of their prior knowledge of Apodaca's unfitness. *Id.* at 25–26.

### A.    Applicable Law

Under New Mexico law, "[a] principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." *Lessard v. Coronado Paint & Decorating*

28

*Ctr., Inc.*, 168 P.3d 155, 165 (N.M. Ct. App. 2007) (quoting Restatement (Third) of Agency § 7.05(1) (2006)).  The basic elements of these claims are that the employer knew or should have known the employee was unfit; that the employer failed to exercise reasonable care in hiring, training, supervising or retaining the employee; and that the employer's negligence caused the plaintiff's injury.  *See* NMRA, Civ. UJI 13-1647; *Ocana v. Am. Furniture Co.*, 91 P.3d 58, 73 (N.M. 2004) (standard for negligent supervision or retention is "whether the employer knew or reasonably should have known that some harm might be caused by the acts or omissions of the employee" (quoting *Los Ranchitos v. Tierre Grande, Inc.*, 861 P.2d 263, 269 (N.M. Ct. App. 1993))); *Lessard*, 168 P.3d at 165 ("Negligence in hiring or retention is based on the employer's negligent acts or omissions in hiring or retaining an employee when the employer knows or should know, through the exercise of reasonable care, that the employee is incompetent or unfit." (citing *F & T Co. v. Woods*, 594 P.2d 745, 747 (N.M. 1979))).

### B.  Chavez's Prior Knowledge

For the reasons described above with reference to Chavez's motion, the Court finds the Archdiocese Defendants were not negligent in hiring Apodaca based on Chavez's prior knowledge of his character and conduct.  While tort claims under § 41-4-6 are distinguishable in some ways from common law claims for negligent hiring and retention, the question of knowledge is functionally identical: what the defendant knew or should have known about the risk the employee posed.  The Archdiocese Defendants

29

are therefore entitled to summary judgment to the extent the claims against them are based on Chavez's prior knowledge of Apodaca's dangerous propensities.

### C. Apodaca's Application for Employment

Plaintiff argues that, even without prior knowledge of Apodaca's sexual misconduct at Gonzales, the Archdiocese Defendants were negligent in hiring him because they (1) insufficiently vetted his application, and (2) should have recognized that it was fraudulent on its face. *Doc. 204* at 18–25.

a.   <u>Insufficient Vetting</u>

Plaintiff asserts the Archdiocese Defendants did not conduct even a "minimal" investigation of Apodaca, accepted inadequate "boiler plate" references, did not announce the vacancy "outside the diocese" as required by Santo Niño policy, did not conduct a "face-to-face interview" with Apodaca as required by the "VIRTUS Protecting God's Children 4.0 Program," and did not "have conversations with former employers" as required by NMAC 8.8.3. *Doc. 192* at 42–43; *doc. 204* at 5, 18–21.

The Court disagrees. The undisputed evidence shows that the Archdiocese Defendants did, in fact, conduct some investigation of Apodaca's application. Specifically, Santo Niño obtained a Background Screening Report with results from the National Criminal Database, *doc. 131-6*; obtained written references from the three references listed on Apodaca's application, *doc. 131-7*; and obtained a background check from CYFD, which stated that Apodaca was "eligible to provide care in accordance with

Title 8, Chapter 8, Part 3, Governing Background Checks and Employment History Verification," *doc. 131-8*.  In addition, Chavez had recently worked with Apodaca at Gonzales where she had frequent opportunities to observe his work.  Plaintiff asserts that Apodaca's references were "generic boiler plate assessment" and did not "provide[] anything meaningful about Apodaca or his character."  *Doc. 192 at 42*.  However, all three references recommended Apodaca "with enthusiasm," *doc. 194-8* at 2–4, which would not have alerted Santo Niño to a need for further investigation.  Two were work supervisors and one was a colleague.  *See id*.  Plaintiff does not cite, and the Court is unaware of, any New Mexico law imposing a more stringent reference requirement on prospective employers.[17]  As for Plaintiff's claim that Santo Niño should have advertised the vacancy "outside the diocese," *doc. 204* at 18–19, it appears based on their selection of Apodaca—who was not a diocese employee at the time of his application—that Santo Niño manifestly followed this guidance.[18]  Finally, the assertion that Santo Niño violated its internal policy that hiring should be "dependent upon . . . a person's qualifications for the position," *doc. 204* at 18, is unavailing because there is no

---

[17] Plaintiff also states that the Archdiocese Defendants did not elicit written references "for his hiring as the summer camp director or school nurse."  *Doc. 204* at 12.  Plaintiff provides no authority for the proposition that an employer should obtain separate references when a current employee is hired for a new role, or when an employee is hired a role additional to the one applied for.

[18] Plaintiff also takes issue with Santo Niño's purported failure to give hiring preferences "to practicing Catholics," as required by internal policy, because Apodaca was not Catholic.  *Doc. 204* at 19.  Plaintiff does not demonstrate that there were any Catholic applicants; indeed, the undisputed evidence is that there were no other applicants.  *See doc. 193-1* at 6, 26:8–13.  Nor does Plaintiff demonstrate that Catholic applicants, as a class, are less likely to abuse children than non-Catholic applicants.

evidence that any more qualified applicants applied, or that Apodaca's qualifications for the role were in some respect inadequate.

The Archdiocese Defendants' failure to conduct a face-to-face interview[19] likewise does not establish their negligence.  Although Plaintiff states categorically that "[t]he Archdiocese follows the VIRTUS Protecting God's Children 4.0 Program," *doc. 204* at 5, Plaintiff submits no evidence[20] that the attached "Quick Reference Guide" titled "Steps from *A Plan to Protect God's Children*," which lists various steps for screening, monitoring, and detecting warning signs, *see doc. 204-7*, was adopted as an internal policy of Santo Niño.  Thus, Plaintiff fails to establish that any failure to follow those specific steps constituted a policy violation.  But at any rate, even if there were such a policy, it strains credulity to imagine that a face-to-face employment interview would have altered Chavez's opinion of Apodaca when—as Plaintiff has repeatedly emphasized—she had substantial opportunity to talk with him and observe his behavior as his supervisor at Gonzales.  In short, Plaintiff can show no reasonable possibility that a face-to-face interview would have revealed disqualifying information or altered the outcome of the employment process.

Finally, Plaintiff argues that the Archdiocese Defendants violated the New

---

[19] The Archdiocese Defendants dispute Plaintiff's assertion that there was no face-to-face interview.  *Doc. 209* at 8.  Because the Court finds in any case that the decision not to conduct a face-to-face interview was not negligent, it is immaterial that the fact is disputed.

[20] The cited evidence shows only that Apodaca completed an online course titled "Protecting God's Children" when he was hired at Santo Niño.  *Doc. 204-5* at 3; *doc. 205-2* at 2.

Mexico Administrative Code which required Santo Niño to speak with each former employer and document those conversations. *Doc. 204* at 19. Plaintiff refers to the provision requiring "[t]he licensee" to "verify the employment history of any prospective direct care provider by contacting references and prior employers/agencies to elicit information regarding the reason for leaving prior employment or service; the verification shall be documented and available for review by the licensing authority[.]" NMAC 8.8.3.10(B)(2). "Licensee" is defined as "the holder of, or applicant for, a license, certification, or registration pursuant to 7.20.11 NMAC, 7.20.12 NMAC, 7.8.3 NMAC,[21] or other program or entity within the scope of these rules." NMAC 8.8.3.7(P). Section 8.8.3 as a whole "applies to CYFD-contracted, direct care providers and their employees, subcontractors, volunteers, and student interns." NMAC 8.8.3.2. Plaintiff contends that if Apodaca's former employers had been contacted in accordance with the regulation, Santo Niño would have received reports of misconduct from Flint at SFPS, and of an incident of "sexual abuse" from the Boy Scouts of America.[22] *Doc 204* at 19–20.

First, it is not at all clear that Santo Niño falls under NMAC 8.8.3 as Plaintiff has

---

[21] The three listed sections are evidently inapplicable to Santo Niño. Section 7.20.11 applies by its title to "child and adolescent mental health services," 7.20.12 to "child and adolescent mental health facilities," and 7.8.3 to "residential shelter care facilities for children." NMAC 7.20.11, 7.20.12, 7.8.3.

[22] As no record of any abuse relating to the Boy Scouts exists before the Court, the Court assumes Plaintiff is referring to the Critical Incident Report from Big Brothers Big Sisters of Northern New Mexico describing an incident on February 19, 2016, where a child reported that Apodaca, a volunteer, had "pulled his pants down" while playing. *Doc. 193-3* at 1.

not directed the Court's attention to any evidence or legal authority showing that Santo

Niño is a "CYFD-contracted" provider.  But in any case, even assuming NMAC 8.8.3

applies to Santo Niño, it did not violate the regulation.  At the time of his application to

Santo Niño in August 2019, Apodaca was a current, not former, employee of SFPS.

Thus, there was no need to determine Apodaca's "reason for leaving," *see* NMAC

8.8.3.10(B) (requiring "contacting . . . prior employers/agencies to elicit information

regarding the reason for leaving").  As SFPS was not a "prior employer," the regulation

required only the "contacting of references."  *Id*.  Santo Niño indeed contacted Anita

Hett, Apodaca's direct supervisor at SFPS, for a written reference.  Moreover,  Santo

Niño was able to directly consult Chavez who, until approximately one month prior,

had been Apodaca's supervisor.  In short, assuming Section 8.8.3.10(B) applied to Santo

Niño, it complied with the regulation as related to his ongoing employment with SFPS.

Plaintiff's allegation that Santo Niño violated the regulation related to Apodaca's

involvement with Big Brothers Big Sisters of Northern New Mexico[23] also fails.  Again,

the Court notes that Plaintiff has failed to establish that Santo Niño is governed by

NMAC 8.8.3.10(B).  He cites no authority that Apodaca's volunteer work with Big

Brothers Big Sisters constitutes "employment history" within the meaning of NMAC

8.8.3.10, and the Court holds that it does not.  Moreover, there is no evidence that

Chavez or the Archdiocese Defendants were aware of Apodaca's affiliation with that

---

[23] *See* footnote 22.

group.  Big Brothers Big Sisters does not appear on Apodaca's Santo Niño application, *see generally doc. 194-8*, and the only evidence of knowledge by anyone at Gonzales is Vollmer's statement that she thought she remembered Apodaca was "involved with the Big Brothers program,"[24] s*ee doc. 194-1* at 18, 15–16.  Under these facts, Santo Niño did not violate NMAC 8.8.3.10 by failing to contact Big Brothers Big Sisters of Northern New Mexico.

Finally, Plaintiff argues that NMAC 8.8.3.10 required Santo Niño to contact UNMH Child Life, which was listed under the "Employment History" section of Plaintiff's application from 2010–2012.  *Doc. 204* at 20.  Plaintiff argues that if they had done so, they would have discovered evidence of dishonesty: Plaintiff was "not employed there" because he was a volunteer, not an employee, and "his volunteer time there was significantly less than the two years he claimed on his application."[25]  *Id*.  Assuming that Apodaca's volunteer work at UNMH Child Life should be considered "employment history" because he described it as employment, this alleged violation of

---

[24] Specifically, Vollmer testified as follows at her deposition:
Q: Were you aware that Robert had been involved with the Big Brothers program?
A: I think I remember that.
Q: Did he discuss that at school?
A: The reason I say I think I remember is I think I recall him mentioning that, but not on a regular basis.  Like it wasn't something that he talked about often.  I vaguely remember something about Big Brothers.
*Doc. 194-1* at 18, 41:15–23.
[25] Plaintiff's evidence for the falsity of these representations is that, on Apodaca's 2012 application to SFPS, he listed "UNM Hospitals Child Life" as a part-time volunteer position from 01/2012–11/2012.  *Doc. 204-8* at 2–3.

NMAC 8.8.3.10 has no causal connection to the harm Apodaca later caused.  There is neither evidence nor allegation that UNM had in its possession any information about possible sexual misconduct, and for the reasons explained below, the Court finds that an applicant's misrepresentation about employment qualifications does not render sexual abuse foreseeable.

> b.      "Obviously Fraudulent" Application Materials

Plaintiff argues the Archdiocese Defendants should have known Apodaca was unfit for employment because of his "obviously fraudulent" application materials.  *Doc. 204* at 21.  Plaintiff points to various typographical errors and formatting irregularities on certificates he submitted, indicating forgery and therefore dishonesty; spelling errors on the application itself, indicating "sloppiness" that made him unfit; inconsistencies between the Santo Niño application and Apodaca's applications to SFPS in 2012 and 2019; inconsistencies between his claimed nursing degree and "his prior employment . . . and lack of licensure"; and misrepresentations that could have been caught by a "simple reference check" of various online databases.  *Doc. 204* at 7–12, 21–24.

As a threshold matter, the parties disagree about the law defining the specificity of the foreseeable harm.  The Archdiocese Defendants argue that even if, arguendo, they were negligent in failing to detect Apodaca's fraudulent application, there were not reasonably on notice about his propensity for sexual misconduct.  *Doc. 209* at 17–18.  Plaintiff, relying on language from the case law, contends he need only show Apodaca

was "unfit in some way" for the position at Santo Niño, not that his unfitness related to sexual misconduct. *Doc. 204* at 17. In other words, Plaintiff argues the case law should be interpreted to mean that if an employer knew its employee was unfit in *any* way, then *any* kind of harm resulting from the employee's actions is per se foreseeable.

But Plaintiff presents no authority where tort law principles have been so loosely applied. On the contrary, a review of the applicable case law shows that New Mexico's courts have consistently assessed the foreseeability of an employee's misconduct based on the specific nature of his prior misconduct. The full context of the language cited in Plaintiff's brief, *see id.*, is instructive:

> Z & E, Inc. argues that Warner's conduct was not foreseeable because an employer could not anticipate that an employee such as Warner would leave his duties without permission, go to the parking lot upon learning that his car had been struck, and that an altercation would ensue in which the employee would jump into the back of a fleeing pickup truck and assault the driver of the truck. We are unpersuaded by this argument. "Foreseeability does not require that the particular consequence should have been anticipated, but rather than some general harm or consequence be foreseeable." We hold that plaintiff was entitled to an instruction on negligent hiring or retention. *Notice of an employee's drinking problem and violent propensities may make an assault and battery by that employee on a business invitee or customer foreseeable.*

*Valdez v. Warner*, 742 P.2d 517, 520 (N.M. Ct. App. 1987) (quoting *Pittard v. Four Seasons Motor Inn, Inc.*, 688 P.2d 333, 340 (N.M. Ct. App. 1984)) (emphasis added). Although it was not necessary for the specific details of the employee's misconduct to be foreseeable, the *Valdez* court nonetheless conducted a fact-specific analysis of the relationship between the prior misconduct and the plaintiff's assault. This conclusion

37

accords with other Court of Appeals decisions finding that an employee's violent conduct may be foreseeable based on knowledge of his prior violent tendencies. In *Pittard*, where the plaintiffs' son was sexually assaulted by the defendant's employee, the court held that "[n]otice of an employee's alcoholism and tendency toward violent behavior may make sexual assault by that employee foreseeable to the employer." 688 P.2d at 341. The court contrasted the facts of the case with *F & T Co. v. Woods*, 594 P.2d 745, 749 (N.M. 1979), where the Supreme Court held the plaintiff's rape by an employee was unforeseeable because "no specific indications of any violent behavior on the part of the employee were brought to the employer's attention." *Pittard*, 688 P.2d at 340; *c.f. Medina v. Graham's Cowboys*, 827 P.2d 859, 861 (N.M. Ct. App. 1992) (employee's demonstrated "propensity to engage in fights" provided "a proper basis for concluding that Cowboys could have reasonably foreseen the danger of Trujillo's engaging in a fight with a patron"). In *Spencer v. Health Force, Inc.*, 107 P.3d 504, 506 (N.M. 2005), the defendant's employee—a caregiver for the disabled plaintiff—injected her with heroin, killing her. The employee had "prior convictions for burglary, aggravated assault, armed robbery, credit card fraud, embezzlement, and shoplifting," which were not discovered because the employer performed no criminal background check at all. *Id.* He had also previously stolen the plaintiff's narcotic prescription pills. *Id.* The New Mexico Supreme Court held these facts might "very well serve as an indicator to the

38

employer that [the employee] presented a foreseeable danger to a physically incapacitated client." *Id.* at 511.

In short, while proximate cause may not demand a very high level of specificity, New Mexico law requires a certain degree of causal connection between the kind of harm that was foreseeable, and the kind that actually occurred. *See, e.g.*, *Woods*, 594 P.2d at 747–48 ("It is not enough that plaintiff prove that defendant was negligent in hiring or retaining Sanders. In addition, plaintiff must prove that the negligent hiring or retention of Sanders was the proximate cause of the rape."); *Lessard*, 168 P.3d at 166 ("[W]e must consider foreseeability as to a particular plaintiff and a particular harm." (citing *Chavez v. Desert Eagle Distrib. Co. of N.M., LLC*, 151 P.3d 77 (N.M. Ct. App. 2006), *cert. denied*, 152 P.3d 151 (N.M. 2007)). In the case of sexual assault, specifically, New Mexico courts have required some evidence that the employer was aware of the employee's violent tendencies. *See Pittard*, 688 P.2d at 341. While it is conceivable that some non-violent conduct might indicate a propensity for sexual misconduct—for example, a history of prior non-violent sex crimes—there is no reasonable connection between falsification of one's professional credentials and a propensity to sexually abuse children. The Court therefore finds as a matter of law that even if the Archdiocese Defendants knew or should have known that Apodaca falsified his application materials, the harm to Plaintiff was not foreseeable.

In the alternative, the Court finds that no reasonable juror could conclude, based on the face of Apodaca's application materials and the various errors asserted therein, that Santo Niño was negligent in failing to detect an "obvious forgery."  While some of the certificates contain typographical errors and formatting irregularities, *see doc. 194-8* at 10; *doc. 205-2*, it is not reasonable to conclude that these errors should have alerted the Archdiocese Defendants to likely fraud.[26]  Plaintiff attaches no evidence that any of the certifications were required for the positions for which Apodaca was hired.  Therefore, although Plaintiff contends the fraud was variously detectable via a "simple reference check," "simple request," or "readily available online search," *doc. 204* at 9–11, the Archdiocese Defendants were not reasonably obliged to perform any independent verification or, indeed, to closely examine these additional materials for spelling and formatting errors.  It is also unreasonable to expect that the Archdiocese Defendants would notice such inferential inconsistencies as that Apodaca "lived in Santa Fe and on February 14, 2020, a school day, was working at both SFPS and Santo Niño and could not have attended a full-day course in Roswell," thereby rendering the Heartsaver First Aid certificate obviously false, *doc. 204* at 12; *see doc. 205-2* at 5, or that with his full-time job at SFPS and his after-school job at Santo Niño, "Apodaca did not have sufficient

---

[26] Indeed, it is not clear to this Court—even with the benefit of considerable review and the detailed argument of Plaintiff's counsel—that any of the certificates except for the Level Three Nursing Certificate from UNM Health Sciences Center, *doc. 205-2* at 3, were forged.  The Level Three Nursing Certificate contains no obvious errors on its face; the forgery is known only because Plaintiff obtained a statement from Sheena Ferguson, one of the signatories, that she did not sign the certificate.  *See doc. 205-3*.

opportunity to obtain a degree," *doc. 204* at 9. And the Archdiocese Defendants could not plausibly have recognized the identified inconsistencies with Apodaca's 2012 and 2019 applications to SFPS, *see doc. 204* at 8, because there is no evidence they had access to those applications. In short, even drawing all reasonable inferences in Plaintiff's favor, the collection of miscellaneous errors identified by Plaintiff's counsel do not support a claim of negligent hiring or retention.

### D.    Negligent Supervision

Plaintiff argues even if the Archdiocese Defendants are not liable for negligent hiring, they are nonetheless liable for negligent supervision because they "had notice that *anyone* in the position of summer camp director overseeing children campers and an all-minor staff without any other adults could cause harm." *Doc. 204* at 25 (emphasis in original). In other words, regardless of whether they had any reason to suspect that Apodaca posed a particular danger, it was negligent to put him in charge of campers without oversight because adults, generally, can be dangerous. *See id.* at 27 ("[I]t was very foreseeable that a general harm or consequence could befall a minor subordinate subjected to the authority of a lone adult male, with no other adults around.").

Plaintiff's sweeping proposition would implicate every adult teacher, coach, counselor, nurse, or other school employee in the state of New Mexico. He provides no legal authority for the argument that it is negligent to allow an adult employee to work with students unless another adult is present, and this Court is aware of none. Under

41

New Mexico law, moreover, it is insufficient to demonstrate the abstract possibility that an employee's actions could cause harm.  Rather, the plaintiff must establish by evidence that the employer "knew or reasonably should have known that some harm might be caused by the acts or omissions of *the employee* who is entrusted with such position."[27]  *Ocana*, 91 P.3d at 72 (quoting *Los Ranchitos*, 861 P.2d at 269) (emphasis added).  Plaintiff has presented no such evidence and cannot sustain a claim of negligent supervision on the general possibility that an adult male might endanger children in his care.

Plaintiff additionally asserts that Santo Niño "violated the Archdiocese's policy to never allow a minor to be alone with an employee without other adult eyes on them." *Doc. 204* at 26.  In fact, what the cited policy states is that "[n]o employee is to be alone with a single student unless the door to the room is open or a window or other opening allows persons to view the room or unless he/she is in an open area of the school or grounds." *Doc. 204-1* at 7.  There is no evidence the Archdiocese Defendants were aware of a violation of this policy, i.e., that they knew Apodaca was alone with a single student in an enclosed, indoor area with the doors and windows closed.  For this and

---

[27] Other state courts, applying similar tort law, have explicitly held that the foreseeable danger must originate from a characteristic of the particular employee in question.  *See Anderson v. Soap Lake Sch. Dist.*, 423 P.3d 197, 210 (Wa. 2018) ("[W]e require a plaintiff alleging negligent supervision of an employee to show that the employer knew or should have known of the dangerous tendencies of a particular employee."); *Moore Charitable Found. v. PJT Partners, Inc.*, 217 N.E.3d 8, 18 (N.Y. Ct. App. 2023) ("[A]n employer is liable only when it has notice of a particular employee's propensity for tortious conduct but neglects to reasonably supervise and control such employee[.]").  Insofar as these decisions are based on state tort law analogous to New Mexico's, the Court finds their reasoning persuasive.

the foregoing reasons, the Court will grant the Archdiocese Defendants' motion for summary judgment.

## VI.    Conclusion

For the foregoing reasons, the Archdiocese Defendants' Motion for Summary Judgment on Count VIII of Plaintiff's Second Amended Complaint (*doc. 186*) is GRANTED; Defendant Robin Chavez's Renewed Motion for Summary Judgment on Count VI of Plaintiff's Second Amended Complaint (*doc. 187*) is GRANTED; and Plaintiff's Motion for Summary Judgment Against the Archdiocese Defendants as to Count VIII of the Second Amended Complaint (*doc. 204*) is DENIED.

**IT IS SO ORDERED.**

_____

GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**